# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ALENA W. HAMMER, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| | ) ) | File No. 1:13-cv-6397 |
| v. | ) | |
| RESIDENTIAL CREDIT SOLUTIONS, INC.; | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

---

## COMPLAINT

**NOW COMES** the Plaintiff, ALENA W. HAMMER, by and through her attorneys, SULAIMAN LAW GROUP, LTD., complaining of Defendant RESIDENTIAL CREDIT SOLUTIONS, INC. as follows:

### NATURE OF THE ACTION

1. Plaintiff ALENA W. HAMMER brings this action against RESIDENTIAL CREDIT SOLUTIONS, INC. for damages resulting from breach of contract and violations of the Fair Debt Collection Practices Act ("FDCPA"), the Illinois Consumer Fraud Act ("ICFA"), and the Real Estate Settlement Procedures Act ("RESPA").

2. All of the claims stated herein stem from the wrongful servicing, debt collection, and loss mitigation activities related to Hammer's mortgage loan, and the ensuing wrongful foreclosure actions filed against Hammer in both 2009 and 2011.

1

## JURISDICTION AND VENUE

3.   Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 as the action arises under the laws of the United States.

4.   The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5.   Venue is proper in this District pursuant to 28 U.S.C. § 391 as Hammer resides in this District, the property that is the subject of this action is situated in this District, and a substantial part of the events or omissions complained of occurred in this District.

## PARTIES

6.   Plaintiff ALENA W. HAMMER ("Hammer") is a senior citizen who resides at 355 N. Addison, Villa Park, Illinois 60181 ("subject property"). The subject property is a single family home and Hammer's primary residence.

7.   Defendant RESIDENTIAL CREDIT SOLUTIONS, INC. ("RCS") is a wholly owned subsidiary of RESIDENTIAL CREDIT HOLDINGS, LLC. RCS is a Delaware corporation with its principal place of business in Fort Worth, Texas. RCS is in the business of servicing loans across the country, including in the state of Illinois.

## INTRODUCTION

8.   Hammer, a grandmother and senior citizen of declining health, obtained a loan modification from RCS's predecessor in July 2010. Since that date, Hammer has tendered her required monthly payment for 39 consecutive months without fail.

9.   When RCS obtained the servicing rights on Hammer's mortgage loan in August 2010, RCS refused to honor Hammer's loan modification.

10. After repeated objections regarding RCS's servicing fell on deaf ears, RCS declared Hammer in default, and then proceeded to prosecute two separate foreclosure actions against Hammer spanning four years. After being defeated in the first case due to its failure to honor the loan modification, RCS, in spite of the ruling, filed another wrongful foreclosure action in 2011; this action was based on the same inaccurate allegations as the first action.

11. Over the last several years, Hammer has made countless "Fair Debt" disputes to RCS. As RCS systematically ignored the disputes, it continued to prosecute its second foreclosure case.

12. Along the way, RCS wrongfully force-placed insurance on Hammer's property at least three separate times, even though Hammer had sent proof of her hazard insurance directly to RCS on numerous occasions.

13. On top of that, RCS illegally set up an "escrow account" and charged Hammer for her "force placed insurance" and also her "failure to pay real estate taxes."

14. At all times since obtaining the underlying loan in 2003, Hammer has paid her taxes in full and has maintained proper and adequate hazard insurance.

15. RCS assessed at least 21 separate unexplained fees on Hammer's account since August 2010; RCS has yet to provide clarification on any of these charges.

16. In an attempt to resolve any discrepancy, Hammer requested reinstatement figures from RCS. RCS provided Hammer with three conflicting payoff letters, one with a reinstatement figure as high as $34,000.00, and one with a figure as low as $10,000.00.

17. This harassment has continued through the date of this complaint. RCS still refuses to honor Hammer's loan modification, or disclaim any wrongful fees, notwithstanding conclusive proof demonstrating its inaccuracy

3

18. As a result of RCS's perpetual harassment and litigation, the stress imposed upon Hammer over the last several years has led to severe medical problems, medical bills, and the abrogation of her right to the quiet enjoyment of her home.

FACTS SUPPORTING CAUSE OF ACTION

19. On December 9, 2003, Hammer executed a 30-year mortgage loan ("subject loan") in the amount of $220,000.00 in favor of First Centennial Mortgage, Inc. for the purchase of the subject property as her primary residence.

20. The subject mortgage required that Hammer make monthly payments of principal and interest, to be applied first to interest, then to principal, then to any outstanding costs and fees.

21. The subject mortgage required that Hammer pay her taxes and maintain hazard insurance separately from the mortgage loan.

22. Hammer opted out of any escrow requirement for the subject loan. The escrow waiver was effective so long as Hammer remained current on her taxes and insurance.

