UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | | |
|---|---|---|---|
| ALENA W. HAMMER, | ) | CIVIL ACTION | |
| Plaintiff, | ) | | |
| | ) | File No. 1:13-cv-6397 | |
| | ) | | |
| RESIDENTIAL CREDIT SOLUTIONS, INC., v. | ) | JURY TRIAL DEMANDED | |
| | ) | | |
| Defendant. | ) | Honorable Judge Durkin | |

**PLAINTIFF ALENA HAMMER'S RESPONSE TO DEFENDANT
RESIDENTIAL CREDIT SOLUTIONS, INC.'S MOTION TO DISMISS COMPLAINT**

Plaintiff, ALENA W. HAMMER ("Hammer"), hereby responds to the Motion to Dismiss filed by RESIDENTIAL CREDIT SOLUTIONS, INC. ("RCS") as follows:

## INTRODUCTION

Even after he penned *The Trial*, the great Frank Kafka would have been stunned by the never-ending, frivolous legal maneuvering employed by RCS against a widowed senior citizen. RCS's conduct, sprinkled heavily across three separate lawsuits, has decimated Ms. Hammer's physical health and caused irreversible mental anguish. RCS lost one foreclosure case, was reprimanded in a second, but continues to rehash the same arguments *ad infinitum* – ones that have already been rejected by courts of competent jurisdiction. RCS lost the first foreclosure case as a result of its failure to honor the precise loan modification it now claims does not exist.

Since obtaining the underlying loan modification, Hammer has tendered her required mortgage payments for 39 consecutive months, without fail. In response, RCS accepted some of the payments while rejecting others, and simply filed a second foreclosure action based on allegations of default that failed in the first case. Along the way, Hammer made countless "Fair Debt Disputes" with RCS and sent numerous Qualified Written Requests ("QWR").

RCS ignored the disputes, wrongfully force-placed insurance on Hammer's home, set up an illegal "escrow account," and assessed 21 unexplained fees. All the while, RCS provided Hammer with conflicting and inaccurate reinstatement figures, one as high as $34,000 (ignoring the modification) and one as low as $10,000 (acknowledging the modification).

RCS still refuses to honor the actual terms of Hammer's loan modification or disclaim any wrongful fees. As a result of RCS's perpetual harassment and serial litigation, the stress imposed upon Hammer has led to severe medical problems, medical bills she cannot afford, and a life overwhelmed by a never-ending battle with a bully who is trying to take her family home.

## BACKGROUND

On December 9, 2003, Hammer executed a 30-year mortgage loan for the purchase of her primary residence. (Comp. ¶ 19.) At all times relevant, Hammer maintained hazard insurance on her home and paid her real estate taxes in full and on time. (*Id.* ¶¶ 24-25.)

### a. The First Foreclosure Case & Loan Modification

On September 9, 2009, AmTrust Bank filed for foreclosure against Hammer ("Foreclosure Case #1"). (*Id.* ¶ 28.) In December 2009, the FDIC was appointed as receiver for AmTrust. (*Id.* ¶ 29.) In January 2010, Hammer received a loan modification offer from the FDIC/AmTrust. (*Id.* ¶¶ 31-32.) AmTrust quoted Hammer a modified balance of $207,176.99, with a waiver of all fees, penalties, and past-due interest. (*Id.* ¶ 33.)

On June 21, 2010, AmTrust notified Hammer that her modification was approved with a principal balance of $207,176.99. (*Id.* ¶ 35.) On June 28, 2010, Hammer received the written agreement. (*Id.* ¶ 36; Ex. A.) The loan modification included a miscellaneous fee of $2,303.30. (*Id.* ¶ 38.) Hammer called AmTrust to question the fee because she was told all fees were

2

waived. (*Id.* ¶ 39.) AmTrust told Hammer that she must make her first payment by July 1, 2010, but did not need to sign the document until the added fee was investigated. (*Id.* ¶ 40.)

