## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT
## OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| Alena W. Hammer | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 6397 |
| | ) | |
| | ) | Judge Thomas M. Durkin |
| v. | ) | |
| | ) | |
| Residential Credit Solutions, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Alena Hammer ("Hammer") brought this lawsuit against Residential Credit Solutions ("RCS") on September 6, 2013, alleging that RCS caused her damages resulting from breach of contract and violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692; the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS § 505/1; and the Real Estate Settlement Procedures Act ("RESPA"),12 U.S.C. §§ 2605 & 2609. RCS moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 30. For the reasons explained below, RCS's motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

Hammer obtained a 30-year home mortgage loan for $220,000 in 2003. R. 1 ¶ 19. The loan required Hammer to pay her taxes and maintain hazard insurance separately from the mortgage loan. *Id.* ¶ 21. Hammer opted out of any escrow

---

[1] The Court construes the complaint in the light most favorable to Hammer, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

requirement for the loan, which was effective as long as she remained current on her taxes and insurance. *Id.* ¶ 22. As of August 2009, that loan was being serviced by AmTrust Bank ("FDIC/AmTrust"). *Id.* ¶¶ 23, 27. In February 2009, Plaintiff was laid off from her job and fell behind on her principal and interest payments on the loan. *Id.* ¶ 26. In August 2009, FDIC/AmTrust declared Hammer's loan in default. *Id.* ¶ 27. On September 9, 2009, FDIC/AmTrust filed a foreclosure against the subject property and against Hammer in DuPage County, Illinois in the case known as *AmTrust Bank v. Hammer,* 2009 CH 3951 ("Foreclosure Case # 1"). *Id.* ¶ 28.

In December 2009, the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for FDIC/AmTrust. *Id.* ¶ 29. In January 2010, Hammer received a call from Theresa Holk of the FDIC/AmTrust about a potential loan modification. R. 1 ¶ 31. Holk explained that Hammer's modified loan amount would be the principal balance on the loan before the FDIC takeover of FDIC/AmTrust, and that all past-due amounts would be waived. *Id.* ¶ 32. Holk told Hammer she would receive correspondence in the mail with instructions on how to complete the modification. *Id.* ¶ 33. Hammer received a letter from FDIC/AmTrust providing her with a loan modification application and checklist of documents to be submitted no later than February 26, 2010. *Id.* ¶ 34. On February 2, 2010, Hammer submitted the application and documentation. *Id.* On June 21, 2010, Holk notified Hammer that her modification was officially approved with a total principal balance of $207,176.99. *Id.* ¶ 35. Holk told Hammer that all future dealings should be through

Hammer's new contact person, Chris Pelaci, and that all loan modification payments should be sent to Sandy Beauregard at FDIC/AmTrust. *Id.*

Hammer received the loan modification agreement—which was dated June 8, 2010—on June 28, 2010. *Id.* ¶ 36. The modification agreement noted that it should be returned no later than June 25, 2010, and instructed Hammer to send her new monthly payment of $749.88 to FDIC/AmTrust by July 1, 2010. *Id.* ¶ 37. It also included a miscellaneous fee of $2,303.30, increasing the modified balance from $207,176.99 to $209.471.59. *Id.* ¶ 38.

When Hammer received the agreement on June 28, she called Pelaci to request additional time to review and sign the modification agreement since she received it three days after the due date in the cover letter. *Id.* ¶ 39. Hammer also disputed the additional fees added to the modified balance. *Id.* Pelaci said she would look into the added fees and told Hammer that she still needed to send in the first $749.88 payment by July 1, 2010, but did not need to sign the document until Pelaci called her back regarding the unknown fees. *Id.* ¶ 40. Hammer sent her first payment in the amount of $749.88 to FDIC/AmTrust on June 28, 2010, which FDIC/AmTrust cashed on July 1, 2010. *Id.* ¶ 41, R. 1-2 at 2. When Hammer did not receive a response from Pelaci regarding the fees, she both called and wrote FDIC/AmTrust to dispute the fee and obtain an explanation and further instruction. R. 1 ¶ 42.

On July 23, 2010, Hammer received a RESPA Notice of Assignment stating that effective on August 1, 2010, FDIC/AmTrust would no longer accept payments

for her loan and that she should make her payments to RCS beginning on that date. The letter advised Hammer of her right to send a RESPA Qualified Written Request[2] ("QWR") dispute within 60 days. *Id.* ¶ 43. On July 28, 2010, Hammer made her second payment (due August 1, 2010) on the loan modification in the amount of $749.88[3] to FDIC/AmTrust which FDIC/AmTrust cashed on July 30, 2010. *Id.* ¶ 44, R. 1-3 at 2.

On August 2, 2010, RCS applied $1,499.76—the two payments of $749.88—to Hammer's account. *Id.* ¶ 45. On or about August 14, 2010, Pelaci spoke with Hammer over the phone and told Hammer that the fees in her modification were assessed in error. *Id.* ¶ 46. Pelaci instructed Hammer to cross out the $2,303.30 fee, write in the correct principal balance of $207,176.99, initial and sign the contract in front of a notary, and return the executed copy to RCS, attention "Jim Bass." *Id.*

---

[2] The RESPA statute defines a Qualified Written Request as "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer" that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

[3] In her complaint, Hammer refers to the June and July payment amounts as $748.88, $748.99 and $749.88. R. 1 ¶¶ 40, 41, 44, 45. However, the Court relies on the amount of $749.88 as reflected in the copies of the June and July 2010 checks and denoted in the loan modification agreement attached as exhibits to Hammer's complaint. R. 1-1 at 2, R. 1-2 at 2, R. 1-3 at 2. *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 823-24 (N.D. Ill. 2013) ("to the extent that an exhibit attached to the complaint contradicts the complaint's allegations, the exhibit takes precedence") (citing *Forrest v. Universal Sav. Bank, F.A.,* 507 F.3d 540, 542 (7th Cir. 2007)).

Hammer wrote the amounts and then signed, notarized, and mailed the document to Bass as instructed. *Id.*

Upon receiving the document, Bass called Hammer and told her that the modification "did not exist at the time the loan was transferred to [RCS]" and therefore was not valid. Hammer alleges that Bass threatened to take her home and swore at her to the point where she became very distraught. *Id.* ¶ 47. On August 19, 2010, RCS sent Hammer a notice erroneously stating that her real estate taxes were delinquent and that RCS would set up an escrow account to pay the delinquent taxes. *Id.* ¶¶ 49-50.

On August 31, 2010, Hammer disputed the debt in writing, sending a QWR and a Fair Debt Dispute Letter addressed to Beauregard at FDIC/AmTrust. *Id.* ¶ 51. The letters stated that Hammer was sending the money to FDIC/AmTrust because RCS claimed it had no knowledge of the modification. *Id.* On September 1, 2010, Hammer sent her third loan modification payment to FDIC/AmTrust in the amount of $749.88, which FDIC/AmTrust forwarded to RCS. *Id.* ¶ 52.

