**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALENA W. HAMMER, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No.: 13 C 6397 |
| RESIDENTIAL CREDIT SOLUTIONS, | ) | |
| INC., | ) | Judge Durkin |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR REMITTITUR**

Defendant, Residential Credit Solutions ("RCS"), by and through its attorneys, David M. Schultz, James M. Lydon, John P. Ryan, and Palak N. Shah, moves pursuant to Fed.Civ.Pro. Rule 59 for Remittitur, in the alternative of its motion for judgment as a matter of law. And in support of its motion RCS states as follows:

## I. Introduction

Alena Hammer presented evidence of less than $5,000 in alleged economic loss, but yet, she received a total verdict of $2 million, which is more than 400 times that amount. This also means that over $495,000 of Hammer's compensatory award is based upon alleged emotional distress damages. Moreover, the jury awarded Plaintiff $1,500,000 in punitive damages, based in part on the excessive award of compensatory damages.

The jury's awards are subject to remittitur because the awards are nothing more than "a product of passion and prejudice." For example, in Plaintiff's opening statement, over RCS' objection, and in violation of Defendant's Motion in Limine no. 1, Plaintiff's counsel essentially asked the jury to "send a message" to corporate America. *See* Trans. at 203, lines 13-15 ("And what happens in this case will have much to say about how mortgage companies feel they can treat consumers in the greater Chicago area."). Additionally, the awards were improperly issued because, as discussed in the separately filed motion for new trial, the jury was *prevented* from

hearing certain evidence which, in fairness, would have demonstrated that RCS was not an uncaring corporate behemoth. In particular, the jury should have been informed that RCS attempted to settle this matter (twice) with Plaintiff and that Plaintiff rejected RCS' offers.

Because the damage award was well beyond anything reasonably supported by the evidence, it should be substantially reduced, or a new trial should be required.

## II. Standard of Review

A jury award must be set aside or reduced if it is not supported by the evidence. *See, e.g.*, *Avitia v. City of Chicago*, 49 F.3d 1219, 1229 (7th Cir. 1995). "Judges and juries must not be casual with other people's money." *Id*. The Seventh Circuit Court of Appeals "take[s] seriously the responsibility of an appellate court to review the sufficiency of the evidence to support the award of damages." *Id*. If a damages award is not rationally connected to the evidence, a court can order a remittitur, if the plaintiff is willing to accept it, or a new trial if the plaintiff is unwilling to accept the reduced award." *International Fin. Servs. Corp v. Chromas Technolgies Canada, Inc.*, 356 F.3d 731, 739 (7th Cir. 2004).

When reviewing a jury award, the district court should consider "(1) whether the award is 'monstrously excessive'; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is comparable to those in similar cases." *Marion County Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 930-31 (7th Cir. 2010); *see also Matter of Innovative Constr. Sys., Inc.*, 793 F.2d 875, 887 (7th Cir. 1986). Applying the second factor, courts look at whether a jury award "is merely a product of the jury's fevered imaginings or personal vendettas." *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006). In order to ensure the fairness of the judicial process and to avoid retribution against defendants, "damages must be proportioned to injury, so that the slighter the injury the smaller

must be the award of damages." *Avitia*, 49 F.3d at 1229. Even where there is considerable testimony from a plaintiff to demonstrate "a rational connection between" the defendant's conduct and the plaintiff's alleged suffering, courts may still reduce jury awards. *Schandelmeir-Bartels vs. Chicago Bark Dist.*, 634 F.3d 372, 389 (7th Cir. 2011).

## III. Argument in Support of Remittitur

### A. Plaintiff's Award of $500,000 in Compensatory Damages is Excessive

Against this backdrop, Plaintiff's award of $500,000 in compensatory damages far exceeds any reasonable recovery. Plaintiff's recovery is a combination of "hard" and "soft" damages. The "hard" damages are made up of postage fees and attorney's fees, which amount to less than $5,000 in damages. The remaining $495,000 in "soft" damages is attributable to a claim of mental distress. The Court should grant a new trial on damages or this aspect of her compensatory damages should be reduced because her award far exceeds the awards identified in the below cases.