23. Thereafter, AmTrust Bank ("AmTrust") obtained servicing rights for the subject loan.[1]

24. At all times from 2003 through the filing of this complaint, Hammer maintained hazard insurance on her home as required by the mortgage.

25. At all times from 2003 through the filing of this complaint, Hammer paid the real estate taxes in-full and on time.

**a. The First Foreclosure Case & Loan Modification**

26. On February 27, 2009, Hammer was laid-off from her job of seventeen (17) years. As a result, Hammer fell behind on her principal and interest payments.

27. In August 2009, AmTrust declared the subject mortgage loan in default.

---

[1] AmTrust may have become the owner and holder of the indebtedness as well.

28. On September 9, 2009, AmTrust Bank filed a foreclosure against the subject property and against Hammer in DuPage County, Illinois in the case known as *AmTrust Bank v Hammer*, 2009 CH 3951 ("Foreclosure Case #1").

29. In December 2009, AmTrust was closed by the Office of Thrift Supervision. The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for AmTrust.

30. On December 7, 2009, the FDIC instructed Hammer to make her mortgage payment checks out to "FDIC as Receiver for AmTrust Bank, Cleveland, OH," and to send all payments to "the same address you are currently forwarding those items to."

31. In January 2010, Hammer received a call from "Theresa Holk" at the FDIC/AmTrust about a potential loan modification.

32. Holk explained that Hammer's modified loan amount would be the principal balance on the loan before the FDIC takeover of AmTrust, and that all past-due amounts would be waived.

33. Holk quoted Hammer the modified balance of $207,176.99, with a waiver of all fees, penalties, and past-due interest. Holk told Hammer that she would receive correspondence in the mail with instructions on how to complete the modification.

34. Hammer received a letter from the FDIC/AmTrust providing Hammer with a loan modification application and checklist of documents to be submitted no later than February 26, 2010. On February 2, 2010, Hammer submitted the application and documentation.

35. On June 21, 2010, Holk notified Hammer that her modification was officially approved with a total principal balance of $207,176.99 and that all future dealings should be through Hammer's new contact person, "Chris Pelaci," and that all loan modification payments should be sent to "Sandy Beauregard" at FDIC/AmTrust.

36. On June 28, 2010, Hammer received the written loan modification in the mail. *See* Exhibit A attached hereto is a true and correct copy of the loan modification.

37. The loan modification package and cover letter were dated June 8, 2010. The cover letter notified Hammer that she must sign, notarize, and return the modification to AmTrust no later than June 25, 2010, and send her new monthly payment of $749.88 to AmTrust by July 1, 2010. *Id.*

38. The loan modification also included a miscellaneous fee of $2,303.30, increasing the modified balance from $207,176.99 to $209,471.59. *Id.*

39. Hammer called Pelaci to request additional time to review and sign the document since she received the modification three (3) days *after* the due date set forth in the cover letter. Hammer also disputed the $2,303.30 in fees added to the modified balance.

40. Pelaci said she would look into the added fees. Pelaci told Hammer that she still needed to send in her first payment of $749.88 by July 1, 2010, but did not need to sign the document until Pelaci called her back regarding the unknown fees.

41. Hammer sent her first payment to AmTrust on June 28, 2010 in the amount of $749.88. AmTrust cashed Hammer's first loan modification payment on July 1, 2010. *See* Exhibit B attached hereto is a true and correct copy of the June 28, 2010 payment.

42. Hammer did not receive any response from Pelaci regarding the $2,303.30 in unspecified fees. She called and wrote AmTrust/FDIC to dispute the fee and obtain an explanation and further instruction.

43. On July 23, 2010, Hammer received a RESPA "Notice of Assignment, Sale, or Transfer of Servicing Rights" from RCS. The notice stated, "[e]ffective 8/1/2010, your previous loan servicer, AmTrust Bank, will no longer accept payments for your loan. Beginning 8/1/2010,

please make your payments to RCS...." The letter advised Hammer of her right to send a RESPA "Qualified Written Request" dispute within 60 days.

44. On July 28, 2010, Hammer made her second payment (the August 1, 2010 payment) on the loan modification in the amount of $748.88 to AmTrust. AmTrust cashed the check on July 30, 2010. *See* Exhibit C attached hereto is a true and correct copy of the July 28, 2010 payment.

45. On August 2, 2010, RCS applied $1,499.76 in payments to Hammer's account ($748.99 x 2 payments).

46. On about August 14, 2010, Pelaci spoke with Hammer over the phone regarding the $2,303.30 in unspecified fees. Pelaci told Hammer that the fees were assessed in error and that Hammer needed to cross out the $2,303.30 fee, write in the correct principal balance of $207,176.99, initial and sign the contract in front of a notary, then return the executed copy to RCS, attention "Jim Bass." Hammer wrote the amounts as instructed. Hammer then signed, notarized, and mailed the document to Bass as instructed. *See* Exhibit A.