Hammer sent her first payment of $749.88 to AmTrust; AmTrust cashed Hammer's payment on July 1, 2010. (*Id.* ¶ 41; Ex. B.) On July 28, 2010, Hammer made her second payment of $749.88 to AmTrust; AmTrust cashed the check on July 30, 2010. (*Id.* ¶ 44; Ex. C.) On August 14, 2010, AmTrust told Hammer that the $2,303.30 fee was assessed in error, and that Hammer was to cross out the $2,303.30 fee, write in the correct principal balance of $207,176.99, initial and sign the contract in front of a notary, then return the executed copy to RCS. (*Id.* ¶ 46.) Hammer wrote the amounts as instructed and mailed the signed contract to RCS. (*Id.*) When RCS obtained serving rights, it applied Hammer's first two payments to the account, as if to acknowledge the loan modification, but then refused to honor its terms. (*Id.* ¶ 45.)

In September 2010, RCS force-placed insurance on Hammer's home, and set up an illegal escrow account. (*Id.* ¶ 54.) Hammer continued to make payments each month. (*Id.* ¶ 62.)

On January 11, 2011, Hammer sent RCS her fourth Fair Debt Dispute Letter requesting information as to why RCS was returning some of her checks, force-placing insurance, and reporting her as delinquent on her credit report. (*Id.* ¶ 67.) Hammer enclosed proof of hazard insurance. (*Id.*) RCS never responded to her dispute letter or corrected her account. (*Id.* ¶ 68.)

On March 18, 2011, the Honorable Judge Gibson dismissed Foreclosure Case #1. (*Id.* ¶ 70.) Gibson ruled that Hammer's monthly checks that were cashed ratified the modification contract. (*See* Exhibit 1 attached hereto is the March 18, 2011 transcript.) Judge Gibson ruled that the checks cashed by AmTrust and applied by RCS were "deemed acceptance of the terms of the revised modification agreement as revised by Ms. Hammer...the agreement was ratified."

3

(*Id*. p. 4; Compl. ¶ 71.) Judge Gibson also instructed the parties to arrange for Hammer to reinstate pursuant to the terms of the loan modification. (*Id*.; Compl. ¶ 72.)

RCS ignored Judge Gibson's ruling. (*Id.* ¶ 75.) On May 12, 2011, RCS issued reinstatement figures that (a) disregarded the modification; (b) did not incorporate the modified payment; (c) assessed late fees; (d) included illegal escrow charges; and (e) included attorney fees and charges for Foreclosure Case #1 (a case that RCS lost). (*Id.* ¶ 77.)

On August 1, 2011 and August 15, 2011, respectively, Hammer received "acceleration notices" from RCS, first claiming that $32,050.60 was past due (ignoring the modification), and then claiming that $10,507.95 was past due (acknowledging the modification). (*Id.* ¶ 93.)

**b. The Second Foreclosure Case**

On September 21, 2011, RCS filed a second foreclosure against Hammer ("Foreclosure Case #2"). The foreclosure complaint alleged a default under the original note and mortgage and did not reference the loan modification. (*Id.* ¶ 97.) The "default" date alleged in the complaint was October 2010, a date three months *after* the loan modification. (*Id.*)

In October 2011, Hammer sent a QWR to RCS. (*Id.* ¶ 101.) On November 7, 2011, RCS responded. Interestingly enough, and notwithstanding the position in RCS's instant motion, the response letter stated that Hammer's loan modification "had been finalized" on "August 9, 2011" (when RCS cashed the August 2011 payment). (*Id.* ¶ 105.) By January 2012, after Hammer tendered 19 payments, RCS developed a practice of accepting Hammer's checks, keeping them for several weeks, then returning them to Hammer. (*Id.* ¶ 106.) Over the last three years, Hammer developed severe nerve and internal organ problems that her physician could not attach to anything other than undue stress. (*Id.* ¶ 107.) Hammer was diagnosed with neuropathy and fibromyalgia, and must take medication daily to treat her now chronic ailments. (*Id.*)

4

STANDARD

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In ruling on a pending motion to dismiss, the court must construe the allegations in the complaint in a light most favorable to the plaintiff, accept as true all well-pleaded factual allegations set forth therein, and draw all reasonable inferences in favor of the non-moving party. *Fednav Int'l Ltd. v. Continental Ins. Co.,* 624 F.3d 834, 837 (7th Cir. 2010). In the event the court finds that dismissal is warranted, the court should grant the plaintiff leave to amend unless amendment would be futile. *Ford v. Neese*, 119 F.3d 560, 563 (7th Cir. 1997).