On September 19, 2010, Hammer's hazard insurance policy automatically renewed for a twelve-month period. *Id.* ¶ 54. Hammer alleges that at all times since obtaining the underlying loan in 2003, she has paid her taxes in full and has maintained proper and adequate hazard insurance. *Id.* ¶ 14. Also on September 19, 2010, RCS force-placed insurance[4] on Hammer's property. *Id.* ¶ 54. Beginning in

---

[4] Hammer does not define "force-placed" insurance. The Court finds useful the definition provided by another district court: "Under standard residential mortgage agreements, if a borrower's hazard insurance lapses, the lender may 'force-place'

September 2010, RCS billed Hammer's account certain unexplained fees on multiple occasions including in October 2010, and February, April, and May through August of 2011. *Id.* ¶¶ 53, 57, 69, 74, 76, 79, 81-83, 88, 91.

On September 30, 2010, Hammer sent FDIC/AmTrust another Fair Debt Dispute Letter along with her fourth modification payment in the amount of $749.88. *Id.* ¶ 55. The letter stated that Hammer had a loan modification contract with FDIC/AmTrust. *Id.* On October 15, 2010, Hammer received a letter from FDIC/AmTrust telling her that her loan had been transferred to RCS more than 60 days earlier and returning her most recent payment "which needs to be paid directly to [RCS]." *Id.* ¶ 56. The letter included Hammer's October 2010 payment check but not her September 2010 payment check. *Id.* On October 29, 2010, Hammer sent a check to RCS in the amount of $749.88 for her November 2010 payment, also including a third Fair Debt Dispute Letter with her check which stated, "Also, the November payment enclosed as per contract w/FDIC/AmTrust bank prior to transfer to RCS." *Id.* ¶ 58. RCS received the payment on November 1, 2010 and returned the payment on November 5, 2010, without cashing it. *Id.* ¶ 59.

On November 5, 2010, RCS force-placed insurance on Hammer's account for a second time in the amount of $2,615 which RCS "deducted" from Hammer's escrow account, creating a negative escrow balance. *Id.* ¶ 60. On December 1, 2010, Hammer sent a check to RCS in the amount of $749.88 which RCS did not cash but

---

insurance on the home by arranging for its own policy at the borrower's expense." *Decambaliza v. QBE Holdings, Inc.,* No. 13-CV-286-BBC, 2013 WL 5777294, at *1 (W.D. Wis. Oct. 25, 2013).

instead returned to Hammer. *Id.* ¶ 62. After December 1, 2010, Hammer continued to send her monthly payments to RCS via certified mail each month through the filing of her complaint. *Id.* RCS cashed two of Hammer's payments—for August 2011 and September 2012. *Id.* However, RCS returned all the other checks after holding them for time periods of several weeks to several months. *Id.*

On or about December 3, 2010, Hammer received a letter from RCS that it had not received proof of her insurance policy on the subject property. *Id.* ¶ 63. As a result, they secured force-placed insurance for the third time on her behalf through American Modern Home. *Id.* ¶ 63. The letter also stated that the cost of the policy would be paid out of her loan escrow account, which would be set up if it did not already exist and would result in an increase in her mortgage payment and "future insurance policies." *Id.* In response, Hammer sent RCS proof of her insurance again.[5] *Id.* ¶ 64. RCS assessed a third "escrow disbursement" of $2,516 for force-placed insurance from Hammer's account on January 4, 2011. *Id.* ¶ 65.

On January 5, 2011, Hammer filed a motion to dismiss Foreclosure Case # 1, alleging that there was a valid and enforceable loan modification agreement with an effective date of July 1, 2010, and that all payments had been timely tendered. *Id.* ¶ 66. On January 11, 2011, Hammer sent RCS her fourth Fair Debt Dispute Letter requesting information as to why RCS was not cashing her checks and disputing the

---

[5] Hammer does not allege when she first sent RCS proof of insurance, though she asserts that she sent it to RCS "again" on December 3, 2010. R. 1 ¶ 64.

credit reporting on her account.[6] *Id.* ¶ 67. Hammer enclosed copies of her credit report for reference and proof of hazard insurance. *Id.* RCS never responded to her dispute letter or corrected the credit reporting. *Id.*

On March 18, 2011, DuPage County, Illinois, Circuit Judge Gibson heard arguments on Hammer's motion to dismiss Foreclosure Case # 1 and granted the motion to dismiss the lawsuit. *Id.* ¶ 70. Following the dismissal of Foreclosure Case # 1, Hammer requested reinstatement figures from RCS pursuant to her modification and continued to make monthly payments to RCS each month in the amount of $749.88. *Id.* ¶ 73. RCS continued to return her payments and bill her for unexplained fees. *Id.* On May 12, 2011, in response to Hammer's request for reinstatement figures, RCS sent Hammer figures reflecting principal and interest payments, late charges, escrow payments, attorney fees, and miscellaneous fees. *Id.* ¶ 76. Subsequently, Hammer called RCS and Codilis, RCS's collection attorneys, to obtain accurate reinstatement figures. *Id.* ¶ 80. Hammer left numerous messages but did not receive any return calls. *Id.*

On July 25, 2011, Hammer spoke with Codilis' attorney, Courtney Nogar, who had represented RCS in Foreclosure Case # 1. *Id.* ¶ 84. Nogar asked Hammer "if she ever intended to pay back the loan." *Id.* Hammer replied that she had been paying every month, that no one would call her back, and that each of her payments

---

[6] Hammer notes later in her complaint that RCS "report[ed] false information regarding the subject loan to Equifax, TransUnion, and Experian, including that the loan was in default and . . . fail[ed] to report the debt as disputed to the credit bureaus." *Id.* ¶ 135. She also alleges that RCS caused "damage to her credit report" and she was "denied credit" *Id.* ¶ 121.

was being returned to her. *Id.* Hammer asked Nogar for the amount necessary to bring the loan current, but Nogar did not provide that amount. *Id.* ¶ 85. On July 26, 2011, Hammer sent her August 2011 loan modification payment to RCS in the amount of $749.88. *Id.* ¶ 86. RCS cashed that payment on July 28, 2011. *Id.* On July 29, 2011, Hammer received an escrow analysis from RCS showing an escrow shortage of $3,319.80 even though she did not have an escrow account opened pursuant to her mortgage contract or loan modification. *Id.* ¶ 87. The analysis reflected two prior assessments for hazard insurance and indicated that $2,516 would be added to the loan amount in September 2011. *Id.*