The Seventh Circuit and other court within this District have aggressively reduced damages awards found to be excessive even where those awards are less, and the factual scenarios are more egregious than here. For example, in *Marion County*, the Seventh Circuit reduced a $200,000.00 award for compensatory damages to $20,000.00, even though the case involved a plaintiff who suffered racial discrimination, lost his job and as a result "had weekly therapy sessions for several months for situational depression." *Marion County*, 612 F.3d at 931. The court reduced the award despite the complainant's testimony that he "had undergone weekly therapy sessions for several months for situational depression." *Id*. at 931 (internal punctuation marks omitted). The court determined that even the facts of that case—where plaintiff was fired

because of his skin color and in retaliation for his internal complaints—were not "so extraordinary as to warrant such an award [of $200,000]." *Id*.

Similarly, the Seventh Circuit concluded in *Avitia*, that an emotional distress award of $21,000 was excessive for a plaintiff, who suffered retaliatory discharge and received $45,000 in back pay. *Avitia*, 49 F.3d at 1228. The plaintiff testified that being fired after thirteen years of working for the defendant made him feel like he "was thrown like a piece of paper, piece of garbage at the end." *Avitia*, 49 F.3d at 1227. The Seventh Circuit found $21,000 too much for emotional distress damages, even though it acknowledged that it was not "implausible that [the plaintiff] should have been deeply upset at losing a job he had held for so many years; but the deep upset had to be proved, and was not." *Id*. at 1230. The Seventh Circuit expressed concern as to how even an award of only $21,000 would impact future cases. *Id*. at 1229 (if the $21,000.00 award were sustained, "plaintiffs in subsequent cases of retaliatory discharge [would] be sure to include a passage of testimony – always moving and often as a practical matter irrefutable – modeled on [the plaintiff's]"). As a result, the court concluded that "a remittitur to $10,500.00 in damages for emotional distress (half the award) [was] necessary to keep the award of these damages within the limits of the rational." *Id*. at 1230; *See also*, *Schandelmeier v. Chicago Park District*, 634 F.3d 372, 388-89 (7th Cir. 2015) (reducing $200,000 in compensatory damages to $50,000 where the court held that a Caucasian's employee's unlawful termination and suffering from the result of two "racist tirade[s]" did not support the jury's award).

Here, Hammer's claimed emotional distress is certainly less significant than the plaintiffs in the cases described above, who lost their jobs, and many of whom were the victims of racial discrimination.

Additionally, any plaintiff claiming emotional distress in the context of a consumer claim must support his or her claim for damages with objective, corroborating evidence of actual emotional distress and a resultant injury. *Sarver v. Experian Information Solutions*, 390 F.3d 969, 971 (7th Cir. 2004). The Seventh Circuit has "maintained a strict standard for a finding of emotional damage 'because they are so easy to manufacture.'" *Id*. *See also, David v. Caterpillar, Inc*., 324 F.3d 851, 864 (7th Cir. 2003) (upholding district court's reduction of compensatory damage award from $100,000 to $50,000 where the plaintiff became depressed, angry, and humiliated following co-worker's retaliatory promotion, and suffered from stomachaches and difficulty sleeping).

Courts applying this standard often award summary judgment *in favor of defendants* notwithstanding evidence of alleged emotional distress.[1] Here, the evidence does not support an award of almost $500,000 in alleged emotional distress and resultant declining health.[2]