47. Upon receipt of the document, Bass called Hammer. Bass stated that the loan modification "did not exist at the time the loan was transferred to [RCS]" and therefore was not valid, and that RCS would take Hammer's home. Bass yelled and swore at Hammer to the point where she became very distraught. Bass hung up the phone on Hammer.

48. Hammer called RCS several times in an attempt to speak to Bass to resolve the issue. Bass would not take her calls. Instead, Hammer spoke with his associates, who called Hammer a "deadbeat," and told her that she "wouldn't have this problem if [she] had paid her mortgage."

49. On August 19, 2010, RCS sent Hammer a notice that her real estate taxes were delinquent. The letter stated that RCS would set up an escrow account to pay delinquent taxes.

50. Hammer's real estate taxes were always current from 2003 through today.

51. On August 31, 2010, Hammer disputed the debt in writing, sent a Qualified Written Request, and sent Fair Debt Dispute Letter addressed to Sandy Beauregard at FDIC/AmTrust stating, "*[RCS] claims FDIC sent no files to them. No knowledge of modification! I'm sending the payment to you for that reason....I need to know where the money I'm sending is going*."

52. On September 1, 2010, Hammer sent her third loan modification payment to AmTrust in the amount of $749.88, which AmTrust forwarded to RCS.

53. On September 14, 2010, RCS billed $100.00 to Hammer's account in unexplained fees.

54. On September 19, 2010, Hammer's hazard insurance policy automatically renewed for a twelve (12) month period. Also on September 19, 2010, unbeknownst to Hammer at the time, RCS force-placed insurance on Hammer's property and charged Hammer's account.

55. On September 30, 2010, Hammer sent another Fair Debt Dispute Letter to AmTrust/FDIC along with her fourth modification payment in the amount of $749.88. The letter stated that Hammer had a loan modification contract with AmTrust/FDIC.

56. On or about October 15, 2010, Hammer received a letter from FDIC/AmTrust, stating "*Please be advised that your mortgage loan was transferred to [RCS] more than 60 days ago. Immediately after the transfer payments were forwarded, however we are enclosing the most recent payment received on your behalf, which needs to be paid directly to [RCS]*." The letter included Hammer's October 2010 payment, but not her September 2010 payment.

57. On October 15, 2010, RCS billed $15.00 to Hammer's account in unexplained fees.

58. On October 29, 2010, Hammer sent a check to RCS in the amount of $749.88 for her November 2010 payment (fifth modification payment). Hammer included a third Fair Debt Dispute Letter with her check stating, "*Also, the November payment enclosed as per contract w/FDIC/AmTrust bank prior to transfer to RCS*."

59. RCS received the payment on November 1, 2010 and returned the payment without cashing it on November 5, 2010.

60. On November 5, 2010, and unbeknownst to Hammer, RCS "force-placed" insurance on Hammer's account for a second time in the amount of $2,615.00, which RCS "deducted" from Hammer's escrow account, creating a negative escrow balance.

61. Hammer did not have an escrow account per the terms of her mortgage contract and modification. RCS had set one up for her without her authorization and was "deducting" the amounts for force-placed insurance and real estate taxes from that account, even though taxes and insurance were current.

62. On December 1, 2010, Hammer sent a check to RCS in the amount of $749.88. RCS returned the payment to Hammer without cashing it. Hammer continued to send her monthly payments to RCS via certified mail each month from July 2010 through today. Unless specifically addressed herein, RCS returned Hammer's payments every month, after holding her checks for several weeks to several months.[2]

63. On or about December 3, 2010, Hammer received a letter from RCS that it had not received proof of her insurance policy on the subject property. As a result, they secured "force-placed" insurance on her behalf through "American Modern Home." The letter also stated:

> "The cost of this policy will be paid out of your loan escrow account. If you do not have an escrow account for insurance, one will be set up to begin collecting funds to pay for this policy and all future insurance policies. This will result in your mortgage payment increasing to pay for this policy and future insurance policies. Any insurance policy we purchase on your behalf may be cancelled at any time by providing us with evidence of other acceptable insurance. If you provide coverage effective the date of the policy we purchased, the escrow account we established to pay for this insurance will be deleted and you will continue to be responsible for obtaining and paying for insurance coverage."

---

[2] Hammer has proof of all of her payments, including the U.S. certified mail "green card" to establish delivery to RCS.

64. Hammer again sent RCS proof of her insurance.

65. On January 4, 2011, RCS assessed a third "escrow disbursement" of $2,516.00 for force-placed-insurance from Hammer's account.