ARGUMENT

**I. HAMMER PROPERLY STATED A CLAIM FOR BREACH OF CONTRACT**

To state a claim for breach of contract, the plaintiff must allege (a) the existence of a contract with the defendant (Compl. ¶ 117.); (b) plaintiff's performance under the contract (*Id*. ¶ 118.); (c) defendants' breach of the contract (*Id*. ¶¶ 119-20.); and (d) the plaintiff's resulting damages. (*Id*. ¶ 121.) *Demes v. ABN Amro Services Co., Inc.*, 2001 WL 563813, at *1 (N.D.Ill. 2001) (citing *Petri v. Gatlin*, 997 F.Supp. 956, 963-64 (N.D.Ill. 1997)).

    **a. RCS has acknowledged a valid and enforceable contract**

In its motion, RCS mischaracterizes Hammer's well-pled allegations, and then argues that there is no enforceable contract between Hammer and RCS because there was never a "meeting of the minds." (RCS Mtn. p.5.) RCS's self-serving, rewritten narrative is irrelevant for purposes of a motion to dismiss. Hammer adequately alleged the formation of a valid and enforceable contract with AmTrust and its assignee, RCS. (Compl. ¶¶ 117-21.)

5

As a preliminary matter, RCS conceded the existence of a valid loan modification in multiple writings. First, on August 15, 2011, RCS issued a "reinstatement" letter that incorporated the terms and monthly payments directly from the loan modification contract. (*Id*. ¶ 93.) Second, on September 21, 2011, RCS's Foreclosure Complaint #2 alleged a "default date" of October 2010, three months *after* the effective date of the modification. (*Id.* ¶ 97.) Third, on November 7, 2011, RCS again conceded the validity of the loan modification by stating that the loan modification "had been finalized" in response to Hammer's QWR. (*Id*. ¶ 105.)

### b. Judge Gibson has already adjudicated the issue of contract formation

Judge Gibson ruled on several occasions that the loan modification was ratified, and thus, valid and enforceable between the parties. On March 18, 2011, in Foreclosure Case #1, Gibson made a legal and factual finding that Amtrust and RCS's conduct was "deemed acceptance of the terms of the revised modification agreement as revised by Ms. Hammer." (Ex. 1, p. 4.) As recently as December 16, 2013, in Foreclosure Case #2, Judge Gibson again restated his factual findings. (*See* Exhibit 2 attached hereto is the December 16, 2013 transcript.) While the entire transcript is telling, Judge Gibson ruled, in pertinent parts:

> *"I'm very familiar with the facts of this case because there was already a foreclosure suit that was dismissed. The court notes that Ms. Hammer--Ms. Hammer is a senior citizen and that the way she was treated by the lenders was poor. I didn't like it."* (*Id*. p. 10, lines 13-18.)
>
> *"There was a loan modification agreement."* (*Id.* p. 11, line 22.);
>
> *"It certainly appeared that the lender breached the loan modification agreement."* (*Id. p. 12, lines 10-11.);*
>
> *"And it certainly appeared that Ms. Hammer did everything possible that she could to effectuate the terms of the loan modification agreement."* (*Id. p. 12, lines 10-13.);*
>
> *"And lenders can't do an end around by selling the mortgage to somebody else...."* (*Id. p. 12, lines 13-15.);*
>
> *"[Y]ou can see that [RCS] did accept the initial [loan modification] payments."* (*Id. p. 13, lines 23-24.)*
>
> *"I'm not ruling on the--which is the correct amount. I mean in the scheme of things it was a relatively--relatively small difference. I don't think that there was any dispute about the amount of payment that was to be made--[]--on either side. So that--that can be part of this*

6

*order. That's uncontested, what the modified payment was supposed to be." (Id. p. 14, lines 10-19.)*

*[Foreclosure Counsel for RCS, Mr. Ryan: "Your Honor the bank never signed the modification that might be--" (Id. line 20.]*

*"The bank never signs a lot of things. And that's one of the problems that homeowners have. They're told to sign a document and send it back. And then they're told to make the payments, they're accepted for several months, but the bank never sends them back a fully executed version. What are they supposed to do in those situations?....[The Bank] certainly can't cash [the loan modification] checks month after month." (Id. p 15, lines 22-14, p. 16, lines 1-4.)*