On August 1, 2011, approximately four months after the dismissal of Foreclosure Case # 1, Hammer received an acceleration notice from Codilis on behalf of RCS that stated: "As of 7/29/2011 the amount of the debt we are seeking to collect is $32,050.60, which includes the sum of payments that have come due on and after the date of default 10/01/2010." *Id.* ¶ 89. On August 8, 2011, RCS sent Hammer a notice that it was renewing her force-placed insurance and deducting the amount from her escrow account. *Id.* ¶ 91. Hammer again sent RCS proof of her insurance. *Id.*

On August 15, 2011, Hammer received a second "acceleration notice" from RCS stating, "As of 8/11/2011 the amount of the debt we are seeking to collect is $10,507.95, which includes the sum of payments that have come due on and after the date of default 10/01/2010." *Id.* ¶ 93. That amount was $21,542.65 less than the amount listed in the first acceleration notice. *Id.* On August 17, 2011, in an attempt

to resolve the discrepancy, Hammer called the number listed on the acceleration notice and spoke with someone named "Randy" from RCS's loss mitigation department. *Id.* ¶ 94. That person never called her back. *Id.* On or about September 16, 2011, Hammer received a letter from RCS stating that her account had been referred to foreclosure for a second time for a failure to cure the default. *Id.* ¶ 95. On September 20, 2011, RCS deducted $2,516 from Hammer's escrow account to pay for force-placed insurance. *Id.* ¶ 96.

On September 21, 2011, RCS filed a second foreclosure against the subject property and against Hammer in DuPage County, Illinois, in the case known as *RCS v. Hammer*, 2011 CH 004503 ("Foreclosure Case # 2"). *Id.* ¶ 97. The foreclosure complaint alleged a default under the original note and mortgage. *Id.* The complaint did not reference or attach the loan modification. *Id.* On September 30, 2011, Hammer received a "Notice Pursuant to the Fair Debt Collection Practices Act" from Codilis on behalf of RCS notifying her of her right to dispute the debt within 30 days. *Id.* ¶ 98. Hammer also received another notice of force-placed insurance and a deduction of $2,516 from her escrow account. *Id.* ¶ 99.

On October 28, 2011, Hammer sent another Fair Debt Dispute Letter requesting verification of the debt in writing and RCS to cease all phone calls to her. *Id.* ¶ 100. Hammer also sent RCS a QWR asking for a payment history, the amount alleged to be owed, an accounting, a record and proof of each payment that Hammer made, an "[e]xplanation on the alleged lapse in Hazard Insurance that was force placed on the account when proof of insurance had been previously provided," and

"the identity of the holder of [the] mortgage pursuant to U.S.C. § 1641(f)(2)," as well as a complete breakdown of the fees, payments, and amounts alleged as owing on the loan and how each was calculated. *Id.* ¶ 101. On October 31, 2011, RCS acknowledged receipt of Hammer's QWR and FDCPA dispute letter. *Id.* ¶ 102.

On November 4, 2011, Hammer filed a motion to dismiss Foreclosure Case # 2. *Id.* ¶ 103. On February 29, 2012, Judge Gibson granted the motion to dismiss the first amended complaint without prejudice.[7] *Id.* On November 7, 2011, RCS partly responded to both Hammer's QWR and her FDCPA dispute letter in a single response. *Id.* ¶ 104. The response letter provided a breakdown of fees and amounts to reinstate the loan. *Id.* It did not provide an explanation of fees or the force-placed insurance, nor did it provide verification of the debt. *Id.* The response letter stated that Hammer's loan modification "had been finalized" on August 9, 2011, the date that RCS cashed Hammer's August 2011 payment. *Id.* ¶ 105.

By January 2012, after Hammer tendered 19 consecutive payments pursuant to the loan modification, RCS developed a pattern and practice of accepting Hammer's checks, keeping them for several weeks to several months, then returning them to Hammer. *Id.* ¶ 106. Over this period of time, Hammer's health and well-being "drastically deteriorated." *Id.* ¶ 107. She developed severe nerve and internal organ problems that her physician could not attach to anything other than stress. *Id.* Hammer's medical records show a steady decline in her health from the

---

[7] Neither party specifies whether Judge Gibson's February 29, 2012 dismissal was of RCS's original complaint or first amended complaint. However, since RCS filed its second amended complaint on March 28, 2012, R. 32-4, the Court presumes the complaint Judge Gibson dismissed was indeed RCS's first amended complaint.

time that RCS took over the loan through the filing of Hammer's September 6, 2013, complaint. *Id.*

On February 3, 2012, Codilis sent Hammer another reinstatement letter with figures that did not recognize her loan modification. *Id.* ¶ 108. On March 28, 2012, RCS filed a second amended complaint in Foreclosure Case # 2, R. 32-4, alleging that the terms of the loan modification as presented by Hammer were unenforceable because there was no "meeting of the minds." R. 1 ¶ 109. Hammer continued to send in her loan modification payments every month, but RCS rejected all of Hammer's subsequent payments until September 2012, when RCS cashed her payment. *Id.* ¶¶ 110-11. On September 19 and October 5, 2012, RCS sent Hammer letters stating that it had reviewed her insurance policy and that she was required to increase the amount of her policy coverage because it was inadequate compared to her outstanding loan balance and did not cover the loss of the property. *Id.* ¶ 112.

On September 6, 2013, as a result of RCS's actions, Hammer filed a four-count complaint in this Court. On January 27, 2014, RCS filed a motion to dismiss all four counts of the complaint, R. 29. Briefing on the motion was completed on March 10, 2014. At a hearing before the Court on March 27, 2014, the parties represented that Foreclosure Case # 2 is currently stayed in state court.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim

showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

Rule 9(b) requires a pleading to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading "ordinarily requires describing the who, what, when, where, and how of the fraud." *Anchorbank, FSB v. Hofer,* 649 F.3d 610, 615 (7th Cir. 2011) (internal quotations omitted). One of the purposes of the particularity and specificity required under Rule 9(b) is "to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mutual Life Ins. Co.,* 172 F.3d 467,

469 (7th Cir.1999). *Camasta v. Jos. A. Bank Clothiers, Inc.,* No. 13 C 2831, 2014 WL 3765935, at *3 (7th Cir. Aug. 1, 2014).

## ANALYSIS

### I.     Count I—Breach of Contract Claim

Hammer alleges that she had a valid and enforceable mortgage contract with RCS in the form of the loan modification and RCS breached that contract. RCS contends that Hammer's claim for breach of contract fails because RCS did not assent to the loan modification that FDIC/AmTrust offered to Hammer or to Hammer's unilateral amendment of that loan modification thirteen days after RCS took control of the mortgage. R. 30 at 4-5.