---

[1] For example, in *Bagby v. Experian Info. Solutions, Inc.*, 162 Fed. Appx. 600, 604–605 (7th Cir. 2006), the court granted summary judgment to a defendant in a FRCA claim where the consumer's allegations as to stress, tension headaches, and clashes with his fiancé over credit problems and the consumer did not seek medical or psychological treatment for the alleged emotional distress. Similarly, the court in *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 833 (7th Cir. 2004) granted summary judgment in an FRCA claim to a defendant where the consumer claimed that he was humiliated every time he was rejected for credit, was distressed when dealing with credit reporting agencies and embarrassed to have him check his credit. The court in *Wantz* specifically found that the plaintiff's testimony that he was "humiliated and embarrassed" and that dealing with credit reporting agencies was "mentally and emotionally distressful" to him did not render the case into "one of the few cases in which the facts are so inherently degrading that a jury could infer the existence of emotional distress." *Id*. at 834. The court in *Bassett v. I.C. System, Inc*., 715 F.Supp.2d 803, 812 (N.D. Ill. 2010) granted summary judgment to a defendant where the plaintiff had claimed that repeated debt collection calls had subject him to "an environment where he feels abused or harassed" which in turn provoked and agitated his bipolar disorder, and led him to contact a nurse to inquire about increasing his medication during the relevant time period. According to the court, "[a]ssuming these facts as true, Bassett has failed to present evidence supporting a genuine issue of material fact for trial regarding his emotional distress damages because his conclusory statements fail to contain sufficient detail to overcome the Seventh Circuit's strict standard in proving emotional damages." *Id*. *See also, Perry v. Experian Info. Solutions, Inc*., 2005 WL 2861078, *9 (N.D. Ill. Oct. 28, 2005) (granting summary judgment in an FRCA claim to a defendant where the consumer testified that a debt collector's conducted caused her to cry, become anxious, depressed, sleepless, and fear for her marriage); *Thomas vs. Boscia*, 2009 Wl 2778105, *4 (S.D. Ill. 2009) (holding, in a Fair Debt Collection Practices Act ("FDCPA") claim, "[t]here is no evidence indicating that mental health treatment was required . . . there is nothing to suggest that the actions taken in this case were unusual, nor is there any- thing to indicate that they were inherently degrading from which emotional damages might be inferred."); *Tallon v. Lloyd & McDaniel*, 497 F. Supp. 2d 847, 850 (W.D. Ky. 2007) (granting summary judgment to a defendant in a FDCPA

Against this backdrop, Plaintiff's compensatory award far exceeds the typical verdicts awarded to consumer-rights plaintiffs, who typically receive $10,000 or less in damages in damages in cases involving alleged improper debt collection activity involving the Fair Debt Collection Practices Act. *See*, *e.g.*, *Gilmore v. Account Mgmt*, *Inc.*, 2009 WL 2848278, at *9 (N.D. Ga. Apr. 27, 2009) ($10,000 for stress and suffering which led to chest pains, and ultimately resulted in plaintiff having to undergo open heart surgery); *Chiverton v. Fed. Fin. Group, Inc.*, 399 F. Supp. 2d 96, 102 (D. Conn. 2005) ($5,000 where plaintiff suffered anxiety, stress and frustration, was unnerved and irritated by the defendant's conduct, and was made to fear for his job and a possible promotion); *Berry v. Nat'l Fin. Sys., Inc.*, 2009 WL 2843260, at *3 (W.D. N.Y. Aug. 27, 2009) ($3,000 where plaintiff was "highly disturbed" and "disgusted," and lost sleep and felt fearful whenever he heard the telephone ring; his wife cried and lost her hair; and communications between them were rendered "difficult"); *Jenkins v. E. Asset Mgmt., LLC*, 2009 WL 2488029, at *3 (E.D. Mo. Aug. 12, 2009) ($2,000 for plaintiff who was "intimidated and disturbed," upset, and "afraid" of "getting in trouble" at work, who "cried for several days," had "very bad headaches," "felt helpless," and was made to feel "worthless and ashamed").

Further, Plaintiff's claim for damages was unfairly exacerbated by the fact that RCS was not allowed to present evidence regarding its attempts to offer Plaintiff a new loan modification which would have brought her loan current ended the foreclosure action. *See* RCS' motion for new trial p. 2-4. Plaintiff rejected each proposal and instead chose to continue with the foreclosure action, which she alleges was the source of her emotional distress. *See also Whittler*

---

claim where the consumer testified that his experience was extremely stressful, embarrassing, and humiliating for him, that he was anxious and that he had experienced loss of sleep and appetite).

[2] Plaintiff's treating cardiologist, Dr. Hasanain, provided conclusory opinions at a deposition, which was never meant to be presented at trial. *See* RCS' motion for new trial at p. 4-14. Allowing Dr. Hasanain to provide his conclusory and unsupported opinions severely prejudiced RCS because the jury used his unqualified testimony to award Plaintiff a substantial amount of damages.

*v. Midland Funding, LLC*, 2015 WL 3407324, *3 (N.D.Ill. May 27, 2015) (to the extent that plaintiff's ICFA claim is based upon the wrongful filing of a lawsuit, her claim is dismissed because Illinois limits a plaintiff to malicious prosecution or abuse of process claims for the wrongful filing of a lawsuit); *Witbrod v. Blitt and Gaines, P.C.*, 2015 WL 1996803, *3 (N.D.Ill. April 29, 2015) (same).