66. On January 5, 2011, Hammer filed a motion to dismiss Foreclosure Case #1, alleging that there was a valid and enforceable loan modification agreement with an effective date of July 1, 2010, and that all payments had been timely tendered.

67. On January 11, 2011, Hammer sent RCS her fourth Fair Debt Dispute Letter requesting information as to why RCS was not cashing her checks, and disputing the credit reporting on her account. Hammer enclosed copies of her credit report for reference and proof of hazard insurance. RCS never responded to her dispute letter or corrected the credit reporting.

68. RCS did not report that Hammer disputed the debt to credit bureaus, nor reverse the charges for forced placed insurance.

69. On February 3, 2011, RCS billed four (4) separate fees totaling $511.50 to Hammer's account without explanation.

70. On March 18, 2011, the Honorable Judge Gibson heard arguments on Hammer's motion to dismiss Foreclosure Case #1. Judge Gibson granted the motion to dismiss the entire lawsuit.

71. Gibson ruled that Hammer's monthly checks that were cashed for July and August 2010 ratified the modification contract. Gibson specifically ruled as a matter of law that the June 28, 2010 and July 28, 2010 checks cashed by FDIC/AmTrust were "deemed acceptance of the terms of the revised modification agreement as revised by Ms. Hammer...the agreement was ratified."[3]

72. In conjunction with the court order, Hammer requested reinstatement figures pursuant to her loan modification so that she could tender a one-time payment to address all of the

---

[3] Hammer can provide a copy of the relevant transcript.

wrongfully rejected payments to date. Judge Gibson instructed the parties to arrange for Hammer to reinstate pursuant to the terms of the loan modification.

73. In the intervening period following the dismissal of Foreclosure Case #1, Hammer continued to make monthly payments to RCS each month in the amount of $749.88. RCS continued to return her payments and bill her for unexplained fees.

74. On April, 8, 2011, RCS billed $100.00 to Hammer's account in unexplained fees.

75. RCS effectively ignored Judge Gibson's ruling and continued to harass Hammer and ignore the loan modification.

76. On May 12, 2011, in response to Hammer's request for reinstatement figures, RCS sent Hammer the following reinstatement figures:

| | | |
|---|---|---|
| | $16,714.39 | (May 1, 2009 - March 1, 2010 P&I Payments at $1,519.49 each) |
| | $9,598.92 | (April, 2010 - May 1, 2011 P&I Payments at $685.63 each) |
| | $960.93 | (March 1, 2011 - May 1, 2011 Escrow Payments at $320.31 each) |
| | $1,178.47 | (Late Charges) |
| | $2,526.06 | (Attorney Fees) |
| + | $2,526.03 | (Misc. Fees) |
| | **$33,486.64** | **Total Amount Due Good Through May 31, 2011** |

77. These reinstatement figures:

a) disregarded the loan modification and Judge Gibson's ruling;

b) did not waive past due fees and costs effective July 2010;

c) did not use the modified monthly payment of $749.88 effective July 2010;

d) assessed late fees on Hammer's timely payments;

e) included escrow payments when there was no escrow account; and

f) included attorney fees and late charges for Foreclosure Case #1 (a case that Hammer prevailed).

11

78. Even if Hammer didn't make any payments July 2010 to the date of the acceleration, the amount necessary to reinstate the loan would have been $8,248.68 ($749.88 x 11 payments). RCS was demanding a figure approximately $25,000.00 more to "reinstate the loan."

79. On May 27, 2011, RCS billed $375.00 to Hammer's account in unexplained fees.

80. Hammer called RCS and Codilis (RCS's collection attorneys) directly to obtain accurate reinstatement figures. Hammer left numerous messages but did not receive any return calls.

81. On June 14, 2011, RCS billed $13.50 to Hammer's account in unexplained fees.

82. On July 7, 2011, RCS billed $55.00 to Hammer's account in unexplained fees.

83. On July 19, 2011, RCS billed $13.50 to Hammer's account in unexplained fees.

84. On July 25, 2011, Hammer spoke with the Codilis attorney Courtney Nogar who had represented RCS in Foreclosure Case #1. Nogar asked Hammer "if she ever intended to pay back the loan." Hammer replied that she had been paying every month, that no one would call her back, and that each of her payments were being returned to her.

85. Hammer asked Nogar for the amount necessary to bring the loan current. In response, Nogar simply asked for the balance in Hammer's savings account. Nogar would not provide Hammer a reinstate figure, but promised to call her back. Nogar never called Hammer back.

86. On July 26, 2011, Hammer sent her August 2011 loan modification payment to RCS in the amount of $749.88. RCS *cashed that payment* on July 28, 2011.