Under the law of the case doctrine, which federal courts may apply to orders issued by state courts, once a court rules on a question of law, that ruling is generally binding as to that legal issue between the same or substantially similar parties given the same material facts. *Crigler v. Axia Inc.*, 735 F.Supp. 868, 871-72 (N.D.Ill.,1990). Il. Sup. Ct. R. 273 ("Unless the order...otherwise specifies, an involuntary dismissal....operates as an adjudication upon the merits."). Here, the question of law presented in the instant lawsuit has already been decided in the former proceedings between the same parties on the same material facts. (Ex. A and Ex. B *generally*.) "'An issue may be actually decided even without an express ruling if a court can determine that the issue in question was decided by necessary implication.'" *Crigler*, 735 F.Supp. at 871 (quoting *PaineWebber, Inc. v. Farnam*, 870 F.2d 1286, 1290-91 (7th Cir. 1989)). Judge Gibson's rulings that the loan modification is valid and enforceable prevents RCS from arguing that there was no "meeting of the minds" or enforceable contract in this case.

### c. RCS is bound by the terms of the loan modification

Notwithstanding the foregoing, RCS continues to deny the existence of the modification more than three years after the fact. In making this argument, RCS cites to *Acevedo v. CitiMortgage, Inc.*, 2013 WL 1283807, at *2 (N.D.Ill. 2013). In *Acevedo*, the lender offered the borrower a three month trial loan modification. The trial modification documents themselves explicitly stated that they would *not* take effect unless signed *by the borrower and the lender*.

*Acevedo*, 2013 WL 1283807, at *1 ("The Trial Period Plan advised plaintiffs that it 'will not take effect unless and until both I [plaintiffs] and the Lender [defendant] sign it and Lender provides me with a copy of this Plan with the Lender's signature.'"). The court dismissed the breach of contract claim because "defendant never returned a signed copy of the Trial Period Plan to plaintiffs. Consequently, there was no contract." *Id*.

Here, no such language exists in the modification contract. Hammer's contract states:

"*This Loan Modification Agreement [], made this 1st day of June, 2010, between Alena Hammer,[], and FDIC as receiver for Amtrust Bank,...amended and supplements (1) [the Mortgage] dated December 9, 2003...and (2) the Note.*" The signature page of the agreement reads. "*EXECUTED as of the day and year first above Written. [Alena Hammer-signature.]*" (Compl., Ex. A.)

Hammer clearly returned the signed modification documentation to AmTrust and RCS as agreed between the parties. (*Id.*; Compl. ¶ 33-46, 105; Ex. 1 *generally*; Ex 2 p. 12, lines 10-13. ) Contrary to RCS's assertions, there were no unilateral changes or modifications to the agreement. Everything done by Hammer with respect to the contract formation was done at the express direction of AmTrust and by agreement with AmTrust. (*Id.*) Unlike *Acevedo*, Hammer honored each and every term of the loan modification and complied with the specific parameters of the contract. There was no express term in the agreement similar to that at issue in *Acevedo*.

### d. RCS is bound by the conduct of the assignor, AmTrust

RCS, as an assignee, need not ratify the agreement. The obligations of RCS, as a transferee under RESPA, mandate adherence to the loan modification and acceptance of all payments made pursuant during the 60 day transfer of servicing period. 12 U.S.C. § 2605(d).

> During the 60-day period beginning on the effective date of transfer of the servicing of any federally related mortgage loan, a late fee may not be imposed on the borrower with respect to any payment on such loan and no such payment may be treated as late for any other purposes, if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment. *Id.*

This requirement, in addition to RCS's application of Hammer's payments during the transfer period, validated the contract.