### A. Signature of Loan Modification

Under Illinois law,[8] the elements of a breach of contract cause of action are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (citing *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja*, LLC, 845 N.E.2d 22, 30 (Ill. App. Ct. 1st Dist. 2006), leave to appeal denied, 850 N.E.2d 808 (2006)). "The test for an offer is whether it induces a reasonable belief in the [offeree] that [s]he can, by accepting, bind the [offeror]." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 562 (7th Cir. 2012); *Boomer v. AT & T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002)

---

[8] The parties do not dispute the application of Illinois law. While RCS later cites to a Sixth Circuit case in arguing why the contract claim should be dismissed, R. 31 at 5, RCS initially recites the elements for a breach of contract claim under Illinois law. R. 31 at 3-4.

(quoting *McCarty v. Verson Allsteel Press Co.*, 411 N.E.2d 936, 943 (Ill. App. Ct. 1st Dist. 1980)); *see also* Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").

Hammer's allegations support a plausible inference that a reasonable person in her position would interpret the modification agreement and the surrounding circumstances to constitute a definite offer to provide for permanent modification. This offer was available so long as Hammer satisfied the conditions in the document itself and followed the instructions of the FDIC/AmTrust representative regarding the modification, which, according to Hammer's allegations, she did.

As Hammer notes, the language in her loan modification documents did not explicitly state that the lender's signature was required in order for the modification to take effect. The surrounding circumstances—including the date on which Hammer received the modification, her conversations with Pelaci, and RCS's credit of her June and July payments to her account—also support a plausible claim that no additional signature from her servicer was required to finalize the loan modification. Although Hammer amended the modification by inserting the total amount without fees and crossing out the miscellaneous fee, she alleges that she did so "at the express direction of FDIC/AmTrust and with AmTrust's agreement." R. 31 at 8. FDIC/AmTrust cashed her June and July 2010 payments and RCS applied those payments to her account, as described. While RCS called Hammer after it

received the modification to say there was no modification in place when her loan was serviced, the terms of the modification are "clear and definite enough" to support Hammer's breach of contract theory that the servicer's signature was not required for acceptance. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 565 (7th Cir. 2012). Hammer's contract claim thus survives the motion dismiss to the extent it is attacked for a lack of signature by FDIC/AmTrust.

### B. RCS's Assent to the Loan Modification

RCS also moves to dismiss Hammer's contract claim because it claims it did not assent to Hammer's unilateral changes. Hammer argues that RCS is bound by the conduct of its assignor, FDIC/AmTrust for the following reasons: (1) RCS conceded the existence of a valid loan modification in multiple writings including the August 15, 2011 reinstatement letter incorporating terms and monthly payments from the modification letter, the September 21, 2011 foreclosure complaint alleging a default date of October 2010 (three months after the effective date of the modification) and the November 7, 2011 response to Hammer's QWR stating that the modification had been finalized, R. 31 at 6; (2) Judge Gibson already adjudicated the issue of contract formation, [9] *Id.* at 6-7; (3) RCS is bound by

---

[9] Hammer cites *Crigler v. Axia Inc.*, 735 F. Supp. 868, 871 (N.D. Ill. 1990) for the application of the law of the case doctrine. Hammer claims it dictates that Judge's Gibson's oral rulings on the validity of the loan modification prevent RCS from arguing that there was no enforceable contract in this case. R. 31 at 7. While the Court finds that Hammer's breach of contract claim survives for alternative reasons and thus need not address this argument, it is worth noting that in *Crigler*, the court found that "the complaint filed in [federal] court [was] identical in all substantive respects to the amended complaint dismissed in the state court action,"

the conduct of FDIC/AmTrust as a transferee under RESPA § 2605 (d) which, along with RCS's application of Hammer's payments during the transfer period, validated the contract; or (4) in the event that the Court finds RCS's signature was necessary, the signature requirement was satisfied by RCS's application of payments to Hammer's account (checks endorsed by FDIC/AmTrust), RCS's written response to Hammer's QWR, and RCS's reinstatement letter acknowledging the modification on its letterhead.[10] R. 31 at 5-10.

In addition to its other arguments, RCS responds that the law of the case doctrine does not apply because the foreclosure cases are not the same as this case and Judge Gibson did not in fact decide whether Hammer's revisions were binding on RCS in Foreclosure Case # 2. Even accepting the validity RCS's other arguments, the June and July payments that RCS credited to Hammer's account—which Hammer paid at the direction of Pelaci—were for $749.88, the same amount as the payments listed in the modification that Hammer signed. R. 1-1 at 1, Ex. A; R 1-2, Ex. B; R. 1-3, Ex. C. This at least makes plausible Hammer's claim that the modification was effective because it shows that RCS was operating in accordance with the modification agreement. Additionally, RCS offers no response to Hammer's argument that it conceded the existence of a valid loan modification: (1) on August

which Hammer does not assert here. *Crigler*, 735 F. Supp. at 871-72 (citations omitted).

[10] Hammer notes that she also alleged RCS breached the duty of good faith and fair dealing, but RCS did not raise this argument in its motion to dismiss. In reply, RCS argues that it had no choice but to return Hammer's payments which did not constitute a breach of good faith and fair dealing, R. 32 at 6, but that dispute is not appropriate for resolution on a motion to dismiss.

15, 2011, in its reinstatement letter incorporating terms and monthly payments from the modification letter; (2) on September 21, 2011, in its foreclosure complaint alleging a default date of October 2010, three months after the effective date of the modification; and (3) on November 7, 2011, in its response to Hammer's QWR that the modification had been finalized. R. 31 at 6.[11]

Given that this case is only at the pleading stage, the Court finds Hammer's allegations sufficient to survive dismissal. Her allegations of AmTrust and RCS's offer and acceptance of the loan modification agreement state a plausible claim for a breach of contract. Of course, as the case proceeds, it will be Hammer's burden to prove (not plead) that a contract existed between her and RCS. *See, e.g., Lagen v. United Continental Holdings, Inc.*, 920 F. Supp. 2d 912, 917 (N. D. Ill. 2013).[12]

**c. Damages**

RCS argues that Hammer fails to plead sufficient damages with respect to her contract claim because emotional distress is not available for breach of contract and Hammer did not allege any proof of other actual damages "because there were

---

[11] RCS claims that Hammer conceded in its answer to Foreclosure Case # 2 that there was an actual dispute between the parties whether the unpaid principal balance reflected the parties' mutual agreement and intent. R. 32 at 5. RCS raises this argument for the first time on reply, so the Court will not consider it. *Amerson v. Farrey,* 492 F.3d 848, 852 (7th Cir. 2007) ("Arguments raised for the first time in a reply brief are waived.").