For the reasons set forth above, this Court should substantially reduce Plaintiff's claim for compensatory damages or grant a new trial on the issue of damages.

**B. Alternatively, Plaintiff's Recovery Should Be Reduced Because It Was the Result of Passion and Prejudice**

Alternatively, Plaintiff's recovery should be reduced because her overall award of $2,000,000 was "a product of passion and prejudice," fueled by Plaintiff's counsel's passionate tactics and theatrics, rather than a result of RCS' conduct. *Matter of Innovative*, 793 F.2d at 887. As noted below, Plaintiff's counsel came out of the gate running when he essentially argued in opening statements that the jury should "send a message" to corporate America. *See* Trial April 13, 2015, Trans. at 203, lines 13-15 ("And what happens in this case will have much to say about how mortgage companies feel they can treat consumers in the greater Chicago area."). Plaintiff's counsel's argument was contrary to the Court's prior admonitions. *See, e.g., Id*. at p. 51 ("Don't use the words 'send a message.' You can ask for punitive damages without asking -- using the phrase 'send a message.'"); p. 52, lines 4-6 ("'sending a message' almost invites the jury to ignore instructions, and that is something you can't suggest to a jury they do, either directly or indirectly."). Plaintiff's counsel concluded his opening statement by asking the jury to award $3,000,000 in punitive damages "for punishment for what RCS has done to her." *Id*. at p. 227. On the heels of that statement, Plaintiff's counsel discussed punitive damages during his opening

statement. In response, the court admonished Plaintiff's counsel from discussing punitive damages in his opening during a side bar. *Id*. at p. 210.

Other evidence and testimony (discussed below) severely prejudiced RCS and caused the jury to render a jury award with wild, brimstone and fire stoked passion rather than a rational basis. "Evidence is unfairly prejudicial, if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *See Lewis v. City of Chicago Police Dept.*, 590 F.3d 427, 441 (7th Cir. 2009).

For example, Plaintiff's counsel argued in opening statement that RCS sent men to Plaintiff's home who attempted to "force" their way into Plaintiff's home to try to find Plaintiff's deceased mother. *See* transcript, pp. 217-218. Plaintiff never identified this alleged event in her written discovery responses or at her deposition. The first time this was raised was during opening statement. There was no proof that this occurred. Further, there was no evidence that RCS could be liable for the conduct of its independent contractor that performed the property inspection. The Court even acknowledged that this conduct is "pretty dramatic." *Id*. at 306. The Court also noted Plaintiff should not be able to raise evidence such as this conduct, if it never came out during discovery. *Id*.

The Court ordered Plaintiff on January 30, 2015 to amend her responses to RCS' interrogatories in order to identify all conduct which forms the basis of her claims. Plaintiff provided RCS her amended responses to RCS' interrogatories on February 4, 2015, and still there was no mention of any one on behalf of RCS attempting to force their way into Plaintiff's home to find Plaintiff's dead mother.

Additionally, in allowing punitive damages to proceed to the jury, the Court erred by barring RCS from demonstrating that it acted in a fair and reasonable manner by offering to

settle the underlying matter with Plaintiff. *See* transcript of April 9, pp. 207-216. By precluding RCS from submitting evidence regarding its efforts to end the underlying foreclosure suit, also prevented RCS from presenting *a complete picture of the events in question*, in response to Plaintiff's claim that she suffered emotional distress from RCS continuing to prosecute the foreclosure action. *See* RCS' motion for new trial at p. 2-4.

Further, the testimony from Plaintiff's treating cardiologist, Dr. Hasanain, caused the jury to issue an award of damages based upon passion on prejudice. Dr. Hasanain should have been barred from testifying for the reasons RCS states in its motion for new trial at pages 4-14. The jury used Dr. Hasanain's testimony to enter an improper award of damages as a result of passion and prejudice. Dr. Hasanain never had to answer any questions from the jury about his treatment of Plaintiff's blood pressure, so the jury directed all of their questions about Dr. Hasanain's bald conclusions to RCS' expert. Further, RCS' counsel was prevented from performing a trial cross-examination of Dr. Hasanain to challenge his bald and unsupported conclusions (which even he himself waffled on).