87. On or about July 29, 2011, Hammer received an Escrow Analysis from RCS, showing an "escrow shortage" of $3,319.80, even though she did not have an escrow account per her mortgage contract or modification. The Escrow Analysis also showed that hazard insurance had been assessed at least two (2) times prior and that $2,516.00 was scheduled to be assessed to the subject loan account in September 2011.

88. On August 1, 2011, RCS billed $11.00 to Hammer's account in unexplained fees.

89. On August 1, 2011, approximately four (4) months after the dismissal of the Foreclosure Case #1, Hammer received an "acceleration notice" from Codilis on behalf of RCS. The acceleration notice stated, "As of 7/29/2011 the amount of the debt we are seeking to collect is $32,050.60, which includes the sum of payments that have come due on and after the date of default 10/01/2010."[4]

90. On August 2, 2011, RCS billed $910.00, $290.00, $40.00, $418.00, and $475.00 to Hammer's account, totaling $2,133.00 in unexplained fees.

91. On August 8, 2011, RCS sent Hammer a notice that it was renewing her force-placed insurance and deducting the amount from her escrow account. Hammer still had proper insurance and sent RCS proof of the same.

92. On August 8, 2011, Hammer received a notice from RCS that her "force-placed insurance" was scheduled to expire and that RCS would purchase the "forced-placed insurance" from her "escrow account." Again, Hammer sent RCS proof of her insurance.

93. On August 15, 2011, Hammer received a second "acceleration notice" from RCS stating, "As of 8/11/2011 the amount of the debt we are seeking to collect is $10,507.95, which includes the sum of payments that have come due on and after the date of default 10/01/2010." This amount was $21,542.65.00 less than the amount listed in the first acceleration notice.

94. On August 17, 2011, Hammer called the number listed on the acceleration notice and spoke with "Randy" from the loss mitigation department in an attempt to resolve the discrepancy. Randy took down Hammer's information and said that he would look into the matter and call Hammer back. He never did.

---

[4] The acceleration notice stated that the creditor was "Amtrust_NP SFR Venture, LLC" and that RCS was only the servicer.

95. On or about September 16, 2011, Hammer received a letter from RCS stating that her account had been referred to foreclosure for a second time for a failure to cure the default.

96. On September 20, 2011, RCS deducted $2,516.00 from her escrow account to pay for force-placed insurance.

### b. The Second Foreclosure Case

97.    On September 21, 2011, RCS filed a second foreclosure against the subject property and against Hammer in DuPage County, Illinois in the case known as *RCS v Hammer*, 2011 CH 004503 ("Foreclosure Case #2"). The foreclosure complaint alleged a default under the original note and mortgage. The complaint did not reference or attach the loan modification.[5]

98.    On September 30, 2011, Hammer received a "Notice Pursuant to the Fair Debt Collection Practices Act" from Codilis on behalf of RCS notifying her of her right to dispute the debt within 30 days.

99.    On September 30, 2011, Hammer received another notice of force-placed insurance and deduction of $2,516.00 from her escrow account.

100.  Also on October 28, 2011, Hammer, through her attorney Jack Kozar, sent another Fair Debt Dispute Letter requesting verification of the debt in writing, and requesting that RCS cease all phone calls to Hammer. The letter requested that all future communication from RCS be in writing.

101.  On October 28, 2011, Hammer, through her attorney Kozar, sent a Qualified Written Request ("QWR") asking for a payment history, amount alleged as owing, an accounting, a record and proof of each payment that Hammer made, an "[e]xplanation on the alleged lapse in Hazard Insurance that was force placed on the account when proof of insurance had been

---

[5] The "default" date alleged in the complaint was October 2010, two months after Hammer's July and August 2010 payment under the loan modification.

previously provided," and "the identity of the holder of [the] mortgage pursuant to U.S.C. § 1641(f)(2)," as well as a complete breakdown of the fees, payments, and amounts alleged as owing on the loan and how each was calculated.

102. On October 31, 2011, RCS acknowledged receipt of Hammer's QWR and FDCPA dispute letter.

103. On November 4, 2011, Hammer filed a five (5) part motion to dismiss the second foreclosure. Judge Gibson granted the motion without prejudice on February 29, 2012.

104. On November 7, 2011, RCS partly responded to both Hammer's QWR and her FDCPA dispute letter in a single response. The response letter only provided a breakdown of fees and amounts to reinstate the loan, but did not provide an explanation of fees or the force-placed insurance, not did it provide verification of the debt.

105. Interestingly enough, the response letter stated that Hammer's loan modification "had been finalized" on "August 9, 2011" (when RCS cashed Hammer's August 2011 payment).