Alternatively, if this Honorable Court believes RCS's signature was necessary, that requirement was satisfied by RCS's application of Hammer's payments (the acceptance of checks endorsed by AmTrust), RCS's written response to Hammer's QWR, and RCS's reinstatement letter acknowledging the modification on its letterhead. (Compl. ¶¶ 93, 97, 105); *Stender v. BAC Home Loans Servicing, LP*, 2013 WL 832416, at *2-3 (N.D.Ind. 2013) (the "writing requirement may be decided in a number of ways, i.e. cover letter, use of drafter's name in title of document"). "Whether the terms of a written contract are modified by the acts or conduct is a matter for the trier of fact..." *Sosin v. Hayes*, 258 Ill. App. 3d 949, 630 N.E.2d 969, 971 (1st Dist. 1994). At a minimum, a question of fact exists that must be left for the trier of fact.

  e. ***Wigod* is controlling**

In *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), the lender offered a the borrower a three month trial loan modification. After tendering all three trial payments, the lender refused to extend a permanent modification to the borrower. The borrower sued the lender, *inter alia*, for breach of contract. The lender argued that the contract was not enforceable because the contractual terms conditioned a permanent modification on a review of the borrower's financial information and the lender's acceptance of the permanent modification. The *Wigod* court rejected the lender's arguments and found them contrary to long-standing contract formation law. "'The test for an offer is whether it induces a reasonable belief in the [offeree] that he can, by accepting, bind the [offeror].'" *Id.* at 562 (quoting *Architectural Metal Systems,* 58 F.3d at 1229, citing *McCarty,* 44 Ill.Dec. 570, 411 N.E.2d at 943; see also

1 *Williston on Contracts* § 4.10 (offer existed if the purported offeree "reasonably [could] have supposed that by acting in accordance with it a contract could be concluded.")).

There was a valid offer and a valid acceptance by Hammer. "[A] reasonable person in [Hammer's] position would read the [modification] as a definite offer...that she could accept so long as she satisfied the conditions." *Wigod*, 673 F.3d at 563. RCS is essentially arguing, similar to the defendant in *Wigod*, that the formation of the contract was contingent upon RCS's unilateral ratification. On one hand, this position is contrary to the reasonable expectations of the parties and long-standing contract law, particularly where one party is an unsophisticated consumer and a senior citizen. On the other hand, RCS *did* ratify the contract by applying Hammer's first two payments (an issue already adjudicated and ruled upon by a court of competent jurisdiction). (Compl. ¶ 105; Ex. 1 *generally*; Ex 2 p. 12, lines 10-13.)

It should be noted that Hammer extended the term of her mortgage (from January 2034 to July 2040) *and* agreed to make a balloon payment at maturity as part of the loan modification. "In exchange for [AmTrust's] conditional promise to modify her home mortgage, [Hammer] undertook multiple obligations above and beyond her existing legal duty to make mortgage payments." *Wigod*, 673 F.3d at 564. RCS also argues that the claim for breach of contract should be dismissed because Hammer fails to plead damages. This argument plainly ignores the pleadings and allegations that Hammer suffered actual damages. (Compl. ¶ 121.)

### f. RCS also breached the covenant of good faith and fair dealing

Hammer alleged a breach of the duty of good faith and fair dealing, but RCS did not contest these allegations. (Compl. ¶¶116, 119-20.) Among other arbitrary and unfair undertakings, RCS breached its duty to properly manage Hammer's escrow account or respond to Hammer's repeated objections. "In estimating escrow requirements, good faith requires the

mortgagee to exercise its discretion 'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Poindexter v. Nat'l Mortgage Co.,* 1995 WL 242287, at *4 (N.D.Ill. 1995) (citing *Resolution Trust Corp. v. Holtzman,* 248 Ill. App. 3d 105, 112, (1st Dist. 1993)).

RCS acted arbitrarily and capriciously when it unilaterally imposed an escrow account and force-placed insurance. (Compl. ¶ 120.) RCS failed to provide escrow notices and proceeded to levy unauthorized fees. (*Id.*) The validity of the imposition of the escrow account and charging for forced-placed insurance "is a factual question beyond the Court's cursory review on a motion to dismiss...." *Chatman v. Fairbanks Cap. Corp..* 2002 WL 1338492, at *4 (N.D.Ill. 2002).

## II. HAMMER'S FDCPA CLAIMS ARE BOTH TIMELY AND SUBJECT TO TOLLING

The FDCPA is designed to protect consumers from the abusive practices of debt collectors. "[T]he FDCPA is, in general, liberally construed in favor of consumers to effect its purpose." *Burnside v. AFNI,* 2013 WL 5718438, at *1 (N.D.Ill. 2013).