[12] RCS also contends that Hammer admits that her loan went into default in February 2009 and therefore her monthly payment starting in June 2010 could not bring her account balance up to date. R. 32 at 6. This is a factual dispute inappropriate for resolution on a motion to dismiss. *Cushing v. City of Chicago,* 3 F.3d 1156, 1163 (7th Cir. 1993) (holding that resolving issues of fact are "inappropriate for resolution in a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).")

none; she was able to live in a house that [sic] she quit making payments." R. 30 at 5. RCS's argument is unavailing. While proof of damages is an essential element of a contract claim, Hammer has sufficiently pled damages as a result of RCS's breach. First, in asserting that Hammer may not recover damages for emotional distress for a breach a contract, RCS cites a Sixth Circuit decision applying Michigan law—not Illinois law. R. 30 at 5 (citing *Kevelighan v. Orlans Assocs., P.C.,* 498 Fed. Appx. 469, 476 (6th Cir. 2012) (citing Michigan cases for the proposition that emotional damages are not available for breach of contract)). While Illinois does not allow punitive and emotional distress damages for a breach of contract, "compensation for emotional distress is allowed where the breach of contract was wanton or reckless and caused bodily harm or where the defendant had reason to know, when the contract was made, that its breach would cause more than pecuniary loss." *Woodard v. Chicago Bd. of Educ.*, No. 00 C 5515, 2001 WL 1631892, at *3 (N.D. Ill. Dec. 18, 2001) (citing *Stafford v. Puro,* 63 F.3d 1436, 1443 (7th Cir. 1995); *Morrow v. L.A. Goldschmidt,* 112 Ill.2d 87 (1986); *Maere v. Churchill,* (452 N.E.2d 694) (Ill. App. Ct. 3d Dist. 1983)).

Here, Hammer alleges the following damages beyond emotional damages as a result of RCS's breach: "illegal fees, charges, interest, damage to her credit report, being denied credit . . . physical illness and injury, and the loss of funds that RCS misapplied to Hammer's account." R. 1 ¶ 121. These allegations demonstrate damages recoverable under a breach of contract claim and are thus sufficiently pled to withstand RCS's motion to dismiss. *See Fletcher v. OneWest Bank, FSB,* 798 F.

19

Supp. 2d 925, 932 (N.D. Ill. 2011) (concluding that, under Illinois law, the plaintiff had "alleged damages for her breach of contract claim" by asserting "damages in the form of fees, charges, accrued interest, and damage to her credit reports "); *see also Russo v. Bank of Am., N.A.,* No. 14 CV 382, 2014 WL 3811116, at *8 (N.D. Ill. Aug. 1, 2014) (finding lost credit opportunities cognizable injuries to support a breach-of-contract claim under Illinois law).

Accordingly, RCS's motion to dismiss Hammer's breach of contract claim is denied.

## II.    Count II—Fair Debt Collection Practices Act Claims

In Count II of her complaint, Hammer alleges that RCS violates the FDCPA, 15 U.S.C. §§ 1692d-g and 1692k. Hammer's FDCPA claims are premised on RCS's "debt collection efforts, by misrepresenting the debt's status, the amount owed, and by failing to verify the debt in response to Hammer's dispute letters." R. 1 ¶ 127. RCS contends that Count II is time-barred.[13] 15 U.S.C. § 1692k(d) requires an action seeking to enforce liability under the FDCPA to be brought "within one year from the date on which the violation occurs."

Hammer argues that she alleges FDCPA violations within the statute of limitations, pointing specifically to the following:

---

[13] "[W]here . . . the expiration of the statute of limitations is clear from the face of the complaint, the plaintiff must plead in the complaint any exceptions to the application of the statute of limitations upon which the plaintiff relied in bringing her case. *Thomas v. Ocwen Fed. Bank FSB,* No. 01 C 4249, 2002 WL 99737, at *3 (N.D. Ill. Jan. 25, 2002) (citing *See Theriot, III v. Captain James Sprinkle, Inc.,* 30 F.3d 136 (7th Cir. 1994)).

"(a) mismanagement of the loan account (Compl. ¶ 128); (b) perpetual disregard for the loan modification (*Id.* ¶ 129); (c) misrepresenting the status of the debt (*Id.* ¶¶ 130-34); (d) failing to respond to Hammer's disputes and reporting to credit bureaus during the dispute period (*Id.* ¶¶ 135-38, 142); (e) continuing to prosecute a wrongful foreclosure action without verifying the debt (*Id.* ¶ 145) . . . and cashed Hammer's September 2012 payment . . . and later claimed, deceptively, that no loan modification existed. (Compl. ¶ 111.)

R. 31 at 11. The paragraphs Hammer references cite to 15 U.S.C. §§ 1692d-f and 1692g(b).[14] To determine "the date on which the violation occurs," and thus the starting point for the statute of limitations on these claims, the Court looks to the specific violations Hammer alleges against RCS under the specific sections of the FDCPA. *Typpi v. PNC Bank, Nat'l Ass'n*, No. 13 CV 3930, 2014 WL 296035, at *4 (N.D. Ill. Jan. 27, 2014); *Jones v. U.S. Bank Nat. Ass'n*, No. 10 C 0008, 2011 WL 814901 (N.D. Ill. Feb. 25, 2011).

### A. § 1692d

Section 1692d prohibits debt collectors from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Hammer claims that RCS violated this section when it "engaged in abusive and oppressive conduct through unethical mismanagement of the account and treatment of Hammer's repeated disputes and inquiries over a period spanning a year and a half and two

---

[14] Hammer does not reference her claims alleging a violation of § 1692g(a) (in paragraphs 140 and 141 of the complaint) or 1692k(c) (in paragraph 146 of the complaint) as being within the statute of limitations. Presumably, she asserts that these claims should be considered under her theory of tolling based on fraudulent concealment.

(2) separate foreclosure cases" and "through its perpetual disregard for the loan modification and Hammer's timely payments." R. 1 ¶¶ 128-29.

The only acts with precise dates that Hammer references in Count II of her complaint for a violation of section 1692d are the two foreclosure actions, the first of which FDIC/AmTrust filed on September 9, 2009, and the second of which RCS filed on September 16, 2011. Those alleged violations occurred well before the one-year statute of limitations, requiring an action to accrue after September 6, 2012. The Court cannot precisely identify RCS's remaining conduct that Hammer alleges to have violated FDCPA under § 1692d due to her generalized allegations in this count. However, to the extent Hammer puts forth facts to support a continuing violation and an ongoing, continuous pattern and course of conduct, that argument fails. *See, e.g., Hill v. Wells Fargo Bank, N.A.,* 946 F. Supp. 2d 817, 825 (N.D. Ill. 2013) (rejecting outright a plaintiff's reliance on the continuing violation doctrine in an FDCPA case); *see also Lockhart v. HSBC Finance Corp.*, No. 13 C 9323, 2014 WL 3811002, at *10-11 (N.D. Ill. Aug. 1, 2014) (citing *Hill* and noting that "[t]he purpose of the continuing violation doctrine is not to reset the statute of limitations every time an individual act occurs"). Because the identifiable violations occurred well before the one-year statute of limitations, Hammer cannot maintain her claim against RCS for a violation of 15 U.S.C. § 1692d as pled.