**C. The Jury's Punitive Damage Award Was Erroneous and is Subject to Remittitur**

Due to their penal nature, Courts must be cautious in seeing that punitive damages are not improperly or unwisely awarded. *In re Estate of Wernick*, 127 Ill.2d 61, 83 (1989). Whether the facts of a particular case justify the imposition of punitive damages is properly one of law. *Jackson v. Bunge Corp.*, 40 F.3d 239, 247 (7th Cir. 1994). Here, the issue of punitive damages never should have been given to the jury, and the entire punitive damages award should be vacated. Alternatively, the award should be subject to a considerable remittitur.

The Illinois Supreme Court has commented on the high burden imposed upon a party seeking to plead punitive damages. "Punitive, or exemplary, damages are not awarded as

compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. Because of their penal nature, punitive damages are not favored in the law." *Loitz*, 138 Ill.2d at 414 (internal citations omitted).

The United States Supreme Court addressed the constitutionality of punitive damage awards in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). *Gore* forth three guideposts to test excessiveness: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the compensatory and punitive damages; and (3) the award's similarity to civil or criminal penalties that could be imposed for comparable misconduct. Plaintiff's award of $1.5 million is not supported under any of the three *Gore* factors.

**1. RCS' Conduct Was Not Reprehensible**

As to the first factor, the facts do not demonstrate that RCS' conduct was reprehensible. It is axiomatic that in order to be entitled to punitive damages, Plaintiff must essentially demonstrate that RCS' conduct constituted a conscious disregard for her rights under the law, an evil motive or wilful and wonton conduct that somehow "involves some element of outrage similar to that usually found in crime." *Loitz v. Remington Arms Co.*, 138 Ill.2d 404, 415-6, 563 N.E.2d 397 (1990). Willful and wanton misconduct is a more serious offense than negligence. *Bernier v. Skripek*, 86 Ill.App.2d 118, 129, 229 N.E.2d 890 (1st Dist. 1967). Wilful and wanton misconduct, is a course action that shows a deliberate intention to harm others. *Loftus v. Mingo*, 158 Ill.App.3d 733, 740, 511 N.E.2d 203 (4th Dist. 1987). According to the Illinois Supreme Court, "these damages can be awarded only for conduct for which this remedy is appropriate — which is to say, conduct involving some element of outrage similar to that usually found in crime." *Loitz*, 138 Ill.2d at 415. In summary, punitive damages involve *more* than "mere inadvertence, mistake, errors of judgment." *Id*.

Against these standards, RCS' conduct does not support an award for punitive damages, let alone an award of $1.5 million.[3] There was no evidence of wilful and wanton misconduct. First, Plaintiff put this case into motion by unilaterally attempting to modify the loan terms by changing the amount owed, and when she did so, RCS *did not act unreasonably* (let alone in a reprehensible manner) by not accepting Plaintiff's counter-offer and by sending her a new loan modification agreement. In fact, Plaintiff's own attorney (Mr. Joseph Giralamo) testified that crossing out the proposed FDIC loan modification was not his normal method of reaching a loan modification. Trial Transcript, pp. 1169-70 ("Q: Would it be your custom and practice to have your clients on a general basis alter or modify a loan modification agreement in handwriting, or would you normally request a brand new agreement? A: First we would request an updated agreement.").

Second, RCS' corporate representative, Spencer Cull, took the stand for nearly five hours of questioning by Plaintiff's counsel and repeatedly stated that RCS did not act with the intent required to prove willful and wanton misconduct. Rather, Mr. Cull testified that RCS would never needlessly threaten a consumer's home ownership. Trial Transcript, p. 333. In the beginning of his testimony, Mr. Cull stated that Plaintiff did not accept the offer extended to her from the FDIC. *Id.* at p. 359. Later, he explained that after the first foreclosure case was dismissed, RCS tried again to reach an agreement with Plaintiff. *Id.* at p. 398; 416; 417. In fact, "RCS basically updated the system to reflect the payment terms of the FDIC proposed modification." *Id.* at p. 416. Mr. Cull explained that this situation was unusual. *Id.* at p. 583. He explicitly stated that RCS did not single out Plaintiff and that this was a very different type of situation. *Id.* at p. 585. Mr. Cull explained in detail all the many issues with the proposed loan

[3] The issue of punitive damages should not have been to the jury for the reasons stated in RCS' motion for judgment as a matter of law. *See* RCS' motion for judgment as a matter of law.

modification from the FDIC when Plaintiff sent it to RCS in August 2010, including the handwritten alterations which constituted a counter offer, and that RCS would have liked to been able to use the FDIC offer. *Id.* at p. 592.