106. By January 2012, and after 19 consecutive tendered payments by Hammer pursuant to the loan modification, RCS had developed a pattern and practice of accepting Hammer's checks, keeping them for several weeks to several months, then returning them to Hammer.

107. Over this period of time, Hammer's health and well-being drastically deteriorated. She developed severe nerve and internal organ problems that her physician could not attach to anything other than undue stress. Hammer's medical records show a steady decline in her health from the time that RCS took over the loan through the present date.

108. On February 3, 2012, Codilis sent Hammer another reinstatement letter with figures that did not recognize her loan modification.

109. On March 28, 2012, RCS filed a second amended complaint in Foreclosure Case #2, alleging that the terms of the loan modification as presented by Hammer were unenforceable because there was no "meeting of the minds."

110. Months passed without resolve, but Hammer continued to send in her loan modification payments every month.

111. RCS rejected all of Hammer's subsequent payments, until September 2012, when RCS *cashed* Hammer's payment.

112. On September 19, 2012, RCS sent Hammer a letter stating, inaccurately, that it had reviewed her insurance policy and that she was required to increase the amount of her policy coverage because it was inadequate compared to her outstanding loan balance and to cover the loss of the property.

113. On October 5, 2012, RCS again sent Hammer a letter stating that it had reviewed her insurance policy and that she was required to increase the amount of her policy coverage because it was inadequate compared to her outstanding loan balance and to cover the loss of the property.

114. Through the filing of this complaint, RCS never verified the debt or ceased collection activities in response to the fair debt dispute letter.

## COUNT I – BREACH OF CONTRACT

115. Hammer restates paragraphs 1 through 114 as though fully set forth herein.

116. Under Illinois law, every contract implies a covenant of good faith and fair dealing.

117. Hammer has a valid and enforceable mortgage contract with RCS in the form of the loan modification.

118. Hammer substantially performed her duties under the contract by tendering all monthly payments to RCS, and its assignor, and by complying with all of the other terms of the contract.

16

119. RCS is in material breach of the subject note, mortgage, and loan modification for its:

    a. failure to accept Hammer's timely payments;

    b. failure to properly account for Hammer's payments;

    c. misapplying Hammer's payments;

    d. failure to comply with a court order affirming the loan modification;

    e. filing of a wrongful foreclosure;

    f. charging of unauthorized fees and costs;

    g. failure to provide accurate repayment and reinstatement figures;

    h. failure to accurately respond to Hammer's written correspondence and disputes;

    i. failure to provide an accurate accounting; and

    j. failure to conduct its affairs in good faith.

120. RCS further breached the express terms of the subject note, mortgage, and loan modification and its implied duty of good faith and fair dealing by:

    a. imposing an escrow account and increasing monthly mortgage amounts without notification to or authorization from Hammer;

    b. perpetually ignoring Hammer's written and oral requests for an explanation on why her payments were being rejected;

    c. placing the subject loan in default;

    d. negatively reporting Hammer to credit bureaus:

    e. refusing to respond to Hammer's repeated calls, letters, and objections;

    f. forcing Hammer to pay for force-placed hazard insurance in excess of the amount required by the mortgage contract;

    g. profiting from and failing to disclose commissions and/or kickbacks related to the insurance that it forced on Hammer's property;

    h. converting escrow funds to pay the premiums on the force-placed insurance and unauthorized fees;

    i. charging and collecting unauthorized costs and fees from Hammer not permitted in ¶¶ 1 through 3 of the mortgage, the loan modification, or state or federal law;

    j. charging and collecting fees from Hammer that were not authorized by the mortgage contract;

    k.  debiting amounts from Hammer's real estate "escrow account" and applying Hammer's payments first to escrow before principal and interest in violation of the mortgage contract;

    l.  failing to provide timely and accurate information regarding Hammer's payments and amounts due under the note and loan modification;

121.  RCS's breach of the subject contract has caused Hammer damages that consist of illegal fees, charges, interest, damage to her credit report, being denied credit, emotional distress, physical illness and injury, and the loss of funds that RCS misapplied to Hammer's account.

WHEREFORE, Plaintiff ALENA HAMMER respectfully requests that this Honorable Court:

    a.  find that Defendant RCS materially breached the mortgage contract;

    b.  award Hammer her actual damages to be proven at trial;

    c.  award Hammer her reasonable attorney fees and costs; and

    d.  award Hammer any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT

122.  Hammer restates paragraphs 1 through 121 as though fully set forth herein.

123.  Hammer is a "consumer" as defined by FDCPA § 1692a(3).

124.  The subject debt and related unauthorized fees and costs qualify as a "debt" as defined by FDCPA § 1692a(5) as they arise out of a transaction for personal, family, or household purposes.