RCS argues that Hammer's FDCPA claims are barred by the applicable statute of limitations. First, Hammer filed her complaint on September 6, 2013. Within the prior 365 days, Hammer alleged violations of the FDCPA for RCS's (a) mismanagement of the loan account (Compl. ¶ 128); (b) perpetual disregard for the loan modification (*Id.* ¶ 129); (c) misrepresenting the status of the debt (*Id.* ¶¶ 130-34); (d) failing to respond to Hammer's disputes and reporting to credit bureaus during the dispute period (*Id.* ¶¶ 135-38, 142); and (e) continuing to prosecute a wrongful foreclosure action without verifying the debt (*Id.* ¶ 145). RCS even cashed Hammer's September 2012 payment, within the one year statute of limitations period, and later claimed, deceptively, that no loan modification existed. (Compl. ¶ 111.)

Alternatively, Hammer alleged sufficient facts to toll the statute of limitations due to RCS's fraudulent concealment. Fraudulent concealment includes efforts beyond the wrongdoing

11

complained of that imply deliberate efforts to prevent the plaintiff from suing within the applicable one year statute of limitations." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 452 (7th Cir.1990). While some of RCS's conduct began outside of one year, it's own efforts prevented Hammer from suing within the limitations period. RCS employed a perpetual tactic of supplying conflicting information that left an elderly widow in a state of confusion. RCS provided Hammer three conflicting reinstatement letters in a 90 day period, provided conflicting information in response to all of her disputes leading up the instant lawsuit, and misrepresented the status of her own loan, or its willingness to honor the contractual terms or Judge Gibson's orders. At a minimum, a question of fact remains as to RCS's concealment of facts, and the statute of limitations issue should not be decided on a motion to dismiss.

### III. HAMMER PROPERLY STATED A VALID ICFA CLAIM AGAINST RCS

ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive practices." *Boyd v. Sasco Aames Mortgage Loan Trust, Series 2003-1*, 787 F.Supp.2d 747, 752 (N.D.Ill. 2011) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17, 775 N.E.2d 951, 960 (2002)). Hammer's allegations of unfairness and misrepresentation "implicate consumer protection concerns," amounting to "more than a mere breach of contract claim." *Llames v. JPMorgan Chase & Co.*, 2012 WL 1032910, at *3 (N.D.Ill. 2012).

RCS incorrectly argues that the heightened pleading standard applies to unfairness. A plaintiff is entitled to recover under ICFA for *any* unfair or misleading conduct *without* meeting the heightened pleading standard. *Sindles,* 2012 WL 1899401, at *4 ("[H]eightened pleading [standard] applies only to the deceptive acts prong of the ICFA."). *See Windy City Metal Fabr. & Supp.*, 536 F.3d 663, 670 (7th Cir. 2008) (notice pleading standard for ICFA unfairness); *Typpi*

*v. PNC Bank, N.A.*, 2014 WL 296035, at *3 (N.D.Ill. 2014) (same); *Centerline Equip. Corp. v. Banner Pers'l Serv., Inc.*, 545 F.Supp.2d 768, 778-79 (N.D.Ill. 2008) (same).

### a. Unfairness

"[C]onduct is 'unfair' if it: (1) violates public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) substantially injures consumers." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). "The second prong is met where the conduct is so oppressive that the consumer has little choice but to submit. The third is met if the injury (1) is substantial; (2) is outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) is one that consumers themselves could not reasonably have avoided." *Id.* (citations and quotations omitted). *Windy City*, 536 F.3d at 672.

The allegations of force-placed insurance and illegal fees are sufficient to state an ICFA claim for unfairness. (Compl. ¶¶ 63-71.) *Id. See Typpi,* 2014 WL 296035, at *8 (plaintiff stated an unfairness claim where he could not avoid fees for force-placed insurance as they were deducted without his knowledge or consent). While any of the unfair acts in isolation may not be oppressive enough to violate public policy, when taken as a whole over several years, RCS's conduct was so unethical and unending, that Hammer had no choice but to submit. *See id.*

### b. Deception

An ICFA claim for deception involves (1) a deceptive act or practice; (2) intent that the consumer rely on the deception; and (3) that the deception took place during a course of conduct involving trade or commerce. *Robinson*, 201 Ill. 2d at 417, 775 N.E.2d at 960. Contrary to RCS's assertion, reasonable reliance is not an element of an ICFA claim for deception. *Paterson*, 2012 WL 4483525, at * 5 (N.D.Ill. 2012) (citing *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001)). The first and second prong may be satisfied by innocent