### B. § 1692g(b)

Section 1692g(b) states, in relevant part, that when a consumer timely notifies a debt collector in writing that a debt is disputed, "the debt collector shall

cease collection of the debt . . . until the debt collector obtains verification of the debt or a copy of a judgment . . . and a copy of such verification or judgment ... is mailed to the consumer by the debt collector." 15 U.S.C. § 1692g(b). "Because the FDCPA bars any debt collection activity until verification, a cause of action under Section 1692g(b) accrues when the debt is pursued prior to verification." *Typpi,* 2014 WL 296035, at *4 (citing *Jones v. U.S. Bank Nat. Ass'n*, No. 10 C 0008, 2011 WL 814901, at *4 (N.D. Ill. Feb. 25, 2011)). "Where an [alleged] FDCPA violation arises out of a collections lawsuit, the Seventh Circuit has not decided when the FDCPA's statute of limitations begins to run, though the circuit courts that have ruled on the issue agree that the clock starts when the allegedly wrongful litigation begins." *Judy v. Blatt, Hasenmiller, Leibsker & Moore LLC,* No. 09 C 1226, 2010 WL 431484, at *3 (N.D. Ill. Jan. 29, 2010) (citing *Johnson v. Riddle,* 305 F.3d 1107, 1113 (10th Cir. 2002); *Naas v. Stolman,* 130 F.3d 892, 893 (9th Cir. 1997)).

Hammer asserts that she disputed her debt through an October 28, 2011 Fair Debt Dispute Letter and that RCS has nonetheless continued to prosecute the Foreclosure Case # 2, which it commenced on September 16, 2011, without verifying the underlying debt. Hammer's cause of action arising under 1692g(b) accrued when RCS commenced the debt collection through the foreclosure case prior to verification, well before the one-year statute of limitations which ran out on September 16, 2012. Therefore, Hammer's claim under 1692g(b) does not survive the motion to dismiss.

### C. §§ 1692e-f

Hammer also asserts that RCS violated 15 U.S.C. §§ 1692e and 1692f. Hammer alleges that RCS violated these sections by "lumping the attorney fees, unauthorized fees and costs, and costs to repay force-placed insurance in with the principal debt obligation," R. 1 ¶ 138, and "by including escrow overdraft charges and improper corporate advances (from the force-placed insurance) in its dunning letters, acceleration notices, restatement letters, and payoff letters sent to Hammer." *Id.* ¶ 139. Section 1692e states that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692f prohibits using "unfair or unconscionable means to collect or attempt to collect any debt." § 1692f.

The accrual of these claims, as pled, occurred before the September 6, 2012 limitations date. According to Hammer's complaint, RCS first assessed unexplained fees on Hammer's account on September 14, 2010, R. 1 ¶ 53, and assessed attorney's fees and escrow payment charges as early as May 12, 2011, in response to Hammer's request for reinstatement figures. R. 1 ¶ 77. As early as December 3, 2010, RCS notified Hammer that it had secured force-placed insurance on her behalf. R. 1 ¶ 63. Thus, the clock began to run on these claims in 2010 and 2011, so they are time-barred.[15]

---

[15] Hammer also argues that RCS violated section 1692e in its attempt to collect the subject debt by way of foreclosure, perpetually declaring the subject loan in default, illegally force-placing insurance, and establishing an escrow account. R. 1 ¶ 134. The accrual of that claim, too, occurred prior to the statute of limitations for the

Hammer also alleges that RCS violated subsections e(2),(5), and (8) of the FDCPA. Section e(5) prohibits "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. §1692e(5). Hammer's claim under section e(5) is based on RCS continuing its pursuit of the foreclosure cases. Assuming the pursuit of the foreclosures is actionable, they were commenced in 2009 and 2011, respectively, barring Hammer's claim under section e(5) as well.

Hammer's claims under section 1692e(2) and (8) also cannot withstand RCS's statute of limitations argument. Section e(2) prohibits false representation of "the character, amount, or legal status of any debt; or . . . any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt." § 1692e(2). Section e(8) prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." § 1692e(8). Hammer alleges that RCS violated section e(2) by misrepresenting the collectable status of the debt, R. 1 ¶ 131, and violated section e(8) by reporting false information regarding the loan to credit bureaus.

It is unclear from the face of Hammer's complaint when these activities first took place. However, there is no indication in the complaint that these activities first took place on or after September 6, 2012, which would be within the statute of limitations. In terms of activity alleged after September 6, 2012 that might fall under the category of "misrepresenting the collectable status of her debt," Hammer

reasons stated with regard to when Hammer became aware of the escrow account, foreclosure actions, and force-placed insurance.

asserts that RCS sent her letters on September 19 and October 5, 2012 regarding her insurance policy stating that she was required to increase her policy coverage due to her loan balance. R. 1 ¶¶ 112-13. However, Hammer first received a letter from RCS about her alleged lack of insurance on December 3, 2010, R. 1 ¶ 63, long before the September 6, 2012 date. Additionally, Hammer does not allege that RCS reported information regarding the loan to credit bureaus on or after September 6, 2012. Thus, the clock on these claims—if they materialized at all—began to run prior to September 6, 2012. All of Hammer's FDCPA claims are barred by the statute of limitations.

### D. Statute of Limitations Tolling

Hammer contends the statute of limitations should be tolled for her FDCPA claims prior to September 6, 2012, because RCS engaged in fraudulent concealment which prevented her from timely filing suit. In response, RCS argues that Hammer fails to plead fraudulent concealment with specificity as required under Federal Rule of Civil Procedure 9(b) because she fails to explain how RCS's alleged fraud prevented her from timely discovering the basis of her claims.[16]

"Equitable estoppel, a subset of which is fraudulent concealment, applies when the plaintiff shows that the defendant misled him or took active steps to

---

[16] RCS raises the issue of equitable tolling, but that is distinct from fraudulent concealment. *Olszewski v. Quicken Loans Inc.,* 12 CV 3131, 2013 WL 317060, at *2 (N.D. Ill. Jan. 28, 2013) ("Equitable tolling is frequently confused with fraudulent concealment, a subset of equitable estoppel . . . [h]owever, the Seventh Circuit has clearly held that equitable tolling and fraudulent concealment are two separate doctrines" (citing *Shropshear v. Corp. Counsel of Chi.,* 275 F.3d 593, 595 (7th Cir. 2001); *Asher v. Chase Bank United States, N.A.,* 310 Fed. Appx. 912, 917 (7th Cir. 2009))).

prevent him from filing suit before the statutory period expired." *Asher v. Chase Bank USA, N.A.,* 310 Fed. Appx 912, 917 (7th Cir. 2009) (citing *Smith v. Potter,* 445 F.3d 1000, 1010 (7th Cir. 2006); *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450-51 (7th Cir. 1990)). The "doctrine contemplates that the plaintiff has discovered, or . . . should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *Hentosh v. Herman M. Finch Univ. of Health Sci./The Chi. Med. Sch.,* 167 F.3d 1170, 1174 (7th Cir. 1999) (citations and quotation marks omitted). The alleged acts of fraudulent concealment must constitute more than a failure to disclose the alleged initial fraudulent conduct. *Arriaga v. Wells Fargo Bank, N.A.,* No. 09 C 2115, 2011 WL 4738522, at *3 (N.D. Ill. Sept. 30, 2011) (citing *Sharp v. United Airlines, Inc.,* 236 F.3d 368, 372 (7th Cir. 2001)). Courts should apply equitable estoppel "sparingly." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002).