Third, Spencer Cull testified that immediately upon learning that Plaintiff thought a loan modification had been executed with the FDIC/AmTrust, when in fact it had not, RCS offered her a loan modification in September 2010 that mirrored the FDIC offer's terms. Plaintiff refused this offer. *Id*. at p. 636-37. This further bolsters the fact that RCS, in no plausible way, acted with a wilful and wanton intent toward Plaintiff.

Fourth, RCS attempted to settle the underlying matter with Plaintiff and RCS' offers were rejected. However, the jury was not allowed to hear this evidence based upon the Court's ruling on Plaintiff's Motion in Limine Nos. 3 and 4 (dkt# 136, pp. 14-16). *See* April 9, 2015 hearing trans, p. 208-210. In particular, RCS' attorneys, Codilis & Associates, offered a loan modification to Plaintiff wherein Plaintiff only had to pay the exact amount of the monthly payments that were returned. Trial Trans, pp. 666-68 (Court at p. 668 ("That which is a loan modification is -- shouldn't come in, because it's an effort to resolve the case while there's pending foreclosure litigation. So if you can redact it, great. If you can't, then you can't offer it."). Further, as set forth in RCS's response to Plaintiff's Motion in Limine No. 4 (dkt. # 141, pp. 18-19), Jack Kozar Plaintiff's former foreclosure attorney would have testified that Plaintiff rejected the settlement offer, which Judge Gibson recommended. The jury was also not allowed to hear that Plaintiff fired Mr. Kozar because he recommended that she resolve the foreclosure action based upon an offer that RCS made pursuant to Judge Gibson's recommendation. *Id. See also* Trial Trans, pp. 669. The Court also barred RCS from introducing evidence that Plaintiff fired attorney Giralmo because he recommended that she apply for a loan modification with

RCS. *See* April 9 hearing transcript at 228-29.

**2. The Punitive Damages Award Was Inflated by Improperly Awarded Compensatory Damages**

As to the second factor, while the punitive damage award is only three times the total compensatory damage award, the punitive damage award is more than 300 times the amount of Plaintiff's alleged economic loss. The emotional distress damages are extremely inflated for the reasons discussed above. Thus, the punitive damage award is excessive because the jury award of excessive compensatory damages improperly drove up the size of the award of punitive damages. *See, e.g.,Gore,* 517 U.S. at 582 ("the constitutional line is [not] marked by a simple mathematical formula.") Put another way, if the jury had not awarded $500,000 in compensatory damages based upon dubious medical testimony, it is unlikely that the jury would have award $1.5 million in punitive damages. *See* RCS' Motion for New Trial, pp. 4-14.

**3. The Award of $1.5 Million Exceeds All Other Comparable Cases**

At to the third factor, the amount in question ($1.5 million) is outside of the range of verdicts for comparable conduct. As noted above in Section III-A, courts have routinely reduced excessive compensatory damages awards where the facts to not support such high awards. Here, RCS has not been able to find a comparable case which supported the imposition of $1.5 million dollars in punitive damages. "Federal judges may, and should, insist that the award be sensible and justified by a sound theory of deterrence. Random and freakish punitive awards have no place in federal court, and intellectual discipline should be maintained." *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 625 (7th Cir. 2000).

For the reasons set forth above, the issue of punitive damages never should have been given to the jury, and the entire punitive damages award should be vacated. Alternatively, this Court should substantially reduce Plaintiff's claim for punitive damages.

WHEREFORE, for the reasons set forth above, Defendant Residential Credit Solutions prays that this Honorable Court enter an order reducing the compensatory and punitive damages awards in this case and/or granting Defendant any other relief that is equitable and just.

Respectfully submitted,

Residential Credit Solutions, Inc.

By: /s/ John P. Ryan
One of its Attorneys
John P. Ryan
HINSHAW & CULBERTSON
222 N. LaSalle Street, Ste 300
Chicago, IL 60601
(312) 704-3000
jryan@hinshawlaw.com

**CERTIFICATE OF SERVICE**

I, an attorney, hereby certify that on June 1, 2015, I electronically filed the above document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ John P. Ryan
John P. Ryan