125.  RCS is a "debt collector" as defined by U.S.C. § 1692a(6)  because it regularly uses the mails and/or the telephone to collect, or attempt to collect, delinquent consumer accounts.

126.  RCS is a "debt collector" in relation to the subject debt because it treated the debt like it was in default when it acquired and serviced the debt and is therefore a debt collector as defined in §1692a(6).

127.  RCS violated 15 U.S.C. §§ 1692d(5), 1692e(2)(5)(10)(11), 1692 f(1)(5)(6), and 1692g through its debt collection efforts, by misrepresenting the debt's status, the amount owed, and by failing to verify the debt in response to Hammer's dispute letters.

### a.  Violation of  § 1692d

128.  RCS engaged in abusive and oppressive conduct through unethical mismanagement of the account and treatment of Hammer's repeated disputes and inquiries over a period spanning a year and a half and two (2) separate foreclosure cases.

129.  RCS engaged in abusive and oppressive conduct through its perpetual disregard for the loan modification and Hammer's timely payments.

### b.  Violation of § 1692e & f

130.  RCS took repeated actions to collect upon the subject debt while the loan modification was in effect and while timely payments had been tendered.

131.  RCS misrepresented the collectable status the subject debt in direct violation of § 1692(e)2.

132.  RCS took action to collect on the subject debt while the loan modification was in effect and while Hammer was making timely payments.

133.  RCS continued Foreclosure Case #1 and Foreclosure Case #2  in direct violation of § 1692(e)5.

134.  RCS's attempt to collect the subject debt by way of foreclosure, perpetually declaring the subject loan in default, illegally force-placing insurance, and establishing an escrow account represents false, deceptive, or misleading behavior in violation of § 1692e of the FDCPA.

19

135.  RCS violated § 1692e(8) by reporting false information regarding the subject loan to Equifax, TransUnion, and Experian, including that the loan was in default and by failing to report the debt as disputed to the credit bureaus.

136.  RCS used false or deceptive means to collect the debt by filing false or incomplete pleadings and briefs in the first and second foreclosure actions, as well as providing Hammer with correspondences that misstated the amount of debt and the status the loan modification.

137.  RCS used unfair and unconscionable means to collect the debt by communicating to Hammer that her loan modification was not enforceable, both before and after Judge Gibson's ruling.

138.  RCS misrepresented the debt in violation of §§ 1692e and 1692f by lumping the attorney fees, unauthorized fees and costs, and costs to repay force-placed insurance in with the principal debt obligation.

139.  RCS violated §§ 1692e and 1692f by including escrow overdraft charges and improper corporate advances (from the force-placed insurance) in its dunning letters, acceleration notices, restatement letters, and payoff letters sent to Hammer.

### c.  Violation of § 1692g(a)

140.  RCS included unauthorized fees and costs in all reinstatement and payoff statements sent to Hammer in violation of § 1692g(a).

141.  In all correspondences and written demands for payment sent to Hammer, RCS misstated the amount of the debt under § 1692g(a) and misled Hammer as an unsophisticated consumer under § 1692e, which amounted to unfair or unconscionable means of collection under § 1692f.

#### d. Violation of § 1692g(b)

142.  Hammer sufficiently disputed the debt to trigger RCS's duty to verify the debt under § 1692g or cease collection actions until it obtained verification of the debt.

143.  Upon receipt of the October 28, 2011 Fair Debt Dispute Letter, RCS failed to either verify the debt or cease all collection activities.

144.  RCS continued collection efforts after receiving Hammer's Fair Debt Dispute Letter in violation of § 1692g.

145.  Through the date of this complaint, RCS has continued to prosecute Foreclosure Case #2 without ever verifying the underlying debt upon receipt of Hammer's October 28, 2011 Fair Debt Dispute Letter in violation of § 1692g(b).

#### e. Violation of  § 1692k(c)

146.  RCS failed to maintain procedures reasonably adopted to avoid improper debt collection practices in violation of § 1692k(c).

WHEREFORE, Plaintiff ALENA HAMMER requests that this Honorable Court:

a.  enter judgment in her favor and against RCS;

b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

c.  award Hammer statutory and actual, in an amount to be determined at trial, for the underlying FDCPA violations;

d.  order the deletion of all adverse credit reporting related to the loan;

e.  award Hammer costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

f.  award any other relief as this Honorable Court deems just and appropriate.

## COUNT III – VIOLATION OF CONSUMER FRAUD ACT

147.  Hammer restates paragraphs 1 through 146 above as though fully set forth herein.

148.  Hammer meets the ICFA definition of "consumer." *See* 810 ILCS 505/1.

149.  RCS violated 815 ILCS 505/2 by engaging in unfair and deceptive acts or practices by using fraud, deception, and misrepresentation in its attempt to collect a superseded debt.