13

representations; plaintiff need only show that the defendant intended plaintiff to rely on the act, irrespective of whether the deception was intentional or unintentional. *Choi v. Aegis Morg. Corp.*, 286 F.Supp.2d 956, 963-64 (N.D.Ill. 2003). "It is enough to allege that the defendant committed a deceptive or unfair act and intended that plaintiff rely on that act[.]" *Wigod,* 673 F.3d at 574. Hammer has utilized 25 pages of a complaint and 15 pages in this brief outlining RCS's deceptive conduct over a three year period, and its intent that Hammer rely on RCS's actions. Whether RCS's deception was intentional is irrelevant. *Id*.

Hammer documented all of the specific communications over three years and three lawsuits, including the precise parties, individuals, dates, details of the conversations, and the overall timeline. The allegations in her complaint provide the who, what, where, and when of the entire deceptive process, from start to finish. *See Michalowski v. Flagstar Bank, FSB*, 2002 WL 113905, (N.D.Ill. 2002) (finding ICFA deception claim sufficiently pled); *Fletcher v. OneWest Bank, FSB*, 2012 WL 5199632, at *5 (N.D.Ill. 2012) ("'[A]ccepting [her] modified payments during the trial period yet continuing to threaten foreclosure proceedings despite promising not to do so'" adequately alleges ICFA deception) (citing *Wigod*, 673 F.3d at 575).

### IV. RCS VIOLATED THE REAL ESTATE SETTLEMENT PROCEDURES ACT

RESPA is a consumer protection statute that regulates the servicing of loans and assignment of loans. *Catalan v. GMAC Mort. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). Hammer alleged that RCS violated RESPA when it (a) unilaterally imposed an escrow account; (b) mismanaged Hammer's escrow account; (c) failed to provide any of the required notices related to an escrow account or an "escrow deficiency;" (d) failed to honor Hammer's loan modification within the 60 day transfer period; (e) failed to adequately respond to Hammer's inquiries within 60 days; (f) failed to make necessary corrections after receiving proof of insurance; and (g)

14

reported her as in default to credit bureaus. (Compl. ¶ 161-72.) 12 U.S.C. § 2605, 2609; *See Baginski v. JPMorgan Chase Bank, N.A.*, 2012 WL 1899401, at *2, *5-6 (N.D.Ill. 2012) (RESPA violations for failure to respond to borrower inquiries regarding a loan modification and escrow account). *Johnstone v. Bank of America, N.A.*, 173 F.Supp.2d 809, 813 (N.D.Ill. 2001). All of these allegations, when taken as true, are per se violations of RESPA.

In its motion, RCS argues that Hammer cannot state a RESPA violation because RESPA does not apply to loans in default. Hammer's entire complaint is based on the premise that the loan has *not* been in default since Hammer accepted a loan modification in July 2010. *Johnstone,* 173 F.Supp.2d at 814 (plaintiff properly stated violations of RESPA § 2605(e), irrespective of lender's foreclosure, based on (i) wrongful late fees, (ii) the bank's failure to correct problems, and (iii) the negative reporting to a credit bureaus within 60 days of her QWR); *Vangness v. Deutsche Bank Nat'l Trust Co.*, 2012 WL 5989354, at *3 (declining to dismiss a RESPA claim despite an ongoing foreclosure); *Marais v. Chase Home Finance, LLC*, 736 F.3d 711, 721 (6th Cir. 2013) (RESPA violation for servicer's failure to respond to a QWR or reinvestigate misapplied payments).

WHEREFORE, Plaintiff Alena Hammer prays that this Court enter an order denying all relief requested in RCS's Motion to Dismiss, granting all relief prayed for in Plaintiff's Complaint, and for any other relief this Honorable Court deems just and proper.

                                    Respectfully Submitted,

                                    By: ___/s/Ross M. Zambon___
                                          Attorney for Plaintiff

Sulaiman Law Group, Ltd.
Ross M. Zambon
ARDC # 6294149
Mara A. Baltabols
ARDC # 6299033
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523