In the context of tolling, "[a] plaintiff must plead with Rule 9(b) particularity the specific conduct of the defendant that entitles the plaintiff to toll the limitations period for fraudulent concealment." *Arriaga,* 2011 WL 4738522, at *4 (citing *Whitley v. Taylor Bean & Whitacker Mortg. Corp.,* 607 F. Supp. 2d 885, 900 (N.D. Ill. 2009)). "A complaint should distinctly state what the discovered fraud actually was and when the plaintiff discovered it, so that the Court may evaluate whether he could have discovered it through the exercise of due diligence." *Greer v. Bank One*, No. 01 C 7352, 2002 WL 1732366, at *3 (N.D. Ill. July 25, 2002), *aff'd sub nom. Greer v.*

27

*Cnty. of Cook, IL*, 54 Fed. Appx. 232 (7th Cir. 2002) (citations omitted). A plaintiff must state "'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 668 (7th Cir. 2008) (quoting *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir. 1997)).

Hammer's allegations in the complaint fall short of the standard to state a plausible claim for tolling based on fraudulent concealment. Hammer contends:

> RCS employed a perpetual tactic of supplying conflicting information that left an elderly widow in a state of confusion. RCS provided Hammer three conflicting reinstatement letters in a 90[-]day period, provided conflicting information in response to all of her disputes leading up the instant lawsuit, and misrepresented the status of her own loan, or its willingness to honor the contractual terms or Judge Gibson's orders.

R. 31 at 12. Hammer fails to allege with the required specificity how RCS's conduct and the content of its misrepresentations prevented her from discovering her cause of action. She also fails to allege how RCS's fraudulent concealment goes "above and beyond" the wrongdoing upon which her claim is founded and further fails to allege when she actually discovered the fraud so the Court may evaluate whether she could have discovered it through the exercise of due diligence. Therefore, the FDCPA claims are not tolled and Hammer's FDCPA claims are dismissed with prejudice.

### III.    Count III—Illinois Consumer Fraud Act

Hammer alleges that RCS violated the ICFA by engaging in unfair and deceptive acts. RCS argues that Hammer's ICFA claim should be dismissed for the following reasons: (1) Hammer fails to plead proximate cause and actual damages with specificity; (2) the foreclosure actions are not governed by the ICFA; and (3) some of Hammer's allegations are time-barred. R. 30 at 7. In response, Hammer argues that her allegations meet the corresponding standards for both her fraud and unfair practice claims.

"To state a cause of action under the ICFA, five elements must be proven: (1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Wiegel v. Stork Craft Mfg., Inc.,* 780 F. Supp. 2d 691, 693 (N.D. Ill. 2011) (citing *Dubey v. Public Storage, Inc.,* 918 N.E.2d 265, 277 (Ill. App. Ct. 5th Dist. 2009)). For claims of fraud under the ICFA, the sufficiency of a complaint is analyzed under the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 446–47 (7th Cir. 2011).

Hammer does not respond directly to each of RCS's arguments, though she does argue that the heightened standard does not apply to her unfair practice claims under the ICFA. R. 31 at 12. Hammer contends that her allegations of force-

placed insurance and illegal fees are sufficient to state an ICFA claim for unfair practices under *Typpi*. She argues that "when taken as a whole over several years, RCS's conduct was so unethical and unending, that Hammer had no choice but to submit." R. 31 at 13. RCS responds that Hammer's complaint in fact alleges fraud and misrepresentations, not an unfair practice.

Courts interpreting the meaning of "unfair practice" have held that a plaintiff states a claim under the ICFA where the defendant's conduct "gave plaintiff no reasonable alternative to avoid a charge or penalty." *Typpi,* 2014 WL 296035, at *8 (citing *Hill v. PS Ill. Trust,* 856 N.E.2d 560, 569) (Ill. App. Ct. 1st Dist. 2006) (additional citations omitted)). To evaluate whether a business practice is unfair, a court must look to: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 961 (Ill. 2002). "Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of "Rule" 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal,* 536 F.3d at 670.

In response to RCS's motion to dismiss, Hammer identifies as unfair practices RCS's force-placed insurance and illegal fees. R. 31 at 13. However, in her complaint, Hammer asserts that "RCS committed a deceptive act or practice by force-placing insurance multiple times and by assessing fees and costs that

Hammer did not owe," R. 1 ¶ 153, making no reference to the force-placed insurance and related fees being a basis for unfair as opposed to deceptive conduct. This indicates that Hammer's deceptive practices claim—not her unfair practices claim—relies on the force-placed insurance and related fees.

To the extent Hammer relies on additional allegations to support her unfair and deceptive practice claims under the ICFA, it is difficult to sort out what Hammer is pleading as violations of the ICFA. Hammer's complaint is unclear about which facts go to unfair practices, requiring conformance to Rule 8, and which facts go to fraud and deceptive practices, requiring conformance to Rule 9(b). For example, Hammer's complaint alleges that RCS "engag[ed] in unfair and deceptive acts or practices by using fraud, deception, and misrepresentation in its attempt to collect a superseded debt, . . . RCS's communications to Hammer were confusing, deceptive, and unfair as Hammer was attempting to resolve any discrepancies in good faith [and] . . . [t]he misrepresentations, deception, and unfair practices complained of occurred in the course of conduct involving trade or commerce" *Id.* ¶¶ 149, 155, 157. Hammer's broad allegations of deception raise "the very concerns that Rule 9(b) seeks to protect in requiring particularity." *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Trust v. Walgreen Co.*, No. 09 C 2046, 2010 WL 624709, at *7 (N.D. Ill. Feb. 18, 2010) *aff'd*, 631 F.3d 436 (7th Cir. 2011) (noting that "a principle purpose of requiring fraud be pleaded with particularity is . . . to protect individuals and businesses from privileged libel" and "if adding an allegation of 'unfairness' to every allegation of fraud required a fall-back to a more relaxed

pleading standard under Rule 8(a), then all consumer fraud cases would be pleaded with these words and be subject to the less stringent standard") (citing *Kennedy v. Venrock Assoc.*, 348 F.3d 584, 594 (7th Cir. 2003)). For that reason, both Hammer's unfair practice and fraud claims under the ICFA are dismissed without prejudice. Hammer may, however, replead her ICFA claims. *See Vangsness v. Deutsche Bank Nat'l. Trust Co.*, No. 12 C 50003, 2012 WL 5989354, at *5 (N.D. Ill. Nov. 29, 2012) (instructing plaintiff to replead ICFA claims for fraud and deception in separate counts from unfair conduct) (citing *In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation*, 491 F.3d 638, 641 (7th Cir. 2007)).