150.  RCS's attempt to collect and foreclose upon a superseded debt was deceptive.

151.  RCS made material misrepresentations of fact regarding the status of the subject loan, payments made, and the status of Hammer's taxes and hazard insurance.

152.  RCS made material misrepresentations of fact regarding the amount owed on the subject loan, and the amounts that Hammer had "failed" to pay under the subject loan.

153.  RCS committed a deceptive act or practice by force-placing insurance multiple times and by assessing fees and costs that Hammer did not owe.

154.  RCS failed to provide clear and accurate disclosures regarding the status of the subject loan and amounts necessary to reinstate after dismissal of Foreclosure Case #1.

155.  RCS's communications to Hammer were confusing, deceptive, and unfair as Hammer was attempting to resolve any discrepancies in good faith.

156.  At all times relevant, RCS misrepresented and misstated the amounts due on the loan.

157.  The misrepresentations, deception, and unfair practices complained of occurred in the course of conduct involving trade or commerce.

158.  An award of punitive damages is appropriate because RCS's above described conduct was outrageous, willful, and wanton, and it showed a reckless disregard for the rights of Hammer over the course of 18 months.

WHEREFORE, Plaintiff ALENA HAMMER requests that this Honorable Court:

    a. enter judgment in her favor and against RCS;

    b. declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

    c. award Hammer statutory, actual, and punitive damages, in an amount to be determined at trial, for the underlying ICFA violations;

    d. order the deletion of all adverse credit reporting related to the loan;

    e. award Hammer costs and reasonable attorney fees as provided under 815 ILCS 505/10a(c); and

    f. award any other relief as this Honorable Court deems just and appropriate.

### COUNT IV – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (AGAINST RCS)

159. Hammer restates and realleges paragraphs 1 through 158 above as though fully set forth herein.

160. RCS qualifies as a "servicer" under RESPA, § 2605(i)(2).

161. RCS violated 12 U.S.C. § 2605 by failing to honor Hammer's payments made within 60 days of the transfer from the FDIC to RCS.

162. RCS violated RESPA § 2605 when it failed to honor Hammer's loan modification within 60 days of obtaining servicing rights, and instead declaring Hammer in default.

163. RCS violated RESPA §2605(d) when it failed credit payments made during the 60 day transfer period.

164. RCS failed to send Hammer the required RESPA notices or properly respond to Hammer's QWRs.

### a. **Force-Placed Insurance**

165.  RCS purchased force-placed insurance on multiple occasions, wrongfully set up an escrow account, and deducted amounts from Hammer's account for the force placed insurance.

166.  RCS sought an "escrow shortage or deficiency" without producing documentation to substantiate the shortage or deficiency or prior notice to Hammer as required under RESPA.

167.  RCS failed to provide any notice of this alleged escrow shortage to Hammer until *after* it had charged the amount to Hammer's account and deducted it from the escrow.

168.  RCS assessed fees against Hammer without conducting an annual escrow analysis or providing prior notice as required by RESPA and its implementing regulations. 12 U.S.C. § 2609(b); 24 C.F.R. § 3500.17(f).

169.  The subject mortgage and RESPA require notice of any shortfall or deficiency prior to imposing the amount on a borrower's loan. RCS did not did not send notice of the escrow increase or conduct the annual escrow analysis before imposing the fee to Hammer's escrow.

170.  RCS did not correct the wrongful escrow increase, charge, and deduction for force-placed insurance.

171.  RCS failed to verify Hammer's insurance before force-placing insurance in violation of RESPA, or reverse the force-placed insurance after receiving proof of insurance.

172.  RCS failed to correct its mistakes after learning that Hammer had insurance.

173.  Hammer suffered actual damages from violations of RESPA §§ 2605 and 2609.

WHEREFORE, Plaintiff ALENA HAMMER requests that this Honorable Court:

    a.   grant judgment in her favor and against Defendant RCS;

    b.   declare RCS's perpetual conduct to be a violation of RESPA;

    c.   award Hammer actual and additional damages pursuant to 12 U.S.C. § 2605; and

    d.   award Hammer her reasonable attorney fees and costs pursuant to RESPA § 2605(f); and

    e.   and any other relief this Honorable Court deems equitable and just.

**Jury Demand**

Plaintiff demands trial by jury.

Respectfully Submitted,

By: ___s:/Ross Zambon____
**Ross Zambon**
Attorney for Plaintiff

Sulaiman Law Group, Ltd.
Ross M. Zambon
ARDC # 6294149
Mara A. Baltabols
ARDC # 6299033
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523
(630) 575-8181
pleadings@sulaimanlaw.com