If Hammer chooses to replead, she must specifically set out her unfair practices claims under the ICFA in a separate count from her deceptive practice claims (meeting the requirements of Rule 9(b)) under the ICFA. In each count, Hammer should set out the facts alleged to be in support of the claims in that particular count rather than incorporating facts by reference.

### IV.    COUNT IV—RESPA Claim

RCS argues that Hammer's RESPA claim should be dismissed because Hammer's loan fell into default in August 2009, which meant that after that point (and before transfer to RCS) the loan was no longer being serviced and no servicing rights existed to be assigned, sold, or transferred under 12 U.S.C. 2605(i)(3). R. 30 at 10. Hammer responds that her entire complaint is based on the premise that the

loan has not been in default since Hammer accepted a loan modification in July 2010.[17]

"RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans." *Catalan v. GMAC Mortg. Corp.,* 629 F.3d 676, 680 (7th Cir. 2011). RESPA places a duty on loan servicers to respond to borrower inquiries. 12 U.S.C. § 2605(e). "RESPA defines 'servicer' to mean 'the person responsible for [the] servicing of a loan', and 'servicing' to mean 'receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan [.]'" *Jones v. Wells Fargo Home Mortgage, Inc.*, No. 10 C 0008, 2014 WL 3974261 (N.D. Ill. Aug. 12, 2014) (citing 12 U.S.C. § 2605(i)(2), (i)(3)). As discussed, Hammer's breach of contract claim survives dismissal. Hammer states a plausible claim that beginning in August 2010, RCS became the servicer of her loan and was receiving payments—some of which it cashed or credited to her account—specifically those in August 2010, August 2011, and September 2012. As such, RCS plausibly received, at least on those dates, scheduled periodic payments from Hammer pursuant to the loan terms, and was responsible for servicing the loan. Thus, Hammer has pled sufficient facts to state a plausible claim that RCS was servicing her loan.

RCS directs the Court to *Daw v. Peoples Bank & Trust Co.,* 5 Fed. Appx. 504, 505 (7th Cir. 2001) and *Sanchez v. Onewest Bank, FSB,* 2013 WL 139870, at *3

---

[17] On reply, RCS first argues that any alleged conduct prior to September 6, 2012 is also time barred by RESPA's one-year statute of limitations. However, RCS failed to raise this argument in its opening brief. As a result, it is waived. *Amerson v. Farrey,* 492 F.3d 848, 852 (7th Cir. 2007).

(N.D. Ill. Jan. 10, 2013) to argue that RCS was not servicing the loan and was not a servicer because Hammer's loans had already gone into default and a foreclosure complaint had been filed against her when RCS took over her loan. This contention is not persuasive. The facts in *Daw* and *Sanchez* are distinguishable from those here. In *Daw,* which was before the court on summary judgment, plaintiff's loan servicer assigned the mortgage to the guarantors of the debt—plaintiff's parents—after they paid off the defaulted loan. 5 Fed. Appx. at 504. The plaintiff alleged under RESPA Section 2605(b) that she had not been notified of the assignment, sale, or transfer of the servicing of the loan to her parents after she defaulted. *Id.* at 506. The court found that there were no servicing rights to assign, sell, or transfer once Daw defaulted as there were no longer any scheduled periodic payments to make or collect. *Id.* However, unlike in this case, there was no allegation in *Daw* that the lender continued to act as a servicer of the loan, through its acceptance of payments or otherwise. Thus, although Hammer defaulted on her loan, she alleges that a loan modification agreement was subsequently put in place and that she continued to make payments according to that agreement, some of which RCS accepted. The allegations that RCS serviced her loan therefore distinguish her case from *Daw*.

Similarly, *Sanchez* did not address the status of a servicer under RESPA where a plaintiff, like Hammer, claimed that the servicer continued to collect payments after the default. In *Sanchez*, plaintiff defaulted, the servicer initiated foreclosure proceedings, and the Cook County Circuit Court entered a foreclosure

judgment against the plaintiff in the underlying case. *Sanchez*, 2013 WL 139870, at *2. After the foreclosure judgment was entered, the plaintiff sent the servicer a letter it labeled a QWR under RESPA, requesting information relating to the loan history. *Id.* The servicer responded, noting that it was no longer servicing the account as an active mortgage loan and could not provide the information requested. *Id.* The property at issue in *Sanchez* was already in foreclosure and had been sold pursuant to a judicial sale three weeks prior to the plaintiffs' letter on which it based its RESPA claims. *Id.* at *3. The court did not address, however, whether the outcome would have been the same if the plaintiffs had continued to make payments after defaulting or the loan servicers had continued to accept those payments. In this case, Hammer's allegations are enough to state a plausible claim that RCS was servicing the loan, so the Court rejects RCS's argument that her RESPA claim should be dismissed on that ground.

Moreover, while RCS argues that no rights existed to be serviced after plaintiff's default in August 2009, documents Hammer received belie that argument. Hammer alleged that the RESPA notice she received from RCS on July 23, 2010, was entitled "Notice of Assignment, Sale, or Transfer of *Servicing* Rights" R. 1 ¶ 43 (emphasis added). The notice stated, "[E]ffective 8/1/2010, your previous loan servicer, AmTrust Bank, will no longer accept payments for your loan. Beginning 8/1/2010 please make your payments to RCS . . . ." R. 1 ¶ 43. The letter also advised Hammer of her right to send a RESPA QWR dispute within 60 days. *Id.* The letter accompanying the modification agreement stated that it would "bring

[her] loan current by capitalizing the amount that [she was] currently behind over the life of the loan" and that the representative was "pleased" to be able "to work with [Hammer] in bringing [her] loan current to avoid [her] home going into foreclosure." R. 1-1 at 2. This language supports a plausible claim that Hammer's loan was no longer in default as it was being brought current, her loan was being serviced, and RCS would be the servicer of the loan effective August 1, 2010. Thus, Hammer has alleged facts to plausibly suggest that RCS was servicing the loan after her August 2009 default and the initiation of Foreclosure Case # 1 on September 9, 2009. As a result, RCS's motion to dismiss Hammer's RESPA claim is denied.

## CONCLUSION

Hammer has pled sufficient factual allegations to survive RCS's motion to dismiss her claims for breach of contract and violation of RESPA. The Court grants RCS's motion to dismiss Hammer's FDCPA claims with prejudice and grants the motion to dismiss Hammer's ICFA claim without prejudice and with leave to replead.

ENTERED:

_Thomas M Durkin_

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: September 11, 2014

36