# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ALENA W. HAMMER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 6397 |
| | ) | |
| | ) | Judge Thomas M. Durkin |
| v. | ) | |
| | ) | |
| RESIDENTIAL CREDIT SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.

## INTRODUCTION

Plaintiff Alena W. Hammer ("Hammer") filed suit against Defendant Residential Credit Solutions, Inc. ("RCS") for claims arising out of RCS's servicing of Hammer's home mortgage loan and debt collection activities. Hammer alleged claims for (1) breach of contract, (2) violations of Illinois' Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS § 505/1 *et seq.*, and (3) violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.* After a five-day trial, the jury returned a verdict in favor of Hammer on all three of her claims and awarded $500,000 in compensatory damages and $1,500,000 in punitive damages. Presently before the Court are RCS's post-trial motions for judgment as a matter of law, a new trial, and remittitur. For the reasons that follow, RCS's post-trial motions are denied.

## II.

## BACKGROUND

The following is based on the evidence introduced at trial. Hammer was approximately 63 years old when her mortgage troubles began in August 2009. AmTrust Bank ("AmTrust"), the servicer on Hammer's home mortgage loan, initiated foreclosure proceedings after she defaulted on her loan payments. But in December 2009, the foreclosure proceedings were stayed after the Federal Deposit Insurance Corporation ("FDIC") took over as receiver for AmTrust. R. 169 at 54 (Tr. Transcript 368). Thereafter, the FDIC worked with Hammer on a loan modification with the goal of lowering Hammer's monthly payments and avoiding foreclosure. In or about the last week of June 2010, the FDIC sent Hammer a written loan modification agreement ("the Loan Modification Agreement" or "Agreement") for Hammer to execute. A cover letter sent by the FDIC[1] with the Loan Modification Agreement asked Hammer to sign the Agreement and return it to AmTrust by June 25, 2010.

Hammer testified that she did not receive the FDIC's cover letter with the enclosed Loan Modification Agreement ("Loan Package") until sometime between June 25 and June 28. R. 170 at 216 (Tr. Transcript 708). Upon receipt of the Loan Package, Hammer saw that the FDIC had charged her $2,303.60 in fees and costs,

---

[1] On its face the cover letter reflects that it was sent by the "Loss Mitigation Department" of AmTrust. R. 202-3 at 2 (Pl. Tr. Ex. 6). But it is undisputed that the FDIC sent the letter while acting on AmTrust's behalf. R. 169 at 34 (Tr. Transcript 348); R. 170 at 112 (Tr. Transcript 604).

2

which had been added to the loan's principal balance and increased that amount from $207,167.99 to $209,471.59. As a result, Hammer's monthly payment under the loan modification also increased, from $741.63 to $749.88. R. 202-2 at 2 (Pl. Tr. Ex. 5); R. 202-3 at 2 (Pl. Tr. Ex. 6); R. 169 at 29, 36-37 (Tr. Transcript 343, 350-51). When Hammer received the Loan Package, the first payment under the Agreement was due in only a week or less. R. 202-3 at 2 (Pl. Tr. Ex. 6). Hammer called the FDIC to ask about the additional fees and costs. R. 170 at 210, 217 (Tr. Transcript 702, 709). The person with whom Hammer spoke told Hammer that she needed to begin making payments immediately according to the Agreement as written. In the meantime, Hammer was told, the added fees and costs would be investigated and someone would get back to her about them. R. 170 at 210-11 (Tr. Transcript 702-03). Hammer testified that she followed the instructions given to her and sent her first payment in the amount of $749.88 to AmTrust on or about June 28, 2010. R. 170 at 211, 215-18 (Tr. Transcript 703, 707-10); R. 202-16 at 2 (Pl. Tr. Ex. 28). Hammer made a second payment of $749.88 to AmTrust on or about July 28, 2010. R. 202-16 at 3 (Pl. Tr. Ex. 28). Both of these payments were for the amount stated in the Loan Package, which included the additional $2,303.60 in fees and costs. Hammer made these payments although she did not sign the Agreement at this time.

In approximately mid-July 2010, Hammer received two written notices, one from the FDIC and one from RCS, informing her that the servicing of her loan was being transferred from the FDIC to RCS effective August 1, 2010. R. 189-6 at 2-4

(Def. Tr. Exs. 21, 22). After sending in her August payment on July 28, 2010, Hammer contacted the FDIC to inquire again about the added fees and costs. This second conversation about the fees and costs took place in mid-August 2010, after the loan had transferred to RCS. Hammer testified that she spoke by phone with Theresa Hoke, who was an FDIC loan negotiator. R. 170 at 158 (Tr. Transcript 650); R. 171 at 77-80 (Tr. Transcript 849-52). Hammer testified that Hoke told her to sign the Agreement right away and mail it to RCS, because RCS was now the loan servicer. Hoke further instructed Hammer to cross out the typed principal loan balance of $209,471.59 and write in the amount of $207,167.99 in its place. *Id.* Either Hammer crossed out the $209,471.59 figure and replaced it with $207,167.99, or else she directed the attorney she had hired to review the Agreement to do so based on Hoke's instructions. The notary date on the Agreement indicates that Hammer signed it on August 16, 2010. RCS does not dispute receiving the executed Loan Modification Agreement a short time later.

Hammer first learned RCS had a problem with the Loan Modification Agreement in a phone conversation that took place towards the end of August 2010. A representative of RCS told either Hammer or her attorney that the Loan Modification Agreement was invalid and that, if Hammer wanted a loan modification, she would have to sign a new agreement with RCS. Hammer refused to enter into a new loan modification agreement with RCS, and instead kept mailing mortgage payments to RCS based on the Agreement with the FDIC. R. 171 at 75-76 (Tr. Transcript 847-48). Thus began a course of conduct continuing over the

next two years, in which Hammer consistently sent RCS loan payment checks each month in the amount of $749.88 based on the FDIC's Loan Modification Agreement, and RCS consistently returned Hammer's checks uncashed because RCS demanded Hammer pay $1,519.49 per month pursuant to the terms of the original, unmodified AmTrust loan as well as make up with one lump sum payment all her previous missed monthly payments under the original loan. In addition, because RCS took the position that Hammer continued to be in default under the original loan notwithstanding her attempts to make payments under the Loan Modification Agreement, RCS revived the state foreclosure proceeding originally initiated by AmTrust in August 2009. Hammer hired another attorney to defend her in the foreclosure action, who filed a motion to dismiss based on the Loan Modification Agreement. A hearing on Hammer's motion to dismiss was held, after which the state court entered an order in Hammer's favor dismissing RCS's foreclosure action. Thereafter, RCS and Hammer failed to reach a resolution of their differences, and RCS subsequently filed a second foreclosure action. Hammer then filed this lawsuit.[2]

---

[2] According to the parties, since the date RCS filed the second foreclosure action, RCS has transferred Hammer's loan to a new loan servicer, the new loan servicer has been substituted for RCS in the second foreclosure action, and the state court has stayed the second foreclosure action while this litigation has been pending.

### III.

### ANALYSIS

### A.

### *RCS's Motion For Judgment As A Matter of Law*

A party who, before the case was submitted to the jury, filed a motion for judgment as a matter of law under subsection (a) of Fed. R. Civ. P. 50, may no later than 28 days after the entry of judgment file a renewed motion for judgment as a matter of law under subsection (b) of Fed. R. Civ. P. 50. "In ruling on the renewed motion, the [C]ourt may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). Judgment as a matter of law on any issue may be granted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue." Fed. R. Civ. P. 50(a)(1). "The standard governing a Rule 50 motion mirrors that employed in evaluating a summary judgment motion. Looking to all of the evidence in the record, [the Court] must ask whether any reasonable jury could have found" for the nonmoving party. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir. 2003) (quotation marks and citation omitted). "In undertaking this review, [the Court] must construe the evidentiary record in [Hammer's] favor, drawing all reasonable inferences in her favor and resisting temptation to weigh the evidence or to make [the Court's] own credibility determinations." *Id.* at 579.

Because a Rule 50(b) motion is a renewal of the pre-verdict Rule 50(a) motion, it can be granted only on grounds advanced in the pre-verdict motion:

> The earlier motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available. The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury. This fulfillment of the functional needs that underlie present Rule 50(b) also satisfies the Seventh Amendment.

Fed. R. Civ. P. 50, advisory committee note, 2006 amendment.

As an initial matter, Hammer argues that RCS has waived several of the arguments it makes in its Rule 50(b) motion based on its failure to raise those issues in its earlier Rule 50(a) motion. R. 202 at 3, 4, 6, 13. RCS takes issue with Hammer's waiver arguments, asserting that its oral Rule 50(a) motion made at the close of evidence was sufficient to preserve any arguments for judgment as a matter of law not contained in its written Rule 50(a) motion made earlier at the close of Hammer's case. RCS also asserts that "the individual legal propositions" that support many of RCS's contentions in its Rule 50(b) motion "were [ ] raised throughout the proceedings" even though not necessarily included in RCS's written Rule 50(a) motion or encompassed by RCS's oral renewal of the earlier written motion. R. 203 at 10-11.

On the one hand, the Court agrees with Hammer that some issues RCS raises in its Rule 50(b) motion were not preserved by its Rule 50(a) motion. *See, e.g., Jimenez v. City of Chi.*, 877 F. Supp. 2d 649, 672-73 (N.D. Ill. 2012) (rejecting argument that issues not set forth in Rule 50(a) motion could be argued in Rule 50(b) motion because they raised "purely legal" questions). On the other hand, the Court agrees with RCS that its Rule 50(a) motion adequately preserved other

issues. *See, e.g., Havco Wood Prods., LLC v. Indus. Hardwood Prods., Inc.*, 2013 WL 1497429, at \*3 (W.D. Wis. Apr. 11, 2013) (although the issue must be identified in the Rule 50(a) motion, the specificity requirement is satisfied if the moving party provides a basic description of the argument where the trial court already is aware of the grounds for the moving party's challenge). The Court will indicate in its discussion below which of RCS's arguments it finds RCS waived. In addition, the Court also will address the waived arguments on the merits as an alternative basis for its ruling.

### 1.    BREACH OF CONTRACT

RCS argues it is entitled to judgment as a matter of law on Hammer's breach of contract claim because the FDIC and Hammer did not enter into an enforceable agreement to modify Hammer's home mortgage loan. The parties[3] agree that Illinois law is controlling on this issue. "Under Illinois law, a valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration." *Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 189 (Ill. App. 2004); *see Gorman Publ'g Co. v. Stillman*, 516 F. Supp. 98, 108 (N.D. Ill. 1980) ("A modification of a contract is itself a contract and, as such, is only enforceable where the ordinary standards of contract law are satisfied."). Whether the evidence is sufficient to establish the existence of the elements required to form a contract is generally a question "to be determined by the trier of fact." *Yorke v.*

---

[3] The parties to this lawsuit are not identical to the parties to the contract. Hereinafter, references to the "contracting parties" are to Hammer and the FDIC, as opposed to Hammer and RCS.

*B.F. Goodrich Co.*, 474 N.E.2d 20, 22 (Ill. App. 1985). But "if the facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them," then the question of contract formation may become a question of law. *Id.* In other words, sometimes whether a contract is formed is clear and the matter therefore is one of law, but other times the question is not so obvious and in those cases the issue is one of fact. As will be seen, this case falls in the not-so-clear category, and therefore properly was resolved by the jury as the finder of fact.

RCS presented its theory that there was no enforceable contract between Hammer and the FDIC primarily through the testimony of its Director of Loss Mitigation, Spencer Cull. Cull testified to three undisputed facts he believed supported RCS's position. First, Cull pointed to the June 8, 2010 cover letter from the FDIC, which instructed Hammer to return the Loan Modification Agreement by June 25, 2010. Cull testified there was no enforceable modification agreement because Hammer failed to meet this deadline. Second, Cull pointed to Hammer's signature on the Loan Modification Agreement, which was not notarized until August 16, 2010. Cull testified there was no enforceable modification agreement because Hammer did not sign the Agreement until after the loan transferred to RCS. Third, Cull pointed to the executed Loan Modification Agreement itself, which Hammer had altered by crossing out the principal loan amount and writing in a different number in its place. Cull testified there was no enforceable modification agreement because Hammer's hand-written changes to the Agreement created a

9

counteroffer that had never been accepted. *See* R. 170 at 99-100 (Tr. Transcript 591-92). Cull summarized RCS's position as follows:

> Had [the Agreement] been returned timely and executed in a manner that constituted acceptance, then the loan would have come over to RCS already in the condition that [the] . . . offered agreement spelled out. And, unfortunately, that didn't occur. And so as much as we would have liked that to have occurred, it didn't.

*Id.* at 100-01 (Tr. Transcript 592-93).

In its motion for judgment as a matter of law, RCS appears to be raising essentially the same contract formation issues as the ones identified by Cull in his trial testimony. These issues can be grouped under two headings—the first relating to the timing of Hammer's acceptance of the FDIC's Loan Modification Agreement and the second relating to the substance of her acceptance. The Court will address these two categories separately.

### (a)  Issues Relating to the Timing of Hammer's Acceptance

RCS does not dispute that the FDIC made an offer to Hammer to enter into a loan modification agreement. RCS argues, however, that Hammer failed to accept the FDIC's offer in a timely manner.

### (i)  Waiver

As an initial matter, RCS has waived any timeliness argument by making only a token effort to address it in its Rule 50(b) brief, relegating the argument to a two-sentence footnote. R. 189 at 10 n.2. It is axiomatic that "[p]erfunctory or undeveloped arguments are waived." *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005).

RCS's Rule 50(a) motion also failed to adequately preserve the timing issue. Although RCS's written Rule 50(a) motion referred generally to Cull's testimony, it did not provide any argument or explanation of why that testimony supports a ruling by the Court against Hammer as a matter of law. In addition, RCS's written Rule 50(a) motion referred to Cull's testimony under the heading "No Meeting of the Minds," which informed the Court and Hammer that the only contract formation issue RCS was raising had to do with the substance of Hammer's acceptance rather than its timing. Nor was RCS's later oral supplementation to its previous written Rule 50(a) motion sufficient. RCS orally moved to supplement with the one-sentence argument that "the evidence does not support each element of a breach of contract claim." R. 173 at 4 (Tr. Transcript 1232). This general statement, like RCS's previous written argument, failed to provide the detail required under Rule 50(a) to alert the Court to how the additional arguments RCS intended to raise by its oral motion differed from the arguments RCS previously had made in its written motion. *See* Fed. R. Civ. P. 50(a)(2) (pre-verdict motion for judgment as a matter of law must "specify the judgment sought and the law and facts that entitle the movant to the judgment"). Finally, the fact that RCS may have argued the timing issue at various other points in the proceedings is not sufficient to preserve the issue for RCS's Rule 50(b) motion. *See Jimenez*, 877 F. Supp. 2d at 673 (similar arguments raised at summary judgment and preliminary jury instruction conference are not preserved unless renewed in Rule 50(a) motion).

Apart from RCS's post-trial waivers of the timing issue, the record shows that RCS also waived the issue during the trial. In particular, the timing issue was addressed on several occasions during colloquies between the Court and counsel over jury instructions. *See* R. 171 at 199-201 (Tr. Transcript 971-73); R. 172 at 44-51 (Tr. Transcript 1019-27); R. 172 at 160-62 (Tr. Transcript 1135-37). In the final discussion on this matter, the Court pointedly asked RCS's counsel if RCS was taking the position that, "when the servicing rights were transferred, any unaccepted offer [by the FDIC] was off the table?" R. 172 at 50 (Tr. Transcript 1025). RCS's counsel responded that if Hammer "had not changed the 209 amount to 207, [RCS] probably would have accepted [the Loan Modification Agreement]." *Id.* In light of this response, the Court observed that the timing of Hammer's acceptance was not an issue in dispute. *Id.* RCS's counsel did not correct the Court or otherwise object to the Court's observation. Nor did he object when the Court ruled thereafter that, as a result of the Court's conclusion that there was no dispute over the relevance of timing, the jury instructions did not need to include the language RCS had suggested limiting the time period in which Hammer was required to have accepted the FDIC's offer. *Id.* at 50-51 (Tr. Transcript 1025-26). Nor did RCS's counsel point to any error in the jury instructions as a whole based on the absence of an instruction raising the timing issue. *See id.; see also* R. 173 at 9, 98 (Tr. Transcript 1237, 1326).

By not objecting to the jury instructions, RCS failed to preserve the legal issue of whether the timing of Hammer's acceptance precluded Hammer's breach of

contract claim as a matter of law. *See United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987) (mere submission of proposed jury instruction is not sufficient to preserve objection to district court's refusal thereof); *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 733 (7th Cir. 2004) (argument that district court committed legal error was waived by failure to propose appropriate jury instruction). While RCS argued the timing issue to the jury as one fact to consider in deciding whether a contract had been formed, the Court must assume based on the result that the jury did not find RCS's timing evidence to be compelling. The Court may not overrule that factual determination by crediting RCS's view of the evidence over that of the jury where, as will be shown, the jury's view was supported by the evidence.

### (ii)    Merits

In any event, even if not waived based on the factors discussed above, the Court concludes that any arguments RCS has made or might make regarding the timing of Hammer's acceptance are without merit for several independent reasons.

### (A)    Theory That The Contracting Parties Reached An Agreement Before Hammer Received The Loan Package.

As an initial matter, the evidence was sufficient for a reasonable jury to have concluded that the FDIC and Hammer had concluded their negotiations and

reached a modification agreement by the beginning of June 2010, notwithstanding that they had not yet memorialized that agreement in writing.[4]

"Under Illinois law, courts focus on the parties' intentions to determine whether an enforceable contract comes into being during the course of negotiations[.]" *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012) (quotation marks and citation omitted); *see McMahan v. Rizza Chevrolet, Inc.*, 2006 WL 2560883, at *2 (N.D. Ill. Aug. 31, 2006) ("In determining the validity of a written agreement under Illinois law, the focus is on the intent of the [contracting] parties."). Because the theory of contract is objective, however, the contracting parties' intentions are measured by their words and conduct, that is, by what transpired between them, and not by their subjective or undisclosed mental state. *See Pratt Cent. Park Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 355 (7th Cir. 1995) ("Judges often speak of contracts as expressing the 'intent' of the parties and even employ the metaphor of the 'meeting of the minds.' That metaphor cannot be taken literally, and the reference to 'intent' does not invite the court to tour the parties' minds.") (citations omitted); *Pampered Chef, Ltd. v. Alexanian*, 2011 WL 6046896, at *13 (N.D. Ill. Dec. 5, 2011) ("[F]or more than a century, it has been recognized that '[t]he law has nothing to do with the actual state of the parties' minds. In contract, as elsewhere, it must go by externals, and judge parties by their conduct.'") (quoting Holmes, The Common Law, 242 (1881) (Howe ed., Harvard University Press 1963)).

---

[4] This discussion puts aside for the moment the statute of frauds, which the Court will address later in this opinion.

One of the contracting parties—the FDIC—was neither a party to this action nor a testifying witness. Nevertheless, ample evidence was introduced at trial concerning the FDIC's contractual intent, properly measured by objective factors such as the FDIC's conduct and written communications. This evidence was introduced through Hammer's testimony as well as through internal bank records prepared by the FDIC that became part of RCS's files upon the FDIC's transfer of Hammer's loan to RCS. This evidence viewed in its entirety shows a clear intent on the part of the FDIC and Hammer to enter into a binding loan modification agreement.

To begin with, Hammer testified that she spoke by phone with FDIC personnel several times in the early part of 2010, and that during those calls she learned that the FDIC had agreed to modify her loan. R. 170 at 209 (Tr. Transcript 701). FDIC records confirmed this testimony, showing that the FDIC approved Hammer's loan for loss mitigation as early as February 4, 2010. R. 169 at 54 (Tr. Transcript 368). FDIC records created in the spring of 2010 describe the FDIC's intentions concerning Hammer's loan as follows:

> In order to provide the borrower the opportunity to stay in her home while making an affordable payment and in an effort to adhere to the FDIC loan modification program, consideration was given to its two primary principles, determining a payment the borrower can afford and protecting investor's interests by requiring that the cost of the modification is less than the estimated cost of foreclosure.

R. 169 at 56-57 (Tr. Transcript 870-71); *see also* R. 202-1 at 2 (Pl. Tr. Ex. 4) (memo from Account Officer Sarah Krugman dated April 21, 2010, stating that Hammer's

loan was to be restructured in a manner that does not reduce book value by using the FDIC Loan Modification Program).

The FDIC's records further indicated that the FDIC intended to reduce the interest rate on Hammer's loan, and to waive both accrued interest not to exceed $18,000 as well as late charges and fees not to exceed $3,500. R. 202-1 at 2 (Pl. Tr. Ex. 4). These terms were approved on May 8, 2010 by K. Kent Kadel, Assistant Post Closing Asset Manager Program. *Id.; see also* R. 169 at 20-23 (Tr. Transcript 334-37). Internal notes kept by the FDIC in an electronic mortgage servicing system[5] indicate that the FDIC approved the modification on April 21, 2010, and sent the file to Hoke to calculate the new loan and payment amounts. An internal electronic note apparently made by Hoke on June 7, 2010 indicates that the modified amount of Hammer's monthly payment would be $741.63, and that this amount was higher than the figure previously communicated to Hammer. Hoke indicated in the note that an "FDIC rep will contact the borrower to advise." R. 169 at 28-29 (Tr. Transcript 342-42).

Between May 27, 2010 and June 7, 2010, the FDIC's electronic notes show that various FDIC personnel engaged in internal follow-up activity regarding preparation of documents and calculation of loan modification figures. *See* R. 169 at 27-31, 54-57 (Tr. Transcript 341-45, 368-71); R. 202-2 at 2 (Pl. Tr. Ex. 5). The notes further show that the FDIC finalized its approval for the modification on May 27,

---

[5] Cull confirmed that the internal loan notes found in the electronic mortgage servicing system were prepared by the FDIC while acting as receiver for AmTrust, and were sent over to RCS in August 2010 when the loan transferred. R. 169 at 30 (Tr. Transcript 344).

16

2007, and that Hoke prepared an internal memo called a "Modification Approval Form" on June 2, 2010, which sought implementation of the modification approved by the FDIC. R. 202-2 at 2 (Pl. Tr. Ex. 5); R. 169 at 23-27 (Tr. Transcript 337-41). The "Comment" section of the Modification Approval Form states that the FDIC was "[w]aiving interest and late charges and fees." R. 202-2 at 2 (Pl. Tr. Ex. 5). A signature of an unidentified person appearing at the bottom of the page bears a date of June 7, 2010. *Id.*

It appears that the FDIC prepared the Loan Package on or about June 8, 2010, the date shown on the cover letter. The cover letter states that the enclosed Loan Modification Agreement was for Hammer's "review and *acknowledgment,*" R. 202-3 at 2 (Pl. Tr. Ex. 6) (emphasis added), suggesting that an offer and acceptance already had transpired.[6] The cover letter's concluding sentence uses the past tense ("I am pleased that I was able to work with you to bring your loan current to avoid your home going into foreclosure . . . ."), which suggests that the "work" performed by the contracting parties "to bring [Hammer's] loan current" (meaning the loan modification agreement) had been completed at the time the letter was written. The Loan Modification Agreement recited on the first page that it was "made this 1st day of June, 2010," and, just above the signature line on the last page, the Agreement stated: "EXECUTED as of the day and year first above

---

[6] In closing argument, RCS's counsel said that the cover letter stated: "Attached hereto please find a proposed loan modification agreement." R. 173 at 147 (Tr. Transcript 1375). But the actual language of the cover letter is: "Enclosed is a copy of the Loan Modification Agreement for your review and acknowledgment." R. 202-3 at 2.

17

written." *Id.* at 3, 5. As written, therefore, the Agreement indicates an intent to enter into an agreement, which was to be effective as of June 1, 2010 (the date appearing on the first page of the Agreement), regardless of when the Agreement actually was signed.

It is well settled that contracting parties can enter into a binding agreement although they have not yet memorialized their agreement in writing. *See Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990) ("where the parties have assented to all the terms of the contract, the mere reference to a future contract in writing will not negat[e] the existence of a present contract") (quotation marks and citation omitted). "All that is necessary to make a binding contract is that the minds of the parties must meet on the essential terms." *Calo, Inc. v. AMF Pinspotters, Inc.*, 176 N.E.2d 1, 5 (Ill. App. 1961). The factfinder may decide that no binding contract was formed prior to execution of a formal written agreement where, for instance, the contracting parties clearly express an unambiguous intent to "make the reduction of the agreement to writing, and its signature by them, a condition precedent to its completion." *Id.* But no evidence of such an unambiguous intent exists here. Indeed, what evidence there was on this issue indicated the opposite. Therefore, the question of whether the FDIC and Hammer intended to be bound by the Loan Modification Agreement prior to its formal execution was a factual question for the jury to decide. To the extent that the jury might have concluded that the contracting parties intended to be bound by the Loan Modification Agreement as of June 1, 2010, regardless of the date on which

Hammer actually signed that Agreement, the Court will not disturb that decision because, as shown above, there was adequate evidence in the record to support it.

### (B) Theory That The Contracting Parties Reached An Agreement After Hammer Received The Loan Package.

As discussed, the Court finds that a reasonable jury could rely on the evidence concerning the conduct of the FDIC and Hammer leading up to Hammer's receipt of the Loan Package, as well as the Loan Package itself, to conclude that an enforceable loan modification agreement already had been formed before Hammer even received the Loan Package. RCS ignores this evidence and argues instead that the Loan Package sent in the mail to Hammer in late June 2010 constituted the offer to Hammer to enter into an agreement to modify Hammer's loan. R. 189 at 9. Even if the Court accepts RCS's position that the Loan Package constituted the FDIC's offer, however, the evidence concerning the conduct of the FDIC and Hammer after Hammer received the Loan Package still was sufficient for a reasonable jury to have concluded that an enforceable contract between the FDIC and Hammer to modify Hammer's loan was formed irrespective of the timing of Hammer's signature on the Agreement.

To begin with, the Court rejects RCS's argument that, as a matter of law, the FDIC's offer expired on June 25, 2010 per the terms of the June 8, 2010 cover letter. For RCS's argument to prevail, it would have to show that the FDIC's instruction in the cover letter to return the signed Agreement by June 25, 2010 was a necessary precondition to the offer. *See Calo, Inc.*, 176 N.E.2d at 5 ("'If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with

19

in order to create a contract.'") (quoting Restatement of the Law Contracts, § 61). If, on the other hand, the FDIC's offer reasonably can be construed as "merely suggest[ing] a permitted place, time or manner of acceptance," then the jury was "not precluded" from concluding that Hammer could have accepted the offer at a later time. *Id.* (quotation marks and citation omitted). "If no specific time limit is fixed with reference to the offer it continues for a reasonable time." *Id.*

The June 8, 2010 cover letter stated that if the Agreement was not returned signed by June 25, the FDIC would assume Hammer was not interested in a loan modification, and would continue with the foreclosure action initiated by AmTrust. R. 202-3 at 2. This language does not expressly state that the FDIC's offer would be withdrawn if the June 25 deadline was not met, and therefore reasonably could be interpreted as permitting an acceptance after that date.[7] But in any event, although the cover letter was dated June 8, 2010, the FDIC's internal notes suggested that the FDIC did not send the Loan Package to Hammer until June 16, 2010. R. 170 at 202 (Tr. Transcript 694). Hammer testified without material contradiction that she did not receive the Loan Package until sometime between June 25 and June 28.

---

[7] By comparison, RCS also sent a letter to Hammer offering to enter into a loan modification agreement, and that letter contains very clear language conditioning the offer on compliance with a deadline. *See* R. 189-9 at 2-3 ("We must receive your Loan Modification Agreement(s) . . . no later than October 1, 2010 or this transaction will be null and void. . . . [D]ue to time constraints, the two (2) duplicate original Loan Modification Agreements, each signed, dated and notarized must be received in our office <u>within 24 hours</u>, by October 1, 2010, or this transaction will be void.") (underscore in original).

R. 170 at 216 (Tr. Transcript 708).[8] Hammer also testified that she spoke with the FDIC after receiving the Loan Package, and that no one at the FDIC indicated to her there would be any problem if she failed to sign and return the Agreement by June 25. R. 170 at 221 (Tr. Transcript 713).

Significantly, the FDIC did not reject Hammer's loan payments, which she sent *after* June 25, and notes made by the FDIC in the internal log dated after June 25 stated that the modification was "in process." Moreover, Hammer testified to at least one phone conversation with the FDIC concerning the Agreement that occurred *after* June 25. Finally, the FDIC's internal loan notes showed that, in the early part of June, the FDIC set the follow-up date on the loan for September 30, 2010, but, at some point in the latter part of June, the FDIC extended that date to October 16, 2010. The jury reasonably could have inferred from this evidence that the FDIC changed the follow-up date to give Hammer more time to return the executed Agreement after the FDIC failed to send the Loan Package to Hammer on June 8, as it originally had intended to do.

Based on this evidence viewed in its totality and in a light most favorable to Hammer, the jury reasonably could have concluded that, even if Hammer's compliance with the June 25 return date originally was intended to be a precondition to formation of an enforceable contract, that precondition had been waived by the FDIC. *See Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d

---

[8] RCS pointed to additional evidence, which at best suggested Hammer might have received the loan package between June 18 and June 23. *See* R. 173 at 151 (Tr. Transcript 1379).

956, 961 (Ill. App. 1992) (a waiver "is an intentional relinquishment of a known right which may be express or implied," and "may be established by conduct indicating that strict compliance with [a contractual] provision will not be required") (citations omitted); *Melrose Park Nat'l Bank v. Carr*, 618 N.E.2d 839, 844 (Ill. App. 1993) ("Whether waiver has occurred is a question of fact when the material facts are in dispute or where reasonable minds might differ in the inferences to be drawn from undisputed facts.").

RCS next points to the fact that Hammer did not sign the written Loan Modification Agreement until August 16, 2010, as shown by the notary date. Since the loan already had transferred to RCS as of this date, was it too late for Hammer to have accepted the FDIC's offer? The simple answer to this question is that the jury reasonably could have found it was not too late because RCS conceded as much. Cull confirmed in his testimony that RCS "was required to follow all the commitments and agreements that the FDIC has made with respect to any particular loan." R. 169 at 19-20 (Tr. Transcript 333-34). RCS would like the Court to now read the word "contractual" as a modifier to the phrase "commitments and agreements." But there was no evidence that would have compelled the jury to conclude as a factual matter that RCS's duty to honor the FDIC's commitments and agreements was limited to contractual "commitments and agreements."

Nor has RCS pointed to a legal basis such as a statute or a contractual requirement that would require the Court to limit RCS's duty as a matter of law. Therefore, the Court looks to general principles of contract law for guidance. Under

those principles, an offer "is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). An offer "ripen[s] into a contract" when "it is accepted." *Moore v. Lewis,* 366 N.E.2d 594, 599 (Ill. App. 1977). In other words, by accepting an offer, the recipient of the offer automatically binds the sender. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 561 (7th Cir. 2012); *see McCarty v. Verson Allsteel Press Co.*, 411 N.E.2d 936, 942 (Ill. App. 1980) ("an offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract").

If, as RCS contends, the FDIC made Hammer an offer in June 2010, by definition that offer is a "commitment" of the FDIC because it transferred the legal power of creating a binding contract out of the FDIC's control to Hammer. A reasonable jury therefore could have concluded that, even if Hammer did not formally accept the FDIC's June 8, 2010 offer until August 16, 2010, RCS was required to honor that offer, and, accordingly, to honor the resulting agreement to which Hammer's acceptance automatically gave rise, notwithstanding that her acceptance occurred after the loan was transferred.

The Court will not disregard the jury's verdict when Cull's testimony supports it, particularly where, as here, the end result makes sense. A loan transfer outside of the borrower's control should not have the effect of cutting off the borrower's right to accept an outstanding modification offer. At a minimum, fairness would dictate that the borrower receive advance notice of the transfer with a

warning that, upon the transfer taking effect, all outstanding offers from the current loan servicer automatically would be rescinded. Such a warning affords the borrower an opportunity to act on the outstanding offer before her rights to accept it are foreclosed. Hammer was notified in advance of the pending transfer of her loan, but nothing in the letters she received from AmTrust and RCS alerted her that the FDIC's outstanding offer (assuming it was only an offer at this point) became void once the loan was transferred.[9]

---

[9] In fact, a fair reading of the FDIC's letter notifying Hammer in July 2010 of the transfer affirmatively suggests that the transfer did not affect the FDIC's offer to Hammer. The letter states that the transfer would not have any effect on "the *terms* or *conditions*" of the loan, "other than those directly related to the servicing." R. 189-6 at 2 (emphasis in original). The letter defines loan servicing as "the collection of payments and the management of operational procedures related" to the loan, and further states that the "sale and transfer of servicing impacts [only] who will be taking your payments, handling your escrow accounts, paying your insurance and taxes and answering questions related to your loan." *Id.* Loan servicing as thus defined would not include a modification offer, so it would be reasonable for Hammer to have concluded that the modification was not affected by the loan transfer to RCS. That conclusion would have been further justified by the letter's statement that, "[i]f your loan is currently in the process of being modified, the information will be forwarded to Residential Credit Solutions, Inc." *Id.* at 3. This statement indicates that the FDIC did not intend to withdraw a loan modification that was "in [ ] process" as of the date of the transfer to RCS. A reasonable jury could have inferred from this that the FDIC understood and expected that RCS would honor the loan modification, even if there was more to be done before it became final. The letter Hammer received from RCS in July 2010 notifying her about the transfer does not provide any additional information that would contradict the reasonable inferences arising out of the FDIC's transfer letter. In fact, RCS's letter confirms that "[t]he assignment sale or transfer of the servicing of your mortgage loan does not affect any term or condition of the mortgage instruments, other than the terms directly related to the servicing of your loan." *Id.* at 4. While RCS's letter, unlike the FDIC's letter, does not define "loan servicing," RCS agrees that loan servicing does not include "[t]he creation, denial or rejection of a loan modification." R. 151-1 at 47. If loan servicing does not include loan modification, and RCS's letter told Hammer that only loan servicing was affected by the transfer, then by implication RCS cannot dispute that the transfer of Hammer's

In any event, even disregarding Cull's testimony, the evidence was sufficient for the jury to have concluded that Hammer accepted the FDIC's offer prior to August 1, 2010. RCS's argument against contract formation prior to the loan transfer assumes that Hammer's acceptance occurred upon her signing of the Agreement. It is true that "where an offer requires a written acceptance, no other mode may be used." *United States v. Integrated Constr. Tech. Corp.*, 2007 WL 893122, at *3 (N.D. Ill. Sept. 28, 2007); *see also Chi. Title & Trust Co. v. Ceco Corp.*, 415 N.E.2d 668, 672 (Ill. App. 1980) ("if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery"). The Court finds, however, that a reasonable jury could have concluded that the FDIC did not intend to limit Hammer's manner of accepting its June 8, 2010 offer to a signature on the Loan Modification Agreement. The cover letter did not expressly limit the means of acceptance, and, as previously mentioned, the Agreement is backdated to June 1, 2010, before the FDIC even mailed it to Hammer.

"Ordinarily one of the acts forming part of the execution of a written contract is the signing of it." *Lynge v. Kunstmann*, 418 N.E.2d 1140, 1144 (Ill. App. 1981). Nevertheless, "[t]he act of executing [an agreement] [is] a matter pertaining to the memorialization of the contract and not to its creation." *Am. Ashland, LLC v. Robbins*, 2013 WL 5436647, at *5 (Ill. App. Sept. 26, 2013). "The object of a signature is to show mutuality or assent," but these facts "may be shown in other

---

loan did *not* affect Hammer's right to accept the FDIC's offer to modify her loan even if she did not accept it until after the transfer.

ways" as well. *Lynge*, 418 N.E.2d at 1144. In short, "[t]here is no requirement that an agreement be 'signed, sealed, and delivered' to be binding, and Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or incomplete agreements." *Seymour v. Hug,* 413 F. Supp. 2d 910, 925 (N.D. Ill. 2005) (citations omitted).

One of the ways in which a party's expression of assent may be shown other than by a signature is through the accepting party's conduct. *See Amelco Elec. Co. v. Arcole Midwest Corp.,* 351 N.E.2d 349, 354 (Ill. App. 1976) ("The principle has been described as 'well settled' as a general matter of contract law, that 'a party named in the contract may by his acts and conduct become bound by its provisions even though he has not signed it.'") (citation omitted). To accept an offer means to express "assent to the terms thereof." *Calo, Inc.,* 176 N.E.2d at 5. Here, the jury reasonably could have concluded that, although she did not sign the Loan Modification Agreement, Hammer assented to the terms of the FDIC's offer in June 2010 by virtue of her conduct in making loan payments consistent with that Agreement. The jury reasonably could have inferred that this manner of acceptance was approved by the FDIC based on Hammer's testimony regarding her June phone conversation with the FDIC, as well as the uncontested fact that the FDIC accepted Hammer's July and August loan payments.[10] This evidence supports the view that a contract was formed on June 28, 2010, when Hammer made the first payment under the Loan Modification Agreement, notwithstanding that she did not sign and

---

[10] Cull admitted that the FDIC "accepted Ms. Hammer's payments for July and August 2010." R. 169 at 40 (Tr. Transcript 354).

return the Agreement at that time. *See Landmark Props., Inc. v. Architects Int'l-Chi.*, 526 N.E.2d 603, 606 (Ill. App. 1988) (binding contract formed where plaintiffs' conduct following receipt of written contract from defendant indicated they agreed to the written contract even though they did not sign it); *McMahan*, 2006 WL 2560883, at *2 (relying on evidence of defendant's conduct showing intent to be bound notwithstanding lack of signature).[11]

**(b)    Issues Relating to Substance Of Hammer's Acceptance**

RCS argues that no valid contract was formed between the FDIC and Hammer because Hammer crossed out the amount of the unpaid principal balance on the Loan Modification Agreement and wrote in a different sum. According to

---

[11] One of RCS's proposed jury instructions required Hammer's acceptance of the FDIC's offer to be in writing. The proposed jury instruction, while based on Illinois Pattern Jury Instruction—Civil 700.03, omitted language from the pattern instruction stating that, in addition to a writing, an offeree's acceptance may be communicated to the offeror by "spoken words, actions or any other conduct that would indicate agreement to a reasonable person." RCS may have omitted this additional language from its proposed instruction based on a rule against oral modifications which it contended applied, either pursuant to the Illinois statute of frauds or the "No Oral Agreements" term of Hammer's original loan. But the statute of frauds would not require Hammer's signature for her to be able to enforce the Agreement, 740 ILCS § 80/2 (signature required only for "party to be charged"), and it is not clear why the "No Oral Agreements" contract provision would either. In addition, the Court concludes later in this opinion that neither the statute of frauds nor the "No Oral Modifications" term in Hammer's original loan prevented a contract from being formed. Nevertheless, Hammer did not object to RCS's proposed instruction on this basis, and so the issue of a writing requirement was never vetted during the jury instruction conference. As a result, the final jury instruction included the writing requirement. The final instruction did not, however, provide for a time limit on Hammer's written acceptance, and therefore the jury presumably found that Hammer's signature on the Loan Agreement on August 16, 2010 constituted the "required" written acceptance. Nevertheless, the final jury instruction was erroneous in its imposition of a writing requirement on Hammer's acceptance. That error, however, worked in RCS's favor and therefore was harmless. *See* Fed. R. Civ. P. 61.

RCS, by doing this Hammer changed a term of the Agreement and thereby turned her acceptance into a counteroffer, which was never accepted by RCS. In addition, RCS argues that, even if a contract was formed, it was unenforceable because of the lack of agreement between Hammer and the FDIC as to the principal loan amount.

### (i)    Mirror Image Rule

RCS is correct that Illinois common law follows the "mirror image rule." Under the mirror image rule, "an acceptance requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed." *Finnin v. Bob Lindsay, Inc.*, 852 N.E.2d 446, 448 (Ill. App. 2006). The issue in this case is whether Hammer's acceptance of the Loan Modification Agreement was *conditioned* on the FDIC removing the additional fees and costs that the FDIC had added to the principal loan balance. If it was, then Hammer's acceptance was really a rejection of the FDIC's original offer. *See D'Agostino v. Bank of Ravenswood*, 563 N.E.2d 886, 889 (Ill. App. 1990). If the FDIC's original offer was rejected by Hammer, it could not then "be revived by later acceptance." *Id.* Under this theory, which is the one adopted by RCS, a loan modification agreement did not arise out of the FDIC's original offer unless RCS, as the new loan servicer, accepted Hammer's counteroffer.

Hammer testified about two phone conversations with the FDIC, one in June 2010 and another in August 2010, to explain the circumstances surrounding her objections to the added fees and costs. As an initial matter, the Court must address

28

RCS's argument that the Court may not consider these conversations because they are hearsay.[12]

An out-of-court statement is not hearsay if it is admitted for some purpose other than the truth of the matter asserted. *See* Fed. R. Civ. P. 801(c). Here, the Court allowed Hammer's testimony of both telephone conversations but instructed the jury that those conversations were being offered for the limited purposes of showing what instructions Hammer was given and explaining why she did what she did. *See* R. 171 at 78-79 (Tr. Transcript 850-51). The testimony for these purposes was not hearsay. *See United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1988) (no error in allowing witnesses to testify "that Lavesta told them that her mother . . . sold drugs out of their apartment" because testimony was offered to establish why the defendant reacted as she did upon hearing the statement).[13]

---

[12] RCS's Rule 50(b) motion raises the hearsay issue only with regard to Hammer's August 2010 conversation with the FDIC. The Court will assume, however, that to the extent the Court also is relying on the June 2010 conversation in concluding that the jury reasonably could have found an enforceable loan modification agreement between the FDIC and Hammer, RCS would make the same hearsay argument.

[13] *See also United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) ("out-of-court declarations that are more in the nature of an order or a request and that, to a large degree, [are] not even capable of being true or false are [ ] not hearsay") (quotation marks and citation omitted); *United States v. Colon-Diaz*, 521 F.3d 29, 34 (1st Cir. 2008) (witness's testimony that agent asked her to "go and purchase drugs," as well as agent's testimony that she told witness they were going to go "to the housing project to buy drugs," was properly allowed for non-hearsay purposes of "describing directions from one person to another" and "demonstrat[ing] why [the witness], accompanied by [the agent], went to" the housing project); *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001) (statements "offered to . . . supply a motive for the listener's action" and "directions from one individual to another" do not constitute hearsay); *cf. Catalan v. GMAC Mortg. Corp.,* 629 F.3d 676, 694 (7th Cir. 2011) (loan officer's statement to plaintiff that her loan would not be approved until

Beyond this, the Court rejects RCS's argument that the limiting instruction to the jury now precludes the Court from considering the two FDIC conversations for purposes of determining under Rule 50(b) whether the evidence was sufficient for a reasonable jury to have found there was an enforceable contract between the FDIC and Hammer. To begin with, RCS does not challenge the Court's allowance of the testimony for the purposes of showing what Hammer was instructed and why she did what she did. A reasonable jury could have inferred from this testimony used solely for these purposes that a contract was formed between Hammer and the FDIC. Moreover, when the Court instructed the jury that Hammer's testimony could not be used to establish whether there was a contract, its intent was to prevent Hammer from testifying about testimonial out-of-court statements by the FDIC concerning contract formation.[14] The Court gave the limiting instruction before it knew what Hammer's testimony would be. As it turned out, Hammer did not testify to a testimonial hearsay statement about the existence of a contract; therefore, the limiting instruction was not necessary.

In any event, the Court is not constrained by a limiting instruction to the jury when the law is clear that the FDIC's statements to which Hammer testified were

the foreclosure was removed was not hearsay because it described the bank's collective intentions).

[14] A testimonial statement about contract formation would be a statement to the effect that a contract does or does not exist. Such an out-of-court statement would be impermissible hearsay. *See, e.g., Hindin/Owen/Engelke, Inc. v. GRM Indus., Inc.*, 869 F. Supp. 539, 544 (N.D. Ill. 1994) ("statement by an employee that his employer agrees to make a proposal would be a statement offered for the truth of the matter asserted, *i.e.*, that his employer agreed to make a proposal, and constitutes hearsay").

not hearsay but verbal acts which give rise to contract formation. *See, e.g., Hydrite Chem. Co. v. Calumet Lubricants Co.,* 47 F.3d 887, 892 (7th Cir. 1995) ("it is direct evidence, not hearsay, when a party to a dispute over a contract testifies to the offer or the acceptance made by the other contracting party"); *Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1182 (7th Cir. 1994) (a verbal act is something "to which truth is irrelevant" because it "has legal consequences; and anyone who heard [the] words could testify that [they] [were] uttered[ ], without running afoul of the hearsay rule"); *accord Steadman v. Green Tree Servicing, LLC,* 2015 WL 2085565, at *6 n.3 (W.D. Wash. May 5, 2015) (statements by loan officer that borrower "could tender acceptance in a different manner effectively modified or re-stated" bank's offer to borrower and were "utterances of verbal conduct" that had the "legally operative" effect of bringing "a contract into being"; the truth of such statements is irrelevant, "for to lead [the borrower] to suppose[ ] that [the bank] assented to his different form of acceptance was to assent to it, contrary intentions (or mistaken impressions) notwithstanding").[15] Therefore, the Court may rely on

---

[15] *See also Calif. Trucking Ass'n v. Bhd. of Teamsters & Auto Truck Drivers, Local 70*, 679 F.2d 1275, 1291 n.20 (9th Cir. 1981) ("The out-of-court statement of the [company] representative . . . had an operative effect in the nature of a contract rejection wholly apart from the truth of the assertion."); *N.L.R.B. v. H. Koch & Sons*, 578 F.2d 1287, 1290–91 (9th Cir. 1978) ("[P]roof of oral utterances by the parties in a contract suit constituting the offer and acceptance which brought the contract into being, are not evidence of assertions offered testimonially but rather of utterances verbal conduct to which the law attaches duties and liabilities.") (quotation marks and citation omitted); *Creaghe v. Iowa Home Mut. Cas. Co.*, 323 F.2d 981, 984 (8th Cir. 1963) (courts "have uniformly held that conversations as to the making and the terms of oral agreements may be testified to by any person who heard them"); *Halmos v. Steiner*, 1998 WL 560286, at *3 n.5 (N.D. Ill. Aug. 25, 1998) ("it has been recognized that the prohibition against hearsay does not

the FDIC's out-of-court statements to establish the existence of a contract. To the extent that the Court's limiting instruction to the jury can be interpreted as precluding such reliance, it was a harmless error that favored RCS. *See* Fed. R. Civ. P. 61.

Turning to the two conversations, Hammer testified that she contacted a representative of the FDIC in the latter part of June about the added fees and costs, and that she was instructed to immediately send in her first loan payment and wait for the results of an investigation into the fees and costs. R. 170 at 215-16 (Tr. Transcript 707-08). Hammer did as she was told, thereby indicating her acceptance of the FDIC's offer. R. 171 at 75 (Tr. Transcript 847). Further, she sent in the payments at the higher amount shown on the Loan Modification Agreement, which included the fees and costs she had questioned. She testified that she did this because securing the loan modification was "more important" to her than being certain that the issue of the added fees and costs ultimately would be resolved in her favor. *Id.* at 217-18 (Tr. Transcript 709-10). Hammer testified that she later made the changes to the Agreement in August 2010 at the direction of the FDIC:

> She [Hoke] said that it was very important that I get the document in because the loan was transferred as of the beginning of the month. So, I needed to get the document in right away. And I said I was waiting for the answer on our problem of the 2300. And she said not to worry about that right now, that the most important thing was getting the document in—the modification. And she said to strike the 2300; initial it next to it—and it had to be done in front of the attorney; and, then, have it notarized and get

preclude relevant testimony as to what the contracting parties said with respect to the making or the terms of an oral agreement").

> it in; and, not to send it in to them, to send it in to Jim
> Bass at RCS.

R. 179 at 79-80 (Tr. Transcript 851-52).

Does Hammer's testimony regarding her two conversations with the FDIC establish beyond dispute that Hammer conditioned her acceptance of the FDIC's offer on the FDIC's agreement to remove the added fees and costs, and thus became a counteroffer as a matter of law rather than an acceptance? The answer is no. "[S]imply because a communication discusses the possibility of modification does not necessarily mean that the communication is a demand for modification." *Hubble v. O'Connor,* 684 N.E.2d 816, 821 (Ill. App. 1997) (quoting Restatement (Second) of Contracts § 39, comment b (1981) ("A mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer is ordinarily not a counter-offer[ ] because such a response "may manifest an intention to keep the original offer under consideration")). An acceptance which requests a change or addition to the terms of the offer will be construed as a counteroffer only when "the acceptance is made to depend on an assent to the changed or added terms." Restatement (Second) of Contracts § 61 (1981).

The jury reasonably could have concluded that Hammer accepted the Agreement without making her acceptance depend on the FDIC's removal of the added fees and costs. This inference flows from Hammer's first two mortgage payments at the higher loan amount, which included the additional fees and costs, as well as her testimony that she made the payments at the higher amount because getting the loan modification was more important to her than having the fees and

costs removed. This evidence showed that Hammer expressly did not condition her acceptance of the modification, and that, as a result, Hammer's June 28, 2010 mortgage payment constituted an acceptance of the FDIC's offer at that time. *See, e.g., Patel v. McGrath*, 872 N.E.2d 537, 540-41 (Ill. App. 2007) ("because the letter proposing the modifications expressly stated that it was not a revocation or a counteroffer, the 'current' contract remained in effect").

Having accepted the FDIC's offer in June 2010, Hammer's actions in August 2010 striking and replacing the principal loan amount did *not* as a matter of law create a counteroffer. A counteroffer "rejects an offer only when made *before* a contract is formed." *Hubble,* 684 N.E.2d at 821 (emphasis in original). The mirror image rule simply is "not relevant" where the contract at issue was formed before the communication that purportedly gave rise to a counteroffer. *Id.; see also Am. Ashland, LLC*, 2013 WL 5436647, at *4-5 (sales contract executed subsequent to plaintiff placing winning bid at auction did not constitute a counteroffer notwithstanding that it contained terms that were different from the terms to which parties had agreed prior to auction, because contract already had been formed "when the auctioneer's gavel fell").

### (ii) FDIC's Lack Of Authority Over The Loan In August 2010

RCS also argues that the FDIC did not have authority over Hammer's loan in August 2010 to agree to Hammer's changes to the Agreement. But if, as discussed, a contract already had been formed when Hammer made the changes, then Hammer's changes did not implicate contract formation. Thus, only the changes themselves

potentially would be invalid due to the FDIC's lack of authority to approve them. Declaring those changes invalid, however, does not help RCS in this case, because Hammer made her monthly loan payments according to the terms of the original Agreement without regard to the August 2010 changes, yet RCS still rejected them.

In addition, RCS ignores the evidence from which a reasonable jury might have concluded that, by telling Hammer to strike the fees and costs, Hoke was not agreeing to a "modification" of the earlier Agreement. Instead, the jury could have concluded Hoke's instructions reflected an intent to correct a mistake the FDIC had discovered upon investigation of the fees and costs issue. This conclusion was supported by evidence in the record indicating that the FDIC intended all along to waive fees and costs, including internal FDIC memoranda prepared in the spring of 2010 documenting the terms of the FDIC's modification offer,[16] as well as evidence

---

[16] RCS argues that the FDIC documents do not show that the FDIC intended to waive all additional fees and costs because those documents refer to "late charges and fees," whereas Cull testified that the $2,303.60 added to Hammer's loan represented foreclosure costs. R. 203 at 8. In the first place, the jury was not required to credit Cull's testimony that the $2,303.60 represented foreclosure costs. But even assuming the jury did credit that testimony, nothing precluded the jury from inferring that the FDIC intended the term "late charges and fees" to encompass both "late charges" and "foreclosure fees," and to equate Cull's testimony regarding "foreclosure costs" with the "foreclosure fees" which the FDIC documents indicated the FDIC was waiving. RCS also argues that one of the FDIC documents showing a waiver of late fees and costs is dated more than a month before the June 8, 2010 cover letter, and was never sent to Hammer. R. 203 at 8. But RCS does not explain why those facts are significant. The jury reasonably could have inferred from Hammer's testimony that she received an offer from the FDIC to waive the $2,303.60 in fees and costs, which offer may have been communicated to her prior to her receipt of the June 8, 2010 letter. The FDIC's internal documents were relevant evidence supporting that inference. *See Kay v. Prolix Packaging, Inc.,* 993 N.E.2d 39, 51-52 (Ill. App. 2013) (parol evidence rule allows extrinsic evidence "when the

showing that, when RCS received the loan through its electronic mortgage servicing system, the principal loan balance reflected in those records was the lower figure that did not include the added fees and costs. *See, e.g.,* R. 169 at 35-41 (Tr. Transcript 349-55).

### (iii) Failure To Reach Agreement On Essential Contract Term

RCS's final argument is that, in any event, Hammer's changes to the written Agreement in August 2010 caused the Agreement to be unenforceable as a matter of law, notwithstanding that the contracting parties may have intended to enter into an enforceable agreement. The contract was rendered unenforceable, RCS argues, because of the ambiguity created by Hammer's striking out of an essential term of the contract.

RCS's argument begins with the premise that the principal loan balance is an essential term of the contract.[17] But the issue here is not whether that term is essential, but whether the $2,303.60 difference in the principal loan balance (which amounts to a difference of approximately $8 per month in Hammer's monthly mortgage payment) was so material that the jury was required to conclude that the contracting parties failed to reach agreement on that essential contract term. RCS cites cases involving alleged contracts where the loan amount was an entirely

contract appears incomplete or ambiguous on its face" and such extrinsic evidence may include "antecedent proceedings").

[17] Cull testified that, other than the principal loan amount, the essential terms of the modification agreement between the FDIC and Hammer were clear and agreed upon. R. 169 at 39-40 (Tr. Transcript 353-54).

unspecified sum of money regarding which the parties had reached no agreement of any kind.[18] Thus, while those cases hold that there cannot be an enforceable contract where the principal loan amount is missing, they do not speak to whether a difference of $2,303.60 in the loan amount is so material that it must be said that the parties failed to reach an agreement on the essential term.

Although the jury reasonably might have found that the $8 difference was *not* material,[19] the Court will assume that it was. Nevertheless, that fact would not invalidate the agreement reached by the FDIC and Hammer in June 2010 regarding how to resolve their differences over the additional fees and costs. Under

---

[18] *E.g., In re Destron, Inc.,* 59 Bankr. 240, 243 (Bankr. N.D. Ill. 1986) (alleged oral contract "to supply wood cabinets" in return for a vague and potentially unlimited promise "to fund" the borrower); *Nelson v. Prod. Credit Ass'n of the Midlands*, 930 F.2d 599, 604 (8th Cir. 1991) (alleged oral agreement to lend money of potentially unlimited proportions characterized as a promise to "provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period or to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation"); *First Nat'l Bank of Logansport v. Logan Mfg. Co.*, 477 N.E.2d 949, 952 (Ind. 1991) (alleged oral agreement to provide "appropriate sums to obtain control of the plastics manufacturing business and to bring the same to Logansport and to operate it there without regard to how much money that might require"); *Peterson Dev. Co. v. Torrey Pines Bank*, 284 Cal. Rptr. 367, 376 (Cal. App. 1991) (blank line appeared where the amount of the loan was supposed to be specified); *Stansel v. Am. Sec. Bank*, 547 A.2d 990, 993 (D.C. 1988) (vague oral agreement to "provide additional loans to Stansel for renovation and permanent financing of the property she had purchased"); *Sipe v. Countrywide Bank*, 690 F. Supp. 2d 1141, 1159 (E.D. Cal. 2010) (alleged agreement to provide Plaintiff with "affordable loan" too vague and indefinite to form a contract); *see also Suffield Dev. Assocs. Ltd. P'ship v. Soc'y for Sav.*, 708 A.2d 1361, 1367 (Conn. 1998) (amount of alleged oral agreement to loan money could only be determined by reference to estimates, which were not sufficiently precise or agreed-to figures).

[19] The jury, as the factfinder, was entitled to resolve that disputed issue, and, in doing so, reasonably could have taken into account the somewhat contradictory position RCS maintained regarding the $4 per month difference between Hammer's payments under the FDIC's Agreement and what her payments would have been under the loan modification RCS offered her, which RCS argued was *not* material.

Illinois law, "a contract is enforceable even though some terms may be missing or left to be agreed upon by the parties." *Seymour,* 413 F. Supp. 2d at 925. RCS argues that this rule does not apply if the missing term is an essential one to the contract. But parties can reach an agreement to be bound "subject only to the condition subsequent of termination by the failure to agree on" the missing term, even if the missing term is essential to the contract. *See Wagner Excello Foods, Inc.*, 601 N.E.2d at 231 (holding that parties could be bound by contract with open price term). Moreover, an agreement with an open term may be enforced even if "the agreement allows one of the contracting parties to later determine the open term so long as the party allowed to make the later determination is required to do so "in good faith in accordance with some existing standard or with facts capable of objective proof." *Wigod,* 673 F.3d at 564-65.

RCS attempts to distinguish *Wigod* by arguing that there was a sufficient standard in that case by which to measure the open terms, whereas here there is not. The Court disagrees. The jury could have concluded that the agreement reached was for the FDIC to check its records to see if it had intended to waive fees and costs, as Hammer believed, and if those records showed that it had intended to waive them, then the $2,303.60 would be removed from Hammer's loan. "A contract is sufficiently definite and enforceable as long as the court can, under proper rules of construction and applicable principles of equity, ascertain what the parties have agreed to." *Seymour*, 413 F. Supp. 2d at 925. The FDIC's internal records maintained in the course of the loan modification process and evidence of

communications with Hammer regarding the terms of the modification constitute "facts capable of objective proof," *Wigod,* 673 F.3d at 565, by which the jury could have found the FDIC had agreed to make its decision whether the added fees and costs were proper. *See Kay*, 993 N.E.2d at 51-52 (parol evidence allowed to resolve contract issues arising out of ambiguous terms in the written agreement).

Finally, the Court is not persuaded by RCS's argument that the Loan Modification Agreement was unenforceable for lack of certainty because Hammer's loan payments did not amortize properly with the lower principal loan balance of $207,167.99. Given that the jury could have found a valid and enforceable agreement existed between the FDIC and Hammer and determined the parties' intent regarding the ambiguous loan term by reference to parol evidence, the amortization issue was easily corrected by reforming the agreement and adjusting Hammer's monthly payments accordingly. For this reason, Cull's testimony portraying the amortization issue as an insurmountable problem outside of RCS's control, which somehow made it "impossible" for RCS to implement the Loan Modification Agreement, was likely viewed by the jury with a heavy dose of skepticism.

**(c)    Statute of Frauds and "No Oral Agreement" Contract Provision**

RCS argues that Hammer's breach of contract claim is barred by Illinois' statute of frauds, which provides that:

> No action shall be brought to charge any person upon any contract for the sale of lands . . . or any interest in or concerning them, for a longer term than one year, unless

39

> such contract or some memorandum or note thereof shall
> be in writing, and signed by the party to be charged[.]

740 ILCS § 80/2.

The only statute of frauds argument RCS makes is that the FDIC's instructions to Hammer in August 2010 to change the principal loan balance was an oral modification of the FDIC's June 8, 2010 offer. But the Court need not decide whether the statute of frauds would bar enforcement of this oral modification of the FDIC's original June 8, 2010 offer. The jury could have found that Hammer accepted the June 8, 2010 offer as written, that is, with the additional $2,303.60 in fees and costs included, by making payments at the higher amount of $749.88. What's more, the evidence showed that Hammer continued to make loan payments at the higher amount of $749.88, and RCS never recognized the validity of these payments. Thus, Hammer's claims in this case arise out of RCS's rejection of the payments she made on a monthly basis at the higher amount, and the hypothetical issue of whether Hammer could have made payments at the lower amount based on the Agreement as modified by Hammer in August 2010 simply was never presented to the jury for decision. In short, any potential statute of frauds problem with enforcement of an oral agreement between the FDIC and Hammer to exclude the $2,303.60 in fees and costs from Hammer's Loan Modification Agreement is irrelevant here.[20]

---

[20] It is at least arguable that Hammer can enforce the FDIC's alleged oral agreement to Hammer's August 2010 changes to the Loan Modification Agreement, notwithstanding the statute of frauds. *See, e.g., Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 297-98 (7th Cir. 2002) ("an attempt at modification that does not satisfy

As to any other statute of frauds argument RCS might have raised relating to Hammer's acceptance of the Agreement in June 2010 without signing it, those arguments have been waived, both by RCS's failure to raise them in its Rule 50(a) motion, and by its failure to plead them as an affirmative defense. *See Harvey v. McKinney,* 581 N.E.2d 786, 788 (Ill. App. 1991) ("[I]f a defendant wishes to assert an affirmative defense such as the statute of frauds at trial, he is required to specifically plead it so that the plaintiff is not taken by surprise. If he fails to do so, he is deemed to have waived the defense, and it cannot be considered even if the evidence suggests the existence of the defense.").[21]

There are numerous other problems with any statute of frauds argument RCS might make as well. For instance, RCS may not be able to raise a statute of frauds defense concerning a contract to which it is not a party.[22] In addition, the

---

the statute of frauds nevertheless can operate as a waiver" if the party seeking to enforce the oral contract can show that she "reasonably relied on the other party's having waived the requirement of a writing," *or* "that the waiver was clear and unequivocal") (quotation marks and citations omitted); *see also Chavez v. Indymac Mortg. Servs.,* 162 Cal. Rptr. 3d 382, 386 (Cal. App. 2013) ("The doctrine of estoppel has been applied where an unconscionable injury would result from denying enforcement [of an oral contract] after one party has been induced to make a serious change of position in reliance on the contract or where unjust enrichment would result if a party who has received the benefits of the other's performance were allowed to invoke the statute.") (quotation marks and citations omitted).

[21] RCS's answer pled only that Hammer's breach of contract claim was barred by the statute of frauds because *RCS* never signed the Loan Modification Agreement. R. 128 at 47 (Seventh Affirmative Defense).

[22] The Restatement (Second) of Contracts § 144 (1981) states that "[o]nly a party to a contract or a transferee or successor of a party to the contract can assert that the contract is unenforceable under the Statute of Frauds." While RCS is the successor to the FDIC, the Restatement states that a successor "may assert the defense only if the terms of the contract of assumption permit." *Id.*, comment a. RCS has made no

contracting parties did memorialize their agreement in a written contract—the Loan Modification Agreement. *See* Restatement (Second) of Contracts § 136 (1981) ("A memorandum sufficient to satisfy the Statute may be made or signed at any time before or after the formation of the contract."). Although RCS has not made the argument (and therefore it is waived), the fact that the FDIC never signed the Agreement does not raise a statute of frauds problem. Either the FDIC would be estopped (and hence so would RCS) from asserting the statute of frauds based on its failure to sign the Agreement,[23] or else the June 8, 2010 cover letter and the internal FDIC memoranda and banking notes are sufficient to constitute a writing signed by the FDIC.[24]

---

showing that the terms of the FDIC's transfer of Hammer's loan to RCS allowed RCS to assert the statute of frauds in defense to an action based on a commitment or agreement entered into by the FDIC prior to the transfer. *See Oakes v. Chi. Fire Brick Co.,* 58 N.E.2d 460, 462 (Ill. 1944) ("The defense of the Statute of Frauds having been raised by appellant, the burden of proving facts justifying the application of the bar was upon appellant.").

[23] *See, e.g., Bank of Texas, N.A. v. Gaubert*, 286 S.W.3d 546, 553 (Tex. App. 2009) ("Promissory estoppel avoids the traditional statute of frauds when the alleged oral promise is to sign an *existing* document that satisfies the statute of frauds.") (emphasis in original); *cf. Ludlow Coop. Elevator Co. v. Burkland*, 87 N.E.2d 238, 240 (Ill. App. 1949) ("That one may be estopped under certain circumstances from asserting the statute of frauds as a defense is clearly established in this State.").

[24] *See Cloud Corp.*, 314 F.3d at 296 ("Neither the common law nor the UCC requires a handwritten signature."); Restatement (Second) of Contracts § 134, comment b (1981) ("Although it is usual to sign at the end of a document, a printed letterhead or billhead may be adopted as a signature"); Restatement (Second) of Contracts § 132 (1981) ("The memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction"); Restatement (Second) of Contracts § 133, comment b (1981) ("There is no requirement that a memorandum be communicated or delivered to the other party to the contract, or even that it be known to him or to

Finally, RCS also argues that Hammer's loan could not be altered by an oral agreement based on the terms of the "No Oral Agreements" notice Hammer signed as part of the original loan. That argument fails, however, because, under Illinois law, a contract provision prohibiting modifications and amendments unless in writing may be waived. *Czapla v. Commerz Futures, LLC*, 114 F. Supp. 2d 715, 718 (N.D. Ill. 2000). Accordingly, the terms of a written contract can be modified by a subsequent oral agreement *even though* the contract precludes oral modifications if the facts justify a finding that the contracting parties intended to orally modify the contract. *See, e.g., Gondeck v. A Clear Title & Escrow Exch., LLC*, 2013 WL 456994, at *5 (N.D. Ill. Aug. 28, 2013). The issue of waiver was one of fact for the jury to decide. The jury reasonably could have found that the FDIC waived the "No Oral Agreements" notice in Hammer's loan when it instructed Hammer in June 2010 to make the payments under the Loan Modification Agreement as written while it investigated the fees and costs, and then instructed Hammer in August 2010 to alter the Agreement and mail it to RCS.

**(d)      Conclusion**

In sum, RCS made a tactical decision to stand on technicalities regarding matters relating to contract formation rather than acknowledge the overwhelming evidence that Hammer and the FDIC intended to enter into a loan modification agreement well before the loan was transferred to RCS. By making that choice, RCS took a serious risk. As the Seventh Circuit has said, "[t]he fact that a contract is

anyone but the signer."); Restatement (Second) of Contracts § 132, comment d (1981) (signed offer authenticates the acceptance invited by it).

incomplete, presents interpretive questions, bristles with unresolved contingencies, and in short has as many holes as a Swiss cheese *does not make it unenforceable* . . . . Otherwise there would be few enforceable contracts." *Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 655 (7th Cir. 2004) (emphasis added). RCS's arguments against an enforceable contract overlook the nature of contracts and the governing principles of contract law as discussed above. The evidence was sufficient for a jury to find that Hammer and the FDIC entered into an enforceable Loan Modification Agreement, which RCS breached. Accordingly, RCS is not entitled to judgment as a matter of law on Hammer's breach of contract claim.

## 2.   ILLINOIS CONSUMER FRAUD ACT

According to RCS, Hammer's claim under the Illinois Consumer Fraud Act was "based entirely on RCS's failure to honor a purported loan modification." R. 189 at 8. Therefore, RCS argues, if no enforceable loan modification agreement came into existence between the FDIC and Hammer, then not only does Hammer's breach of contract claim fail, but her claim under the Illinois Consumer Fraud Act fails as well. Because the Court has found the evidence sufficient for the jury to have concluded that there was an enforceable contract between Hammer and the FDIC, RCS's motion for judgment as a matter of law on Hammer's Illinois Consumer Fraud Act claim also must be denied.

In addition and independent of the above, the Court disagrees with RCS that Hammer's Illinois Consumer Fraud Act claim rises or falls with her breach of contract claim. The Illinois Consumer Fraud Act prohibits "[u]nfair methods of

44

competition and unfair or deceptive acts or practices." 815 ILCS § 505/2. It "is a regulatory and remedial statute intended to protect consumers, borrowers, and business people against fraud, unfair methods of competition, and other unfair and deceptive business practices," and "is to be liberally construed in order to effectuate its purpose." *Johnson v. Matrix Fin. Servs. Corp.*, 820 N.E.2d 1094, 1099-1100 (Ill. App. 2004). The statute "mandates that, in determining whether a given course of conduct or act is unfair, 'consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.'" *Id.* at 1100 (quoting 815 ILCS § 505/2). "The Federal Trade Commission has published a statement of factors that can be used to measure whether a given practice is unfair, including (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Id.* (citing *Robinson v. Toyota Motor Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) (citing *Fed. Trade Comm'n v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5 (1972))). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (quotation marks and citations omitted).[25]

To begin with, even if, as RCS argues, it had a good faith though incorrect belief that the Loan Modification Agreement was unenforceable, the jury reasonably

---

[25] Because the Court upholds the jury's finding that RCS engaged in an unfair business practice, it need not decide whether the evidence was sufficient for the jury to have found, as it did, that RCS's conduct was also deceptive within the meaning of the Illinois Consumer Fraud Act.

could have found that RCS committed an unfair business practice. The jury heard evidence that all of the FDIC's records were available to RCS when the loan was transferred to RCS in August 2010. R. 169 at 42-43, 58 (Tr. Transcript 356-57, 372). As previously discussed, the FDIC's records unequivocally showed that it was the intention of the FDIC to enter into a loan modification with Hammer. The jury reasonably could have found that RCS's reliance on a perceived technical defect in the written Loan Modification Agreement as the basis for ignoring the FDIC's clear intent, in a situation where its legal right to do so as the loan servicer transferee was ambiguous at best, amounted to conduct that was (1) offensive to public policy, (2) immoral, unethical, oppressive, or unscrupulous, and (3) caused substantial injury to consumers.

In addition, even if the Court had concluded that RCS was correct that the Loan Modification Agreement was unenforceable, the Court still would have to uphold the jury's verdict against RCS on Hammer's Illinois Consumer Fraud Act claim. This conclusion is warranted by evidence at trial that supported a finding that RCS pursued collection activities against Hammer knowing those activities were inconsistent with Hammer's rights under the FDIC Loan Modification Agreement as determined by the state court when it dismissed RCS's foreclosure action in March 2011. RCS's collection activities after March 2011 were inappropriate in a number of ways given the state court's dismissal order. For instance, around the time the state court dismissed the foreclosure proceeding, Hammer was behind on her mortgage payments by only about $7,000 as a result of

46

RCS having returned her checks uncashed. Yet, on May 12, 2011, RCS sent Hammer a demand letter informing Hammer she owed mortgage payments totaling $26,313.21. R. 169 at 78-79 (Tr. Transcript 392-93). Moreover, even though Cull conceded that the state court had ordered RCS not to attempt to collect fees and costs related to the dismissed foreclosure proceeding, RCS's May 2011 letter also demanded Hammer pay late charges of $1,178, attorney's fees totaling $2,508, and "miscellaneous fees" totaling $2,526. In addition, Hammer introduced evidence to show that RCS (1) charged Hammer's loan for forced-place insurance notwithstanding that Hammer always paid for her own insurance on the property, R. 169 at 78 (Tr. Transcript 392); R. 171 at 85-87 (Tr. Transcript 857-59); R. 202-19 (Pl. Tr. Ex. 52); (2) charged Hammer escrow fees when the loan was a non-escrow loan, R. 169 at 77 (Tr. Transcript 391); and (3) sent a field representative to Hammer's home on two or more occasions to take photographs of the house, knock on Hammer's front door, and question Hammer's neighbors about her, R. 170 at 56-57 (Tr. Transcript 548-49).

A jury reasonably could have found that, even if RCS thought at the time that the state court's order was wrong—indeed, even if RCS turned out to be correct that the state court's order was wrong—that belief did not give RCS a license to treat Hammer *after* the state court dismissed RCS's foreclosure suit as if she were still in default and subject to foreclosure under the original unmodified loan. *See Smith v. AFS Acceptance, LLC*, 2012 WL 1969415, at *5 (N.D. Ill. June 1, 2012) ("a defendant's 'reasonable belief that his objective is legitimate does not provide a

defendant carte blanche to pursue that objective by outrageous means'") (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1998)); *cf. Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("all orders and judgments of courts must be complied with promptly," and "[p]ersons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect").

RCS argues that the state foreclosure action could not be the basis for Hammer's Consumer Fraud Act claim because of the litigation privilege, which protects the right of private litigants to bring suit in court to resolve their disputes. But RCS's litigation privilege argument completely misses the mark. Hammer's claims are not based on the fact that RCS *filed* the foreclosure proceedings. *See Witbrod v. Blitt & Gaines, P.C.,* 2015 WL 1996803, at *3 (N.D. Ill. Apr. 29, 2015) ("[t]he only proper cause of action based on the filing of a lawsuit is either malicious prosecution or abuse of process"). Nor are Hammer's claims based on RCS's conduct *during* the state foreclosure proceedings. *See O'Callaghan v. Satherlie*, 2015 WL 4123629 (Ill. App. July 8, 2015) (alleged misconduct by opposing counsel which occurred during the course of previous litigation was protected by litigation privilege). Instead, Hammer's claims are based on RCS's debt collection activities outside of the state foreclosure proceedings, and, in particular, after the state court dismissed the first foreclosure proceeding. Simply put, RCS has cited no case law to

support an absolute privilege of a debt collector to engage in collection actions that are inconsistent with, fail to recognize, or contravene, a final court order.[26]

While Cull attempted through his testimony to justify RCS's actions following the state court's dismissal of the foreclosure action, his testimony fell flat. The only reason Cull gave for RCS not immediately recognizing the Loan Modification Agreement was that RCS was advised by its attorneys that the state court had only "suggested" that RCS implement the FDIC modification, and that RCS understood this to mean that booking the FDIC modification was only one possible "option" open to it. R. 169 at 79-80, 85 (Tr. Transcript 393-94, 399). Cull's testimony on this point, however, was evasive. *E.g.,* R. 169 at 88-91 (Tr. Transcript 402-05).[27]

But more important, Cull's testimony regarding RCS's belief based on its attorneys' alleged advice was thoroughly discredited by RCS's own internal loan records. RCS's loan records acknowledged that, in March 2011, the state court had ordered RCS to "*shut down the foreclosure and book the prior servicer mod[ification]*." R. 202-13 at 2 (Pl. Tr. Ex. 22) (emphasis added). RCS confirmed in the loan notes that the state court had told its attorneys that RCS "should have

---

[26] The Court rejected RCS's litigation privilege argument in its order on RCS's second motion to dismiss. R. 117. That order did not explain the Court's reasoning, however. In addition to the above, the Court adopts the arguments made by Hammer on this issue in her previous filings. R. 89 at 7-9; R. 136 at 12.

[27] For example, when Cull was asked whether he agreed that the state court had ordered RCS to reinstate the FDIC modification, Cull responded that he did not "believe" that "was ever the message we got from our attorney," at least not "necessarily." R. 169 at 87 (Tr. Transcript 401). Yet in his answer immediately before that answer, Cull had admitted that a note in RCS's records *entered by one of RCS's attorneys* plainly states that, "based on the [state] court's finding, RCS should have honored this agreement." *Id.*

49

honored [the FDIC] agreement." Yet, RCS's loan notes recognized, RCS had "not acknowledge[d] the new payment amount," and had instead "continued to try and collect payments at the higher (original) amount." RCS conceded in its internal loan records that the state foreclosure action "was dismissed because of [RCS's] failure to implement the loan modification," and observed that "[p]ayments were accepted [by the FDIC]," including at least one payment that "was never credited [by RCS] to the loan." RCS further admitted in the loan records that mistakes had been made, which had never "been corrected." RCS instructed its personnel to prepare documentation to establish correction of "the past errors." It did so, however, *not* because it wanted to right its previous wrong, but instead to allow RCS to "pursue a second foreclosure action." *See* R. 169 at 87-89, 123 (Tr. Transcript 401-03, 437); R. 202-13 at 2 (Pl. Tr. Ex. 22).

Cull testified that RCS finally decided in mid-August 2011 to accept the FDIC Loan Modification Agreement by "booking" it into RCS's system. The jury reasonably could have decided that Cull's testimony was an admission that RCS had committed an unfair business practice by waiting five months before recognizing Hammer's rights under the state court order. Moreover, even after "booking" the Agreement, the jury could have found that RCS still did not treat Hammer fairly. In fact, the circumstances surrounding RCS's "booking" of the Loan Modification Agreement and what followed afterwards were perhaps even more outrageous than RCS's conduct beforehand when it was proceeding as if the state court order had never been entered. The evidence showed that, at the end of July or

50

beginning of August 2011, RCS suddenly and without notifying Hammer accepted one of Hammer's monthly payments under the FDIC Loan Modification Agreement, internally "booked" the Agreement into its system, and applied the one payment it had accepted as well as the two payments the FDIC had accepted a year earlier to Hammer's loan. RCS credited these three payments to Hammer's July, August, and September 2010 monthly mortgage payments, and then immediately (two days later) declared Hammer's loan in default retroactive to October 2010. R. 169 at 103-04, 113-14 (Tr. Transcript 417-18, 427-28). Directly after making these changes to its internal records, and, again, without contacting Hammer to inform her of this change in course, RCS issued instructions to its attorneys to initiate a second foreclosure proceeding against Hammer, this time based on the FDIC Loan Modification Agreement. RCS filed a second foreclosure action against Hammer (1) even though Hammer had attempted to make every payment owed under the Loan Modification Agreement since it took effect in June 2010, (2) even though RCS had rejected and sent every one of those payments back to Hammer, and (3) even though RCS never asked Hammer prior to declaring her in default under the Loan Modification Agreement to resubmit the payments she had been making but RCS had been rejecting. *See* R. 169 at 92-96, 101-03, 134-35 (Tr. Transcript 406-09, 415-17, 448-49); R. 202-13 at 2 (Pl. Tr. Ex. 22); R. 170 at 27 (Tr. Transcript 519).

The jury reasonably could have found that RCS committed an unfair business practice when it "refuse[d] [ ] tendered payment[s]" and then "h[e]ld [Hammer] responsible for having failed to make the payment[s]." *Catalan,* 629 F.3d at 690.

But even beyond this, the jury reasonably could have found RCS to have violated the Consumer Fraud Act by "booking" the Loan Modification Agreement solely for the purpose of establishing RCS's false compliance with the state court order, intending all the while to implement that order in a manner that continued to deny Hammer the rights the state court clearly intended RCS to recognize. The evidence before the jury on this point was extensive, and indicated that, while purporting to "honor" the state court order, RCS never actually intended to do so other than technically and for the sole purpose of allowing RCS to proceed with a second foreclosure action against Hammer.

The jury also reasonably could have found that, after instituting the second foreclosure proceeding, RCS continued to treat Hammer unfairly, even though RCS then claimed it was "honoring" the Loan Modification Agreement. For instance, in reinstatement letters sent to Hammer in the fall of 2011, RCS continued to seek amounts that exceeded what would have been owed by Hammer had RCS in fact honored the Loan Modification Agreement retroactive to when the loan transferred to RCS. *E.g.,* R. 202-5 at 5. Further, RCS's loan notes blamed Hammer for the second foreclosure action, stating that Hammer (1) had "only ever [ ] made 3 payments" under the FDIC modification, (2) had "shown no interest or intent on honoring the terms of the [Loan Modification Agreement]"; and (3) was unable "to cure the delinquency, even after [RCS] compl[ied] [with the Loan Modification Agreement] exactly as the [state] court, and [Hammer] wished." R. 202-13 at 2 (Pl. Tr. Ex. 22). Cull was cross-examined on these loan notes, and was forced to concede

that each of these statements about Hammer was false. R. 170 at 83-93 (Tr. Transcript 575-85). The Court cannot say that the evidence, viewed as whole, could not reasonably support the jury's verdict that RCS engaged in an unfair business practice in the course of its debt collection activities, even if RCS was correct that the state court's order directing RCS to honor the FDIC Loan Modification Agreement was erroneous.

### 3.    PUNITIVE DAMAGES

RCS argues that the evidence was insufficient to support the jury's award of punitive damages because RCS's conduct was based on a good faith legal conclusion that there was no enforceable Loan Modification Agreement. R. 189 at 17. RCS also argues that its good faith was demonstrated by its repeated attempts to provide Hammer with an alternative loan modification to cure her default and avoid further collection and foreclosure activity. *Id.* at 18. The Court rejects these arguments.

In Illinois, "the imposition of punitive damages serves three distinct purposes: (1) retribution against the defendant; (2) as a deterrence to the defendant from committing similar conduct in the future; and (3) as a deterrence to others from engaging in similar conduct." *Wolinsky v. Kadison*, 987 N.E.2d 971, 988 (Ill. App. 2013). "In determining whether to impose punitive damages, the trial court must first determine as a matter of law whether the cause of action in general and the facts of the particular case provide sufficient proof of aggravated circumstances to warrant submitting the issue to the trier of fact. . . . If the facts of the case legally justify an award of punitive damages, the issue is then submitted to the trier of

53

fact." *Id.* at 989 (quotation marks and citations omitted). Punitive damages may be awarded for violations of the Illinois Consumer Fraud Act based on unfair conduct in cases where the defendant acts maliciously or with deliberate indifference. *Wendorf v. Landers*, 755 F. Supp. 2d 972, 981 (N.D. Ill. 2010).

For the reasons discussed above for denying RCS's motion for judgment as a matter of law on Hammer's Illinois Consumer Fraud Act claim, the Court finds there was sufficient proof of RCS's conscious disregard of Hammer's rights to amount to aggravated circumstances warranting submitting the issue of punitive damages to the jury. Moreover, the fact that RCS offered a separate loan modification agreement to Hammer, which she rejected, does not negate the possibility that the jury could find that RCS acted maliciously or with deliberate indifference to Hammer's rights.

In the first place, the jury reasonably could have relied on evidence introduced by Hammer to show that RCS's loan modification offer was not the equivalent of the FDIC's Loan Modification Agreement. *See* R. 170 at 141-46 (Tr. Transcript 633-38).[28] More fundamentally, however, offers to modify Hammer's loan

---

[28] Cull characterized RCS's offer as "closely mirror[ing]" the FDIC's offer, but then conceded that RCS's offer added approximately $1,100 in fees and costs over and above the $2,303.60 in fees and costs added by the FDIC. R. 170 at 142, 145, 187-95 (Tr. Transcript 634, 637, 679-87). In addition, RCS's offer was not the same as the FDIC's offer simply because it required Hammer to contract directly with RCS, which she may not have wanted to do. R. 170 at 222 (Tr. Transcript 714) (first time Hammer communicated with RCS was in a telephone call to Jim Bass, who "screamed and was very nasty on the phone, and told [her] that [she] had no agreement"); *id.* at 223 (Tr. Transcript 715) (in second telephone conversation with RCS, Bass was "very nasty" to Hammer, "hung up on [her]," and "would not accept any of [her] calls after that"); *see InsureOne Indep. Ins. Agency, LLC v. Hallberg*,

do not as a matter of law establish RCS's "good faith" with respect to Hammer's claim that the Loan Modification Agreement was valid. Accepting RCS's argument would impose a requirement on Hammer to agree to a different contract than the one she believed she already had. But Hammer was entitled to seek vindication of what she believed to be her contractual rights without the suggestion that she should have compromised those rights. *See* Fed. R. Evid. 408; *InsureOne Indep. Ins. Agency, LLC*, 976 N.E.2d at 1035 ("an injured party is not required to accept performance from a breaching party on new or modified terms"); *Coppola v. Marden, Orth & Hastings Co.*, 118 N.E. 499, 500 (Ill. 1917) (court will not "impose a burden on the [plaintiff] of doing what the contract" did not require him to do, "in order that the guilty party might be saved from the full consequences of his willful wrongdoing"); *see also FirstMerit Bank, Nat'l Ass'n v. Emerald Props., L.L.C.,* 2014 WL 1292865, at *5 (N.D. Ill. Mar. 28, 2014) (the plaintiff was not required to "take steps that Defendants consider wiser or . . . more advantageous instead of pursuing its contractual remedies in this litigation"). Therefore, the issue of punitive damages properly was submitted to the jury.

### 4.    RESPA

RCS also seeks judgment as a matter of law on Hammer's claim under RESPA, which, among other things, sets out the duties of a loan servicer in responding to borrower inquiries known as "qualified written requests" or "QWRs."

---

976 N.E.2d 1014, 1035 (Ill. App. 2012) ("After defendants intentionally violated the provisions of the restrictive covenants, it would be unreasonable to expect plaintiffs to renew business relationships with them without taking an 'undue risk' that they would not honor their agreements.").

*See* 12 U.S.C.A. § 2605(e). The jury was instructed that to prevail on her RESPA claim, Hammer had to show: (1) she sent a QWR to RCS; (2) RCS failed to respond to her QWR within the time and manner allowed under RESPA, as further delineated in the jury instructions, *or* RCS reported her account to the credit bureaus within 60 days of receiving her QWR; and (3) Hammer suffered actual damages either as a direct result of RCS's failure to properly respond to her QWR, or as a direct result of RCS's reporting of Hammer's account to the credit bureaus in the prohibited time-period. R. 179 at 46.

RCS argues that the Court should enter judgment as a matter of law in its favor on Hammer's RESPA claim for two reasons.

**(a)    Exclusive Mailing Address**

First, RCS relies on the version of RESPA's implementing regulations in effect in October 2011, when Hammer's attorney sent the QWR in question. Those regulations allowed loan servicers to "establish a separate and exclusive office and address for the receipt and handling" of QWRs by notifying borrowers of the address in either the servicing transfer notice or in a separate mailing. R. 189-10 at 5 (24 C.F.R. § 3500.21(e)(1)).[29] Several courts have interpreted this provision to mean that a borrower's inquiry that is not sent to the exclusive address designated for QWRs will not give rise to RESPA liability on the part of the loan servicer, even if,

---

[29] Pursuant to Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, responsibility for administration of RESPA was transferred from the Department of Housing and Urban Development (HUD) to the Consumer Financial Protection Bureau. As a result of this transfer of authority, the regulation at issue here is no longer in effect. *See* 79 Fed. Reg. 34224-01.

as is the case here, the loan servicer actually received the borrower's inquiry. *See, e.g., Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) ("As long as a servicer complies with the notice requirements of 24 C.F.R. § 3500.21 for designating a QWR address, a letter sent to a different address is not a QWR, even if an employee at that address (who may not have training in RESPA compliance) in fact responds to that letter.") (citing *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148-49 (10th Cir. 2013)).

The address RCS designated in its July 2010 letter to Hammer for use as the exclusive address for QWRs, *i.e.,* 4282 N. Freeway, Fort Worth, TX 76137, R. 189-6 at 4, is different from the address used by Hammer in the QWR she sent in October 2011, *i.e.,* P.O. Box 163889, Ft. Worth, TX 76161-3889, R. 189-11 at 2. RCS argues that Hammer failed to present any evidence that the proper exclusive QWR address in October 2011 was *not* the address set forth in the July 2010 letter, and that therefore Hammer failed to prove that she sent a proper QWR by having mailed it to the exclusive address designated by RCS.

RCS filed a motion in limine on this issue. R. 135-10. The Court ruled that there were factual issues surrounding the QWR address, which needed to be resolved by the jury. R. 161 at 84. It does not appear that RCS ever raised the exclusive address issue again, either in its Rule 50(a) motion, or in the jury instruction conference. Therefore, this argument is waived. *See Jimenez,* 877 F. Supp. 2d at 672-73; *Republic Tobacco Co.,* 381 F.3d at 733; *Douglas,* 818 F.2d at 1320.

The jury was instructed that, to qualify as a QWR, Hammer had to prove that she mailed her written correspondence to RCS "at an address RCS provided." R. 179 at 49. This instruction was approved by RCS. R. 173 at 33-34 (Tr. Transcript 1262). Accordingly, RCS may only prevail on this issue if the evidence was insufficient for the jury to have concluded that Hammer mailed the QWR to "an address RCS provided." The Court finds that the evidence was sufficient on this point. Hammer's attorney, who prepared and sent the correspondence in question on Hammer's behalf, testified that he obtained RCS's address either from documents in Hammer's file or else from publically available information. The jury reasonably could have inferred from this testimony that Hammer's attorney sent the QWR to RCS at "an address RCS provided."

Even if the jury had been instructed that Hammer was required to have mailed her QWR to the exclusive address designated by RCS for QWRs, the evidence was sufficient for the jury to have concluded that Hammer met that requirement. Hammer's QWR was sent in October 2011. The letter on which RCS relies as having established a different mailing address for the exclusive QWR address is dated July 23, 2010, over a year earlier. On the one hand, the jury could have concluded, as RCS argued, that the exclusive QWR mailing address in effect on July 23, 2010 was still in effect in October 2011, when Hammer's attorney sent the QWR. On the other hand, the jury just as reasonably could have discounted the July 23, 2010 letter and instead inferred from the testimony of Hammer's attorney that, between July 2010 and October 2011, the designated exclusive QWR mailing

address had been changed. The jury therefore could have concluded that Hammer's attorney sent the QWR to the designated exclusive QWR address in effect in October 2011 after obtaining that address from either the internet or Hammer's loan file.

### (b) Actual Damages

RCS's second argument is that Hammer failed to prove actual damages caused by RCS's violations of RESPA. The jury was instructed in relevant part that RESPA imposed two separate duties on RCS after receiving Hammer's QWR. RCS was required to: (1) conduct an investigation and provide Hammer with a written response to her QWR explaining or clarifying why RCS believed Hammer's account was correct; and (2) refrain from reporting Hammer's account as past due to any consumer reporting agency for a sixty day period following receipt of Hammer's QWR. *See* R. 179 at 46, 50. RCS argues that, assuming it did commit one or both of these RESPA violations, there was no evidence of actual damages to Hammer caused by the violation.

Recovery under RESPA requires more than establishing a violation; a plaintiff must suffer actual, demonstrable damages and the damages must occur "as a result of" that specific violation. *See Eichholz v. Wells Fargo Bank, NA*, 2011 WL 5375375, at *5 (E.D. Mich. Nov. 7, 2011) (quoting 12 U.S.C. § 2605(f)(1)(A)); *Webb v. Chase Manhattan Mortg. Corp.*, 2008 WL 2230696, at *14 (S.D. Ohio May 28, 2008) (same). The jury properly was instructed that Hammer had the burden of

establishing actual damages proximately caused by any RESPA violation it found RCS to have committed. R. 179 at 46.

Hammer argues that she established damages caused by both of RCS's RESPA violations. First, Hammer claims she sustained pecuniary losses as a result of RCS's failure to conduct an investigation of Hammer's QWR. For instance, Hammer claims that RCS's failure to conduct an investigation caused it to send her reinstatement letters after November 2011, which continued to seek improper amounts. She further claims that RCS's failure to conduct an investigation caused it to continue prosecuting the second foreclosure action. Hammer claims to have suffered pecuniary losses as a result of RCS's post-QWR reinstatement letters and prosecution of the second foreclosure action in the form of attorney's fees, postage, miscellaneous out-of-pocket expenses, loss of time, and inconvenience.

RCS does not adequately explain why these damages would not be recoverable as damages caused by its failure to investigate Hammer's QWR. RCS cites to case law holding that a foreclosure is "caused by" the plaintiff's default, not the RESPA violation. But here, Hammer showed she would not have been in default but for RCS's contractual breaches. Presumably, RCS would have realized she was not in default had it conducted a proper investigation. RCS then would have corrected Hammer's account, dismissed the second foreclosure action, and not sent the improper reinstatement letters. RCS also cites to *Konieczka*, 2012 WL 1049910, and *Byrd v. Homecomings Fin. Network*, 407 F. Supp. 2d 937, 946 (N.D. Ill. 2005). But in *Konieczka*, the court held only that attorney's fees incurred to prosecute the

plaintiff's action to recover for the RESPA violations were not recoverable as damages under RESPA. *Id.* at *3. That holding would not preclude Hammer from recovering for attorney's fees to defend the second foreclosure action incurred after she received RCS's QWR response. *Byrd*, on the other hand, held that the plaintiff could not recover attorney's fees as damages under RESPA that were incurred in a separate foreclosure action. But the foreclosure action in that case already had concluded before the sixty-day limit for the defendant to respond to the plaintiff's QWR expired. *Byrd* did not consider the situation here, where Hammer incurred attorney's fees even after the QWR response was sent. Had RCS done an investigation of Hammer's QWR, presumably it would have dismissed the second foreclosure proceeding, and Hammer would not have had to continue to defend against it.

While the Court concludes that the types of pecuniary losses to which Hammer cites appear to be recoverable as damages "caused by" RCS's failure to investigate her QWR, the question still remains whether Hammer presented sufficient evidence to the jury to establish losses in each of these categories. But that issue need not be resolved here because the Court finds that the jury's verdict in favor of Hammer on her RESPA claim must be upheld in any event based on evidence of the non-pecuniary losses Hammer sustained.

Courts have held that the term "actual damages" includes not only pecuniary losses but damages for emotional distress, humiliation or mental anguish as well. *See Hrubec v. Nat'l R.R. Passenger Corp.*, 829 F. Supp. 1502, 1505 (N.D. Ill. 1993).

This general holding has been applied specifically to actual damages arising under RESPA. *See, e.g., Catalan*, 629 F.3d at 696 ("emotional distress damages are available as actual damages under RESPA"); *see also Ploog v. HomeSide Lending, Inc.,* 209 F. Supp. 2d 863, 869-70 (N.D. Ill. 2002) (because "RESPA is a consumer protection statute," the statute's "actual damages provision includes recovery for emotional distress"); *Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d 809, 815 (N.D. Ill. 2001) (emotional damages should be included in actual damages under RESPA because "such damages will compensate individuals for privacy violations by allowing damages for what, in some instances, may be the only harm resulting from the disclosure of confidential information—namely, emotional distress") (quotation marks and citation omitted).

The evidence presented to the jury was more than sufficient to show that, as a result of RCS's conduct in its entirety, Hammer suffered significant emotional distress, which led to physical harm due to the exacerbation of her cardiac condition. Moreover, Hammer testified that her emotional distress was caused by RCS's specific conduct of continuing to prosecute the second foreclosure action and continuing to seek reinstatement at amounts greater than she should have been required to pay. In addition, Hammer testified that RCS's continued negative reporting of her account to the credit bureaus—the other RESPA violation committed by RCS—also caused her emotional distress. *See* R. 171 at 132 (Tr. Transcript 904). The Court concludes that this evidence was sufficient to establish

that Hammer incurred damages in the form of pain and suffering caused by RCS's RESPA violations.

RCS argues that the emotional distress to which Hammer testified was not *caused* by RCS's RESPA violations, citing to case law which holds that to recover for negative reporting to a credit bureau a plaintiff must show she suffered an economic loss such as a higher interest rate or denial of credit. *See* R. 189 at 21. In the first place, Hammer's pain and suffering did not stem solely from the negative credit reporting, but also was caused by RCS's failure to investigate Hammer's QWR. But, in any event, the case law RCS cites regarding negative credit reporting deals with the causation requirement for recovery of *pecuniary losses* stemming from negative credit reporting.[30] None of the cases cited by RCS address the causation requirement for recovery of emotional distress damages resulting from negative credit reporting. To recover for emotional distress damages caused by RCS's negative credit reporting in violation of RESPA, Hammer only had to show that the negative credit reporting occurred and that she suffered emotional distress because of it. Hammer did that here.

While some of the RESPA cases deny recovery for emotional distress damages, they do so not because emotional distress without pecuniary harm can never be the basis for a RESPA claim, but because the plaintiff in those cases failed

---

[30] *See Konieczka v. Wachovia Mortg. Corp.*, 2012 WL 1049910, at *4 (N.D. Ill. Mar. 28, 2012) ("Accordingly, Plaintiffs have not alleged a pecuniary loss . . . ."); *see also Johnstone*, 173 F. Supp. 2d at 814-17 (plaintiff sought recovery for damage to credit rating as a separate category from damages arising out of "mental suffering and constant worry").

to produce sufficient evidence to establish that she in fact suffered emotional distress. *See, e.g., Webb*, 2008 WL 2230696, at *14-15 (plaintiff waived claim for emotional distress damages caused by negative credit reporting by raising it for the first time in her opposition to defendant's motion for summary judgment, and, in addition, failed to submit any evidence to support the claim); *Diedrich*, 2015 WL 1885630 at *9 ("While the Diedrichs need not prove emotional distress with expert testimony or documentary evidence, . . . [their] testimony that they experienced 'stress' and 'worry' based on 'everything' Ocwen has done is conclusory and vague."). In contrast, the evidence here exceeded that described in *Catalan*, 629 F.3d at 696, where the Seventh Circuit reversed a district court's grant of summary judgment and remanded for trial on an emotional distress claim under RESPA, noting that "Plaintiff Morris's medical records indicate that she was under increased stress during this time period because of her 'house situation,'" and that "both of the plaintiffs testified regarding their emotional distress," including testimony "describ[ing] their emotional turmoil in reasonable detail and explain[ing] what they believe[d] to be the source of that turmoil."

While it may be true that, in many RESPA cases, it is difficult for a plaintiff to adequately prove mental anguish or suffering caused by the defendant's RESPA violation, this case is different. It is clear that Hammer suffered greatly from RCS's (1) continued prosecution of the second foreclosure action, (2) sending of reinstatement letters that failed to reflect that any investigation had taken place, and (3) negative credit reporting. Hammer's mental and physical suffering was

proven by credible lay and medical testimony. Accordingly, the Court holds the evidence was sufficient for the jury to have concluded that Hammer suffered emotional distress as a result of RCS's RESPA violations of failure to investigate and negative credit reporting during the prohibited time-period.[31]

Finally, the Court need not consider whether the amount awarded by the jury to Hammer for the emotional distress proximately caused by RCS's RESPA violations—as opposed to RCS's other violations which the jury also found—was excessive. Since RCS did not ask for a break-down of damages, it is precluded from raising that issue now.

---

[31] RCS argues that Hammer failed to establish that the negative credit reporting happened, and/or that her emotional stress from it occurred, *during* the prohibited time period (*i.e.,* within 60 days following receipt of Hammer's QWR). Even if true, RCS does not contest that it continued to prosecute the foreclosure action and sent Hammer reinstatement letters *after* it sent a response to Hammer's QWR. As to the evidence regarding the time period Hammer became aware of RCS's negative credit reporting, RCS cites to Hammer's testimony in which she "admitted" she "only obtained a credit report approximately every one to two years," and could "not remember any particular month or year when she obtained" one. In addition, RCS points out that Hammer never specifically testified that she "viewed a credit report reflecting RCS's credit reporting within 60 days of receipt of the purported QWR." R. 189 at 21. RCS cites only to its cross-examination of Hammer. On direct examination, Hammer confirmed that, "with respect to the time that this dispute has been going on," she did check her credit report, that RCS "always report[ed] [her] in default or in foreclosure," that she "[d]efinitely" wanted the default reporting "corrected," and that she was "upset" it never was. R. 171 at 132 (Tr. Transcript 904). Given that RCS does not contest that it improperly reported Hammer's loan in default during the 60-day period after it received the QWR, this testimony was sufficient for the jury to have resolved any factual dispute or ambiguities in the evidence in Hammer's favor.

## B.

### *RCS's Motion For A New Trial*

Federal Rule of Civil Procedure 59(a)(1)(A) authorizes the Court, on motion, "to grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Trial courts are granted wide discretion in deciding a motion for a new trial. *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998). Under Rule 59(a), "the district judge must determine if the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Frizzell v. Szabo*, 647 F.3d 698, 702 (7th Cir. 2011) (quotation marks and citation omitted). Unlike a Rule 50 motion, a court considering a motion for a new trial "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011). There is no requirement that the Court view the evidence in a light most favorable to the non-moving party. *Id.* at 634. However, a motion for a new trial is subject to the harmless error rule of Federal Rule of Civil Procedure 61.

RCS argues it is entitled to a new trial because of two evidentiary rulings RCS claims were erroneous. A new trial will be granted in the event of an error in the admission of evidence *only* "in extraordinary situations." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002). RCS must show that the evidence in question was improperly excluded or admitted and that the error influenced the jury to such a degree that the verdict "was inconsistent with substantial justice." *Id.*

66

(quotation marks and citations omitted). Evidentiary errors will not result in a new trial unless "a significant chance exists that they affected the outcome of the trial." *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000).

### 1.    EVIDENCE OF SETTLEMENT OFFERS

The first evidentiary ruling challenged by RCS is the Court's ruling with regard to evidence of settlement offers. Federal Rule of Evidence 408(a) prohibits evidence of "furnishing, promising, or offering . . . a valuable consideration in compromising or attempting to compromise a claim," whether for the purpose of "prov[ing] or disprov[ing] the validity or amount of a disputed claim," or for the purpose of "impeach[ing] by a prior inconsistent statement or a contradiction." RCS argues that settlement offers it made to Hammer should have been allowed into evidence to rebut Hammer's argument that RCS acted willfully and wantonly by trying to take Hammer's home.

RCS relies primarily on the Court's ruling on Hammer's pretrial motion in limine. Hammer's motion in limine identified three specific categories of evidence Hammer anticipated RCS would seek to introduce at trial, which Hammer contended would be barred by Rule 408: (1) evidence of new loan modifications offered by RCS to Hammer during the state foreclosure cases; (2) settlement discussions and exchanged correspondence surrounding a pre-trial settlement conference in the state foreclosure proceedings; and (3) settlement offers made by RCS's successor and Hammer's current loan servicer, Ocwen Loan Servicing, LLC. R. 136 at 14-15. RCS's motion for a new trial claims that the Court granted

67

Hammer's motion in limine, but in fact that is not the case. The Court gave its preliminary views regarding the evidence being excludable under Rule 408, but then very clearly stated on the record that it was reserving its ruling based on the arguments RCS raised in opposition to Hammer's motion in limine. R. 161 at 59.[32] As a result, to preserve the argument that evidence of settlement offers should have been admitted at trial, RCS needed to have raised the issue at trial. *See Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 646 (7th Cir. 2011) (objection to district court's ruling on motion in limine does not preserve claim of error where the district court only made a tentative or conditional ruling) (citing *Wilson v. Williams*, 182 F.3d 562, 565-66 (7th Cir. 1999) (en banc)).

The Court has reviewed the record and has found no indication that the Court ever denied RCS the right to introduce evidence on the basis of Rule 408 after it made a preliminary ruling on Hammer's motion in limine. The issue of settlement offers was discussed during trial on several occasions outside of the jury's presence, but none of those occasions concluded with a ruling by the Court denying admission to RCS's evidence of settlement offers. Nonetheless, RCS points to two occasions during the trial when it says the Court did deny it the right to introduce evidence of

---

[32]RCS omits the transcript pages containing the relevant part of the Court's ruling, citing instead to the discussion between counsel and the Court leading up to the Court's ruling. The relevant pages show the Court stated it was "not going to give [the parties] rulings in advance," because it wanted to "consider [the issue] when [it] hear[d] the arguments at trial," and the Court was "not prepared" to rule at that time on the issue of "whether a particular document is a settlement document or not," because the Court did not "know enough about the facts of the case and how [the documents in question were] going to fit into the case." R. 161 at 57-59; *see also* R. 170 at 9 (Tr. Transcript 501).

settlement offers. On the first occasion, RCS indicated to the Court it anticipated seeking to introduce evidence of a new loan modification agreement RCS had offered to Hammer in September 2010. In discussing the proposed evidence, the Court observed that the evidence seemed improper under Rule 408, but specifically told counsel that its ruling was "subject to change." R. 170 at 12 (Tr. Transcript 604). RCS argues that this preliminary indication of what the Court's ruling was likely to be was erroneous. While the Court believes its preliminary ruling was correct, the point is moot because RCS later was able to introduce the September 2010 modification offer into evidence after Hammer opened the door to the evidence during her counsel's examination of Cull. *See* R.170 at 142-46 (Tr. Transcript 634-38). Therefore, RCS cannot point to any error or prejudice from the Court's preliminary ruling regarding the admissibility of RCS's September 2010 modification offer.

RCS also cites to a second occasion when a letter dated May 3, 2012 from RCS's attorneys, Codilis & Associates, to Hammer's attorney, Jack Kozar was discussed. RCS sought to introduce the letter into evidence through Cull's testimony. R. 170 at 173-74 (Tr. Transcript 665-66). The Court initially indicated that the letter fell within Rule 408's exclusion for settlement offers. *Id.* at 174-76 (Tr. Transcript 666-68). After further argument from RCS's counsel, however, the Court asked whether the letter could be offered into evidence through Kozar's testimony instead, to allow the Court more time to consider counsel's arguments before making a ruling on the letter's admissibility. *Id.* at 176-78 (Tr. Transcript

668-70). Counsel for RCS agreed to that procedure. *Id.* Hammer states in her response brief that RCS never attempted to introduce the May 3, 2012 letter during Kozar's testimony or at any other point in the proceedings, R. 200 at 5, and the Court has reviewed the record and believes Hammer is correct. RCS does not respond otherwise in its reply, and therefore the Court concludes that RCS did not make any further attempt to introduce the May 3, 2012 letter after agreeing to delay offering the letter as evidence until a later point at trial. As a result, the Court did not make an adverse ruling against RCS regarding this piece of evidence either.

RCS attaches a few other documents to its reply brief—letters dated April 11, 2012 and May 3, 2012 offering to reinstate Hammer's loan after RCS had declared it to be in default, as well as an email dated August 27, 2013, stating that the parties had reached an agreement in the state court foreclosure proceeding and attaching a copy of that agreement for Hammer's execution. R. 205-2. RCS never brought these additional documents to the Court's attention during trial or offered them into evidence, and, therefore, RCS has waived any claim of error based on them as well. RCS refers to one other document—the Ocwen settlement proposal—but that document also was not offered into evidence at trial. Further, RCS never made the arguments it now makes regarding that document. But even if RCS preserved an objection based on the Ocwen settlement agreement, that document would have been properly excluded pursuant to (1) Rule 408, because it is a settlement offer; (2) Rules 401 and 402, because RCS was unable at the hearing on the parties'

motions in limine to identify a relevant basis for its admission other than to show that Hammer had a predisposition to file lawsuits, *see* R. 161 at 67-68, which is an improper purpose pursuant to Rule 404(a)(1); and (3) Rule 403, because the probative value of the evidence, if any, was outweighed by the risk of unfair prejudice to Hammer, confusing the issues and misleading the jury, undue delay, and wasting of time in that the Court would have had to allow Hammer to conduct a mini-trial about the Ocwen proposal in order to fairly respond to the undue prejudice created by the evidence.

In any event, RCS's new argument that the Ocwen agreement is relevant to show Hammer suffered no economic loss, R. 205 at 7, makes no sense. There has been no showing that Hammer agreed to the Ocwen settlement and thereby received any benefits under it. It seems that RCS is trying to argue not that Hammer suffered no economic loss, but that she could have avoided an economic loss. This is essentially the same mitigation of damages argument previously rejected by the Court when discussing RCS's arguments on the issue of punitive damages.

Because RCS never offered to introduce the documents it now identifies as being settlement offers at trial, RCS's arguments regarding the admissibility of those documents are waived. But even if, as RCS argues, the Court's preliminary views regarding the applicability of Rule 408 to anticipated evidence at trial somehow prejudiced RCS's ability to offer this evidence, that argument still does not entitle RCS to a new trial. To begin with, RCS's evidence of settlement offers was

71

not admissible, or else the Court properly exercised its discretion to exclude it. RCS's argument that it needed the evidence to rebut Hammer's argument that RCS was trying to "take Hammer's house" runs afoul of one of the prohibited uses of settlement offers as stated in Rule 408, namely "to impeach by a prior inconsistent statement or a contradiction." As the 2006 amendment notes to Rule 408 explain, "[s]uch broad impeachment would tend to swallow the exclusionary rule and would impair the public policy of promoting settlements."

RCS claims it should have been allowed to admit the evidence on the issue of whether it acted willfully and wantonly. But courts in this district have held that evidence of settlement offers is not admissible to prove a defendant did not act with malicious intent. *See Clevenger v. Bolingbrook Chevrolet, Inc.,* 401 F. Supp. 2d 878, 881 (N.D. Ill. 2005) (evidence offered to show that defendant acted without intent to defraud is manifestly prohibited by Rule 408). Moreover, even if Rule 408 did not preclude this type of evidence, the Court exercised its discretion to exclude it pursuant to Rule 403 based on the prejudicial effect of the evidence outweighing its probative value. *See Koch v. Greenberg*, 14 F. Supp. 3d 247, 267 (S.D.N.Y. 2014) (settlement offers properly excluded under Rule 403 given their limited probative value), *aff'd*, 2015 WL 5711578 (2d Cir. Sept. 30, 2015).[33]

---

[33] The probative value of the evidence was weak at best. Hammer's counsel's argument to the jury that RCS was trying "to take Hammer's house" was simply another way of saying that RCS was pursuing a foreclosure action against Hammer. An offer by RCS to dismiss the foreclosure action if Hammer would enter into a loan modification agreement with RCS does not rebut the undisputed fact that RCS was pursuing a foreclosure action. Indeed, the evidence, had it been allowed, might have worked against RCS, since it could be said (and no doubt Hammer's counsel would

The only case RCS cites that is even arguably supportive of its position here[34] is *Koch*, 14 F. Supp. 3d 247. Consistent with *Clevenger,* the *Koch* court held that evidence of settlement offers did not vitiate the defendant's state of mind for purposes of liability for fraud, and, if allowed, would unfairly paint the plaintiff as unreasonable in pursuing the lawsuit. But the court also held that the settlement offers could be offered at the damages portion of trial to rebut the plaintiff's allegation that the defendant was liable for punitive damages based on his wanton disregard for the law. The court held that in the context of the damages phase of the trial, the balance of prejudice under Rule 403 tipped the other way, that is, in favor of allowing the evidence. *Id.* at 265 n.7.

The *Koch* court allowed the settlement offers into evidence on the issue of punitive damages only after bifurcating the trial so as not to unduly prejudice the

---

have said) that RCS was improperly using the foreclosure proceeding to force Hammer into accepting a modification agreement with RCS when she had a right to stand on the modification agreement she already had with the FDIC.

[34] None of the other cases RCS cites are on point. *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 484 (7th Cir. 2000), allowed statements made during compromise negotiations to be used to support a claim of waiver; RCS has not made any claim of waiver here. *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293 (6th Cir. 1997), held that Rule 408 was inapplicable to suits seeking to vindicate wrongs committed during settlement discussions. Hammer's suit does not seek to vindicate a wrong committed during settlement discussions; it seeks to enforce an agreement that Hammer claims existed before a dispute with RCS even arose. And, *Bank of Am., N.A. v. Gould*, 2012 WL 3133609, at *4 (N.D. Ill. July 31, 2012), held that information obtained in settlement negotiations may be used to support a claim that is "distinct from the claim for which settlement negotiations were conducted." But Hammer's claims in this case and RCS's defenses thereto are not "distinct" from the claims and defenses in the state foreclosure action; they are essentially the same claims and defenses played out in a different forum.

plaintiff. Here, RCS did not request bifurcation in order to permit the evidence of settlement offers at the damages phase, and therefore it has waived that argument. In any event, however, RCS cannot show that its substantial rights were affected. As previously noted, RCS was able to introduce its September 2010 offer to Hammer. Cull also testified to RCS's "good faith" intention to work with Hammer, and pointed out that Hammer's loan payments under the September 2010 settlement offer would have been only $4 per month more than under the FDIC Loan Modification Agreement. There was no indication that this evidence had any influence over the jury when viewed in the context of RCS's misconduct over a three-year period and the subsequent harms suffered by Hammer. Given that the jury was aware of RCS's initial settlement offer, which occurred prior to the most serious harms being inflicted upon Hammer after the state court dismissed the foreclosure action, the Court concludes that any subsequent settlement offers would not have had an impact on the outcome of the trial.

### 2.    TESTIMONY OF DR. HASANAIN

RCS also challenges the Court's evidentiary rulings regarding the testimony of Dr. Syed Hasanain, Hammer's treating cardiologist.

**(a)      Procedural Issues**

**(i)      Rule 26(a)(2)(C)**

To begin with, RCS challenges the Court's denial of RCS's motion to exclude Dr. Hasanain's testimony based on Hammer's violation of Fed. R. Civ. P. 26(a)(2).[35] Rule 26(a)(2) provides that a party must disclose the identity of any witness it may use at trial to present expert testimony. Dr. Hasanain, as Hammer's treating physician, was a fact witness. But the portion of his testimony that concerns any opinion as to the cause of Hammer's aggravating cardiac condition falls within the scope of expert testimony. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004) ("a treating doctor (or similarly situated witness) is providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation"). To the extent that Hammer wished to rely on Dr. Hasanain's expert opinion, she needed to comply with the expert witness disclosure requirements of Rule 26(a)(2).

The disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B), which include a written expert report, apply only to experts who are "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Dr. Hasanain did not fall in this

---

[35] The Court addressed this issue twice before in this case, once in response to RCS's Motion To Bar Witnesses At Trial, filed on January 29, 2015, R. 101, and again in response to RCS's Motion In Limine No. 14 To Bar Witnesses At Trial, R. 138. In addition to the reasons stated herein, the Court adopts its previous oral rulings, R. 108; R. 131 at 7-21; R. 160 at 120-25, as well as the arguments made by Hammer in response to RCS's two motions, R. 104; R. 155 at 4-8.

category. Therefore, the disclosure requirements applicable to his testimony are found in Fed. R. Civ. P. 26(a)(2(C), which states that if a witness is not required to provide a written report, then the disclosure for that witness "must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." This disclosure must be made at least 90 days before the date set for trial. Fed. R. Civ. P. 26(a)(2)(D).

RCS knew from Hammer's amended complaint filed on September 26, 2014 that Hammer contended that her "health and well-being drastically deteriorated" as a result of RCS's conduct," and that she "developed severe nerve and internal organ problems that her physician could not attach to anything other than undue stress." R. 43 at 15 (¶ 107). RCS also knew from the amended complaint that "Hammer's medical records show[ed] a steady decline in her health from the time that RCS took over the loan through the present date." *Id.* In addition, RCS knew from Hammer's initial disclosures served on RCS in September 2014 that Dr. Hasanain was a fact witness who had knowledge of Hammer's medical condition. R. 104-1 at 3. RCS sent Dr. Hasanain a subpoena for his deposition in the fall of 2014, but Dr. Hasanain's deposition was delayed because RCS had not yet received Hammer's medical records.[36] Hammer's counsel represented to the Court that he tried to

---

[36] RCS blames Hammer for not having provided RCS with her medical records sooner. The Court will not address that issue, however, because RCS never filed a motion to compel, and Hammer's diligence or lack thereof in seeking to give RCS access to her medical records, which were in the physical custody and control of her third-party medical providers, is not clear from the record.

76

contact Dr. Hasanain to find out the details to which he might testify concerning the causes of Hammer's cardiac conditions, but Dr. Hasanain had declined to speak with him, citing to the RCS's deposition subpoena as the reason. Thus, both RCS and Hammer did not learn the details of Dr. Hasanain's causation opinions until February 25, 2015, the first day on which he was deposed.

On January 16, 2015, Hammer served RCS with interrogatory responses explaining that she believed her treating physicians, including her cardiologist, would "relate her repeated issues with congestive heart failure to the aggravation of her chronic fibrillation brought on by stress, worry, and fear experienced by Hammer while she lived in constant fear that defendant's conduct w[ould] result in the loss of her home." R. 101-2 at 7; 8-9. On January 29, 2015, RCS filed a motion to bar Dr. Hasanain from testifying at trial based on Hammer's failure to serve a Rule 26(a)(2)(C) disclosure. R. 101. On February 5, 2015, Hammer served RCS with a formal Rule 26(a)(2)(C) disclosure containing essentially the same information RCS had conveyed in its January 16, 2015 interrogatory responses.

Hammer does not deny that she failed to make a formal Rule 26(a)(2)(C) disclosure in a timely manner. The Seventh Circuit has said that the exclusion of non-disclosed evidence is automatic and mandatory under Fed. R. Civ. P. 37(c)(1) unless non-disclosure was justified or harmless. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996). The Court finds as an initial matter that the lateness of Hammer's official disclosure was harmless. The March 2015 trial date was reset to April 16, 2015 at the request of RCS's counsel. *See* R. 131 (Feb. 5, 2015 Transcript).

As a result, RCS received a disclosure through Hammer's January 16, 2015 interrogatory responses, which contained essentially the same information as the February 5, 2015 formal expert disclosure, 93 days prior to trial. *Compare Musser*, 356 F.3d at 757-58 (7th Cir. 2004) ("This is not a case where the disclosure was late by a trivial amount of time.").

Nevertheless, RCS claims that, in addition to the untimeliness of Hammer's Rule 26(c)(2)(C) disclosure, the disclosure also was substantively deficient. Rule 26(a)(2)(C) provides that the disclosure must state the subject matter on which the witness is expected to present expert testimony and a summary of the facts and opinions to which the witness is expected to testify. The advisory committee notes to Rule 26 explain that the Rule 26(a)(2)(C) "disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B)," and warn that "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have."

Hammer's disclosure on January 16, 2015 provided the subject matter on which Dr. Hasanain was expected to testify and a summary of the opinion he was expected to give. It did not provide a summary of the facts on which Hammer expected Dr. Hasanain's opinions to be based. Hammer's formal Rule 26(a)(2)(C) disclosure on February 5, 2015, however, referenced Hammer's medical records. Although Hammer's disclosures were not very detailed, RCS cannot credibly argue that it was completely in the dark about what Dr. Hasanain was expected to say. It was clear from the early stages of this litigation that his testimony was going to

78

relate Hammer's stress to her aggravated cardiac condition. Dr. Hasanain's expected opinion that stress negatively affected Hammer's health issues was neither that complex of a medical issue nor so difficult for RCS to understand that it could not rely on Hammer's medical records to prepare for Dr. Hasanain's deposition.[37] Even if Hammer's Rule 26(a)(2)(C) disclosure was neither detailed nor, in hindsight, totally accurate,[38] RCS was not prejudiced. The "breadth and foundation" for the expert's opinions may be "fully explored" at the expert's deposition. *Lichtsinn v. Hile*, 2007 WL 1549939, at *2 (N.D. Ind. May 25, 2007). In light of the fact that Dr. Hasanain refused to speak with Hammer's counsel until the deposition, the Court concludes that Hammer was justified in failing to make a more detailed or accurate disclosure.

Taking this history as recounted above into consideration, the Court denied RCS's motion to bar Hammer from relying on Dr. Hasanain as an expert witness, concluding that any prejudice RCS might have suffered by lack of a sufficient disclosure prior to January 16, 2015 could be cured. *See Marr v. Abercrombie & Fitch Stores, Inc.,* 2015 WL 3827326, at *7 (E.D.N.C. June 19, 2015) (the court's focus should be on whether "the plaintiff's noncompliant disclosure created a harm that cannot be cured"); *see also Musser,* 356 F.3d at 759-60 ("We do not hold that a

---

[37] In fact, RCS's counsel informed the Court prior to Dr. Hasanain's deposition that he already had sought out a rebuttal expert witness.

[38] Hammer's disclosure stated that Dr. Hasanain was expected to relate Hammer's worsening cardiac condition to aggravation of her chronic fibrillation. At the deposition, however, Dr. Hasanain related Hammer's worsening cardiac condition to aggravation of her pulmonary hypertension.

district court should always exclude evidence in similar factual scenarios; in fact, well-reasoned cases have come to the opposite result[,] [and] "'[w]e urge district courts to carefully consider . . . the alternate sanctions available, when imposing exclusionary sanctions that are outcome determinative.").

The Seventh Circuit has said that the district court can avoid prejudice to the party who received an inadequate or untimely expert disclosure without having to impose the drastic sanction of exclusion by, among other things, "reschedul[ing] the date for trial and allow[ing] more time for depositions and new motions for summary judgment." *Id.* at 759. With the exception of allowing time for summary judgment motions,[39] the Court did those things here. The majority of the facts on which Dr. Hasanain based his opinion were set forth in Hammer's medical records. There is no contention that those records were voluminous, and RCS was able to review them before Dr. Hasanain's deposition.[40] Thus, the Court directed RCS to proceed with Dr. Hasanain's deposition as the means by which it could acquire more detailed information about Dr. Hasanain's opinions. Moreover, the Court continued the trial date to allow RCS additional discovery time to obtain a rebuttal expert

---

[39] The Court disallowed summary judgment motions because they would unduly delay trial, which was not acceptable due to Hammer's precarious medical condition. This opinion, which denies RCS's motion for judgment as a matter of law, demonstrates that any summary judgment motion RCS might have filed would have been denied. Therefore, RCS was not prejudiced by the Court's decision not to allow the filing of summary judgment motions.

[40] While courts have held that medical records do not satisfy the summary required by Rule 26(a)(2)(C), other courts have held that medical records nonetheless may prevent undue prejudice by giving the opposing party at least some detail regarding the facts underlying the physician's opinions. *See Ballinger v. Casey's Gen. Store, Inc.*, 2012 WL 1099823, at *5 (S.D. Ind. Mar. 29, 2012).

witness, and Hammer gave up her right to depose RCS's rebuttal witness prior to trial. Ultimately, RCS was able to retain a rebuttal expert witness, to file a *Daubert* motion seeking to exclude Dr. Hasanain's testimony, and to present the live testimony of its rebuttal expert witness without Hammer having had the prior opportunity to depose that witness.[41] Because RCS had the opportunity to take "countermeasures" to Hammer's expert causation testimony "such as attempting to disqualify the expert testimony on grounds set forth in *Daubert*, . . . retaining rebuttal experts, and holding additional depositions to retrieve the information not available because of the absence of a[n] [adequate disclosure]," *Musser*, 356 F.3d. at 758, the Court cannot say that RCS was unduly prejudiced by Hammer's allegedly inadequate initial disclosures in January and February 2015.[42]

---

[41] *Compare Tribble v. Evangelides*, 670 F.3d 753, 759-60 (7th Cir. 2012) ("Without proper disclosures, a party may miss its opportunity to disqualify the expert, retain rebuttal experts, or hold depositions for an expert not required to provide a report.") (quotation marks and citation omitted); *McGowan v. Chapman*, 2011 WL 5374116, at *3 (S.D. Ill. Nov.7, 2011) (defendant's "untimely disclosure and failure to provide reports was harmful" to plaintiff because plaintiff "had no opportunity to conduct discovery on the experts' opinions or to find rebuttal experts").

[42] *See Flonnes v. Prop. & Cas. Ins. Co. of Hartford,* 2013 WL 2285224, at *7 (D. Nev. May 22, 2013) ("[U]nder the specific circumstances of this case, Plaintiff's failure to properly disclose under Rule 26(a)(2)(C) is harmless. The five physicians were listed in Plaintiff's initial disclosure. Defendant does not contend that the disclosed treatment records were unreasonably voluminous. Additionally, Defendant had sufficient time to review the records . . . . [T]he Court finds that the severe sanction requested, striking five proposed experts and precluding their testimony at trial, does violence to the disposition of this case on its merits and less drastic sanctions are available."); *Valentine v. CSX Transp., Inc.,* 2011 WL 7784120, at *5 (S.D. Ind. May 10, 2011) ("[T]here is no surprise or prejudice to CSX. . . . Two of the experts . . . are disclosed in CSX's own Rule 26(a)(2)(C) disclosure. Many others have been deposed or their medical records have been provided. The failure to provide summaries is unlikely to disrupt the trial. There is no evidence that Valentine acted in bad faith or willfully by not providing Rule 26(a)(2)(C) disclosures. The Court,

### (ii)    Rule 32(a)(4)

RCS also argues it was prejudiced by the Court's ruling allowing Dr. Hasanain's video deposition to be played at trial pursuant to Fed. R. Civ. P. 32(a)(4).[43]

The first session of Dr. Hasanain's deposition took place on January 28, 2015. The parties appeared before the Court for a status hearing on March 3, 2015, at which time the Court continued the trial at RCS's request to April 13, 2015. The second session of Dr. Hasanain's deposition took place on March 27, 2015. After the March 27, 2015 deposition, Hammer's counsel notified Dr. Hasanain that his appearance at trial was necessary. Dr. Hasanain informed Hammer's counsel at this time that he would be out of the country for most of the month of April 2015 on vacation and could not attend the trial. The following day, on March 28, 2015, Hammer served Dr. Hasanain with a trial subpoena via certified mail. Dr. Hasanain received the certified mailing on April 2, 2015. Hammer's counsel attempted to contact Dr. Hasanain but could only reach his answering service.

Rule 32(a)(4) permits a party to use a witness's deposition as substantive evidence at trial if the witness is "unavailable."[44] A witness is considered to be

---

therefore, finds any noncompliance by Valentine with Rule 26(a)(2)(C) to be harmless.").

[43] Once again, this issue was thoroughly briefed by the parties. In addition to the reasoning above, the Court adopts its previous oral ruling, R. 161 at 8-17; R. 168 at 8-11, and the arguments made in Hammer's briefs. R. 157; R. 200 at 14.

[44] There are two other requirements besides the "unavailability" of the witness for a party to be permitted to use deposition testimony at trial: (1) the party against whom use of the deposition testimony is sought to be admitted must have been

"unavailable" if the court finds "that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." Fed. R. Civ. P. 32(a)(4)(B). The determination of whether the witness is more than 100 miles from the place of hearing or trial or outside the United States is made "at the time the deposition is offered in evidence." 8A Fed. Prac. & Proc. Civ. § 2146 (3d ed.).

Hammer's counsel informed the Court that Dr. Hasanain would have been available to testify at trial had the trial date not been continued at RCS's request. He further explained that Dr. Hasanain had informed both him and RCS's counsel on the second day of his deposition that he would not be in the country for the new trial dates in April. Counsel's representation to the Court that Dr. Hasanain was more than 100 miles from Chicago and out of the country during the trial was sufficient under Rule 32. *See Daigle v. Maine Med. Ctr., Inc.,* 14 F.3d 684, 691 (1st Cir. 1994) ("district court possesses the power to accept, and act upon, a reliable explanation of a deponent's whereabouts"; Rule 32(a)(3)(B) does not require "an evidentiary showing of unavailability," and court saw "no reason to read such a condition into it").

A party also may use a deposition as substantive evidence at trial if "the party offering the deposition could not procure the witness's attendance by

---

"present or represented at the taking of the deposition or had reasonable notice of it," Fed. R. Civ. P. 32(a)(1)(A), and (2) the deposition must be "used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying," Fed. R. Civ. P. 32(a)(1)(B). Hammer's satisfaction of these requirements is not in dispute.

subpoena." Fed. R. Civ. P. 32(a)(4)(D). RCS argues Hammer failed to show she used diligence in attempting to subpoena Dr. Hasanain for trial. *See Griman v. Makousky*, 76 F.3d 151, 154 (7th Cir. 1996) ("For a party to be 'unable' to procure a witness's attendance at trial by subpoena implies that the party used reasonable diligence to get him to attend"). The five circumstances in Rule 32 that make a deposition admissible as substantive evidence "are separated by the word 'or,'" which means that satisfying any one of the subsections "is enough." *Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002). Dr. Hasanain was out of country at the time of trial; therefore, Hammer did not need to show that she used diligence in attempting to subpoena Dr. Hasanain for trial. But even if she did, the Court was aware of the difficulties counsel for Hammer had been having with reaching Dr. Hasanain and scheduling his deposition. The Court also knew about Dr. Hasanain's reluctance to speak with either party outside of formal court proceedings. The Court cannot find fault with Hammer's efforts to procure Dr. Hasanain's attendance at trial under the totality of the circumstances. *See Jones v. Connors*, 2013 WL 5423854, at * 4 (N.D. Ill. Sept. 26, 2013) (holding that defendant "'used reasonable diligence to get [physician] to attend,'" where defendant served physician with subpoena two weeks before trial but physician "did not respond to the subpoena and, when contacted, said he was unavailable during the trial because of his work obligations").

### (iii)   Cumulative Prejudice

RCS contends that it was prejudiced by the cumulative effect of the Court's rulings under Rule 26 and Rule 32(a). According to RCS, when, in January 2015, it first raised the issue of Hammer's inadequate disclosures, the Court noted that any prejudice RCS incurred as a result could be cured by the fact that RCS could depose Dr. Hasanain. RCS claims that Hammer's inadequate disclosure hampered RCS's ability to effectively cross-examine Dr. Hasanain during his deposition, particularly because, according to RCS, Dr. Hasanain's testimony at the deposition relied on facts that were not found in Hammer's medical records. Therefore, according to RCS, even if Hammer's inadequate Rule 26(b)(2) disclosure did not initially unduly prejudice RCS, it later became unduly prejudicial when the Court allowed Hammer to use the transcript of Dr. Hasanain's deposition in lieu of his live testimony at trial.

The Court acknowledges that, at the time the Court directed RCS to take Dr. Hasanain's deposition as a means of supplementing Hammer's expert disclosure, it anticipated that Dr. Hasanain would be testifying in person at trial. The Court's observation to that effect at the February 5, 2015 hearing, however, was not a requirement that the Court imposed as a condition to its ruling denying RCS's motion to strike Hammer's expert. The Court therefore was not constrained in any way when the issue of allowing Dr. Hasanain to testify by deposition was presented for the first time upon learning the unexpected news that Dr. Hasanain would be on a trip outside the country during the week of trial. Discovery and trial

preparation are on-going processes and adjustments often need to be made to accommodate unexpected events. Subpoenaed witnesses sometimes do not appear, through no fault of any party. Hammer's counsel, as experienced litigators, knew all this. RCS had no reason to assume when it took Dr. Hasanain's deposition that a later and as-yet unanticipated request to use Dr. Hasanain's deposition at trial necessarily would be foreclosed.

RCS complains that its examination of Dr. Hasanain at his deposition was not a "trial examination." R. 183 at 12. But that is often the case when deposition testimony is used at trial, unless the parties know in advance that the witness will not be appearing at trial. Nevertheless, Rule 32 allows the deposition to be used at trial under certain circumstances. When presented with the unexpected news of Dr. Hasanain's overseas trip, the Court was faced with a choice between the risk of prejudice to Hammer if she were denied the right to present the testimony of her treating cardiologist, with the risk of prejudice to RCS by permitting the playing of the deposition testimony. The Court believed at the time and still believes that, in many ways, Hammer was the one who was disadvantaged by the process because RCS was able to present its rebuttal expert as a live witness. Deposition testimony, which is presented at trial either by reading a transcript into the record or, as was done here, by playing a videotape of the deposition to the jury, is generally less compelling than the testimony of a live witness. In addition, Hammer was further disadvantaged because, even though Dr. Hasanain was not at the deposition

86

testifying on behalf of either party (as he himself declared),[45] Hammer's counsel allowed RCS to completely control the deposition and, because of time constraints, asked only three questions of his own at the end of the deposition. That meant Dr. Hasanain's testimony in support of Hammer was presented to the jury not through Hammer's direct examination but almost exclusively through RCS's cross-examination of that witness.

In any event, the Court believes that the dictates of justice required that Hammer not be denied the right to present the testimony of her treating cardiologist. *See Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (noting strong federal policy "of deciding cases on the basis of the substantive rights involved rather than on technicalities"). While RCS may not have known the full details of Dr. Hasanain's testimony until the deposition, which took place much closer to trial than the 90-days required for expert disclosures under Rule 26, RCS has not made any argument that it was hampered by this lateness from retaining or preparing a rebuttal witness to respond to the opinions RCS learned at the deposition.

In addition, the Court confirms its prior ruling that RCS's claim of prejudice resulting from its asserted inability to prepare properly for examining Dr. Hasanain at his deposition was not substantial. RCS was aware prior to the deposition that Dr. Hasanain would be providing an expert opinion on causation. *Compare Musser*,

---

[45] Dr. Hasanain stated during his deposition, "You know, I don't represent–I'm not an expert witness for either [Hammer] or you or them. I am just completely unbiased and neutral in this . . . ." R. 183-1 at 98.

356 F.3d at 759 (prejudice may occur where party has to "rely on depositions conducted *without the knowledge that each of the witnesses would be used as experts*") (emphasis added). And, notwithstanding RCS's protestations to the contrary, the information contained in Hammer's January 16, 2015 interrogatory responses and February 5, 2015 disclosure was not so deficient that RCS was unable to effectively cross-examine Dr. Hasanain at his deposition. Indeed, after reading the deposition transcript prior to allowing its introduction at trial, the Court concluded that RCS had effectively impeached Dr. Hasanain by showing through its cross-examination that his opinions were "all over the map." R. 161 at 12 (Tr. Transcript 170), a comment RCS now recites in support of its argument that Dr. Hasanain's testimony should have been excluded under Rule 702.

Moreover, the deposition took place over the course of two days, with a full month in between the first and second day. The Court rejects RCS's contention that it was unduly prejudiced because it was unprepared when, on the first day of his deposition, Dr. Hasanain testified to factual matters that were not contained in Dr. Hasanain's office medical records. The facts to which Dr. Hasanain testified, which RCS complains were not in Hammer's medical records, were that Dr. Hasanain became aware at some point between 2010 and 2013 that Hammer was suffering from some kind of stress and that her blood pressure became aggravated. That the medical records would not contain every observation a doctor might make about a patient is hardly surprising. The purpose of the deposition is to discover those unrecorded observations. In any event, RCS's "surprise" at hearing

this testimony at the deposition did not appear to interfere with its ability to effectively cross-examine Dr. Hasanain. RCS impeached Dr. Hasanain repeatedly on both points by using his office medical records against him. RCS also appears to have effectively made use of the time after the first deposition session and before the second session a month later to obtain some of Hammer's missing hospital records to further impeach Dr. Hasanain. The jury heard this impeachment when the video deposition was played, so there was no prejudice to RCS.

The topics of Hammer suffering from stress and aggravated hypertension are the only ones RCS identifies for which it claims to have been unprepared. As discussed, the Court rejects that contention. RCS has not explained how its cross-examination with regard to those two topics or any other could have been improved upon had it been given another chance at trial. In short, RCS has done nothing more than allege in a conclusory manner that it was prejudiced because its cross-examination during the deposition would have been better with a more detailed disclosure. Accordingly, the Court concludes that the combination of Hammer's Rule 26(a)(2)(C) disclosure and Hammer's use at trial of Dr. Hasanain's discovery deposition in place of his live testimony was harmless.

### (b)    RCS's *Daubert* Motion

RCS also challenges the Court's admission of Dr. Husanain's testimony under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Dr. Hasanain testified as an expert witness in support of Hammer's damages theory

that she was entitled to recover for the physical or bodily pain and suffering[46] she experienced as a result of aggravation caused by RCS of her preexisting cardiac condition.[47] Dr. Hasanain opined in his expert capacity as Hammer's treating cardiologist that Hammer's already severe cardiac condition was further exacerbated between 2010 and 2013 by her aggravated hypertension in that time period, and that her aggravated hypertension was the product of stress.

This Court's gate-keeping function under *Daubert* was to determine (i) whether Dr. Hasanain's expert causation testimony consisted of scientific, technical, or other specialized knowledge that would help the jury to understand the evidence or determine a fact in issue; (ii) whether it was based on sufficient facts or data; (iii) whether it was the product of reliable principles and methods; and (iv) whether Dr. Hasanain reliably applied the principles and methods to the facts of the case in arriving at his conclusions regarding the causes of Hammer's aggravated hypertension and exacerbated cardiac condition. *See* Fed. R. Evid. 702.

RCS does not challenge Dr. Hasanain's specialized expertise to provide a causation opinion regarding Hammer's exacerbated cardiac problems. In addition, RCS all but concedes that the methodology employed by Dr. Hasanain was a

---

[46] *See* 15 Ill. Law and Prac. Damages § 29 ("Physical or bodily pain and suffering in consequence of a wrong occasioning an injury to the person is a proper element of damages").

[47] Under Illinois law, "a tortfeasor is liable for injuries he causes, including the aggravation of a preexisting condition." *Podoba v. Pyramid Elec., Inc.*, 667 N.E.2d 167, 171 (Ill. App. 1996); *see also Wojcik v. City of Chi.*, 702 N.E.2d 303, 312 (Ill. App. 1998) ("A tortfeasor is liable for the injuries he causes, even though the injuries may not have occurred but for the peculiar preexisting weaknesses of the injured person.").

reliable one. Dr. Hasanain testified that "stress is a diagnosis of exclusion after we have ruled out everything else." R. 183-1 at 23 (Hasanain Dep. 84). The methodology to which Dr. Hasanain was referencing with the term "diagnosis of exclusion" is differential etiology, and "[t]here is nothing controversial about it." *Myers v. Ill. Cen. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see also Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013); *Taylor v. Union Pac. R.R. Co.*, 2010 WL 3724283, at * 6 (S.D. Ill. Sept. 16, 2010). "In a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." *Myers*, 629 F.3d at 644. RCS argues that Dr. Hasanain did not apply differential etiology reliably because (i) he "failed to provide any factual basis to explain how he 'ruled in' aggravation of hypertension due to stress as a potential cause of the exacerbation of [Hammer's] cardiac conditions," R. 183 at 9, and (ii) he failed to provide any factual basis for "ruling out" other possible causes of Hammer's aggravated hypertension or worsening cardiac condition, R. 183 at 10.

### (i)    "Ruling In" Aggravated Hypertension Caused By Stress

There are two components to RCS's "ruling in" argument: (a) whether Dr. Hasanain had sufficient facts to conclude that Hammer was suffering from aggravated hypertension, and (b) whether Dr. Hasanain had sufficient facts to conclude that Hammer's aggravated hypertension was caused by stress.

First, the Court rejects RCS's argument that Dr. Hasanain had insufficient facts to conclude that Hammer was suffering from aggravated hypertension. Dr. Hasanain's testimony that Hammer was suffering from aggravated hypertension was not expert testimony; it was fact testimony which Dr. Hasanain gave as Hammer's treating physician. Dr. Hasanain testified that, when he "initially" began treating Hammer, her blood pressure "was perfectly normal." R. 183-1 at 20 (Hasanain Dep. 70). "[S]ince 2011," however, Hammer's "blood pressure became extremely difficult to control." *Id.* at 9 (Hasanain Dep. 26). According to Dr. Hasanain, there was a period during his treatment of Hammer when "she was literally in the hospital every two or three months with congestive heart failure and markedly elevated blood pressure." *Id.* at 10 (Hasanain Dep. 31). RCS cross-examined Dr. Hasanain extensively on this factual issue, pointing out that Hammer's medical records did not indicate that she ever suffered from high blood pressure between 2010 and 2013. But Dr. Hasanain stuck to his testimony, stating that, even though he could not find any indication in Hammer's medical records that she had suffered from aggravated blood pressure in this time period, he "vividly remember[ed]" that "there were times when her pressure . . . was extremely high, very difficult to control several years ago," with "readings as high as like 240 over 140[.]" *Id.* at 47 (Hasanain Dep. 177).[48]

---

[48] RCS cites to Dr. Hasanain's testimony agreeing with the statement that Hammer's aggravated cardiac conditions were attributable to something other than elevated blood pressure, without acknowledging that this testimony was in reference to Hammer's cardiac conditions in 2014-15. *See* R. 183-1 at 36-48 (Hasanain Dep. 133-79).

It was proper for Dr. Hasanain to rely on his factual knowledge regarding Hammer's medical condition in reaching his expert causation opinion. *See, e..g., Taylor*, 2010 WL 3724283, at *7 (in performing a differential diagnosis of plaintiff's symptoms to rule out other causes of his disease, treating physician properly relied on, among other things, "knowledge he has gained by treating" the plaintiff); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) ("The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests."). While RCS challenges the "accuracy and truthfulness" of Dr. Hasanain's testimony regarding Hammer's underlying medical history, those issues are "subject to meaningful exploration on cross-examination and ultimately to jury evaluation." *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010). Dr. Hasanain's treatment observations regarding Hammer's condition constitutes the "data" on which he relied, and the reliability of that data "is not the object of the *Daubert* inquiry." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013); *see also Hardyman v. Norfolk & W. Rwy. Co.*, 243 F.3d 255, 262 (6th Cir. 2001) (district court abused its discretion in holding that unless plaintiff's expert could offer a scientific or epidemiological study, his testimony on causation was speculative; expert applied differential diagnoses as his methodology in determining causation, and that methodology relies solely on an evaluation of the plaintiff himself, not epidemiological studies). Thus, RCS's impeachment of Dr. Hasanain's testimony

that Hammer suffered from aggravated hypertension does not amount to a basis for excluding Dr. Hasanain's expert causation testimony.

Second, the Court rejects RCS's contention that Dr. Hasanain lacked a factual basis for his opinion that the cause of Hammer's aggravated hypertension was stress. RCS supports its argument by pointing out that Hammer's medical records did not mention either stress or the foreclosure proceedings, and that Dr. Hasanain testified that Hammer only mentioned foreclosure issues and problems after Dr. Hasanain became aware he was going to be deposed in this matter. R. 183 at 6. Again, RCS discounts evidence in the record that provided a factual basis for Dr. Hasanain's testimony concerning stress as a possible causal factor in Hammer's aggravated hypertension.

To begin with, Dr. Hasanain testified that he was generally aware at the time of her aggravated hypertension that Hammer was experiencing some sort of stress in her life. *See* R. 183-1 at 15 (Hasanain Dep. 50) ("She always mentioned there were family problems and the house was being foreclosed."); *id.* at 23 (Hasanain Dep. 84-85) ("It seemed that she had been under stress, and it began to appear after many visits."). Dr. Hasanain could have relied on his general awareness that Hammer was experiencing stress, without having to show that he knew of the specific cause of Hammer's stress.[49] RCS offered impeaching cross-examination of

---

[49] Ultimately, Hammer did not need to rely on Dr. Hasanain's testimony to meet her burden of proving either that she was under stress in the relevant time period or that her stress was caused by RCS's conduct. Hammer provided her own testimony on these issues, as well as the corroborating testimony of her son, her neighbor, and

Dr. Hasanain on this point, questioning him about, among other things, the fact that Hammer's medical records did not mention anything about Hammer being under stress. But once again that impeachment went to the weight of the evidence, not to the admissibility of Dr. Hasanain's expert opinion testimony. *See Manpower,* 732 F.3d at 808; *Gayton,* 593 F.3d at 619.

Moreover, Dr. Hasanain did not need to rely solely on his own observations of Hammer's stress for purposes of "ruling in" stress as a possible cause of Hammer's aggravated hypertension and exacerbated cardiac condition. Dr. Hasanain testified that, from a medical standpoint, a cardiologist will always "rule in" stress as a possible causal factor. Dr. Hasanain testified that it is common medical knowledge that stress can lead to high blood pressure and that high blood pressure causes cardiac problems. He further testified that, generally speaking, everyone has some level of stress in their life and people differ as to how they respond to or handle stress. Therefore, according to Dr. Hasanain, from a cardiology point of view the correct approach is to just assume that stress is a possible causative factor.

RCS points to Dr. Hasanain's "admission" that he was not an expert on the causes and treatment of stress. While RCS was free to impeach Dr. Hasanain with this "concession," it was not a basis for excluding his testimony. The issue in the "ruling in" phase is one of general causation only, *i.e.,* whether stress is a possible cause of Hammer's injury, not specific causation, *i.e.,* whether stress was in fact *the* or *a* cause of Hammer's injury. *See Myers*, 629 F.3d at 641-42 (distinguishing

---

the parties' stipulation that she was prescribed Xanax by her primary care physician.

between issues of general and specific causation). Dr. Hasanain's expertise was in the treatment of cardiac conditions, and that area of expertise made Dr. Hasanain qualified to opine on the possible causes of cardiac conditions, one of which was aggravated hypertension. And although Dr. Hasanain was not an "expert" on stress, RCS cannot seriously contend that his medical training was insufficient for him to opine that stress can cause aggravated hypertension. As Dr. Hasanain testified, that medical fact is well known. R. 183-2 at 14 (Hasanain Dep. at 49).[50] Nor can RCS seriously contend that, in "ruling in" stress as a potential cause of Hammer's aggravated hypertension, Dr. Hasanain needed to be an "expert" on the treatment and causes of stress to be able to rely on the facts—which are more like truisms—that everyone experiences some level of stress in their lives and that everyone is different in how they react to stress.

RCS cites to *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002), for the proposition that "(p)ersonal observation is not a substitute for a scientific methodology and is insufficient to satisfy *Daubert's* most significant guidepost." But the court made that statement in the context of discussing whether an expert's specific causation testimony was reliable, when it was based on a particular theory

---

[50] *See, e.g., Lee v. Chi. Youth Ctrs.*, 2015 WL 468879, at *3 (N.D. Ill. Sept. 3, 2015) (observing that high blood pressure is a factor that contributes to heart disease); *Jones v. Hawkins*, 1998 WL 327091, at *3 (E.D. La. June 18, 1998) (rejecting medical testimony that decedent's death did not arise out of his employment on the basis of the court's observation that significant job-related stress factors "plausibly and logically could or would have had some effect upon the progress of [the decedent']s heart disease"); *see also* National Institute of Mental Health, Fact Sheet on Stress, www.nimh.nih.gov/health/publications/stress/index.shtml ("Over time, continued strain on your body from routine stress may lead to serious health problems, such as heart disease [and] high blood pressure . . . .").

as to why a circuit breaker failed to trip that was not supported by any scientific testing or substantiated in any other way. Similarly, in *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106-07 (7th Cir. 1994), which RCS also cites, the issue was whether an expert could reliably determine specific causation on the issue of whether the plaintiff's cataracts were caused by his exposure to radiation based solely on the expert's physical examination of the plaintiff. The court held that the expert's methodology of relying solely on a physical examination to diagnose the specific cause of the plaintiff's cataracts was unreliable without proof that it was supported by scientific evidence. Dr. Hasanain's observations regarding stress—on which he relied for "ruling in" stress as a matter of general causation—were in no way comparable to the observations on which the experts in *Chapman* and *O'Connor* relied in giving an opinion on specific causation in a context in which causation was complex and not widely recognized or understood.

The only case involving general causation cited by RCS is *Fuesting v. Zimmer, Inc.*, 421 F.3d 528 (7th Cir. 2005), but even that case is distinguishable. There the court held that the expert's general causation theory was unreliable because it was not backed up by scientific tests or experiments. But that theory related to the possible causes of the failure of an orthopedic implant, clearly a more complex and not widely understood issue than the two suppositions made by Dr. Hasanain here that all people experience stress and that stress can lead to cardiovascular problems. In short, Dr. Hasanain's "ruling in" of stress as a possible cause of Hammer's exacerbated cardiac condition was reliable. RCS's *Daubert*

arguments attempt to portray the medical evidence at issue here as being more complicated than it is. Dr. Hasanain's medical knowledge derived from his expertise as a cardiologist qualified him to opine that stress can trigger or exacerbate a cardiac condition. This knowledge-based medical opinion, which could more accurately be described as a medical fact, together with the uncontested prevalence of stress in everyday life, constituted a reliable basis for him to "rule in" stress as a potential cause of Hammer's worsening cardiac condition.

### (ii) "Ruling Out" Other Causes Of Hammer's Aggravated Hypertension And Exacerbated Cardiac Condition

RCS also argues that Dr. Hasanain did not reliably apply the methodology of differential etiology because he failed to "rule out" other causes besides stress for Hammer's aggravated hypertension leading to her exacerbated cardiac condition. R. 183 at 10. The advisory committee notes to Rule 702 state that, in assessing an expert's reliability, courts should determine whether the expert "has adequately accounted for obvious alternative explanations." While the committee notes "suggest that a reliable expert should consider alternative causes, they do not require an expert to rule out every alternative cause." *Schultz*, 721 F.3d at 434; *see also Taylor*, 2010 WL 3724283, at *7 ("In general, a failure on the part of a treating physician to rule out *all* possible causes of an injury goes to the weight, rather than the admissibility, of the opinion.") (emphasis in original) (citing case law).

Dr. Hasanain's testimony shows that he accounted for obvious alternative explanations for Hammer's exacerbated cardiac condition by performing a variety of medical tests on her. These tests confirmed that Hammer did not suffer from

coronary artery disease, collagen disorders, pulmonary embolism, blood clots to the lungs, ischemia or lack of blood supply to the heart, fast heart rate, and atrial fibrillation. R. 183-1 at 12-13, 15 (Hasanain Dep. 40-43, 53). Dr. Hasanain also testified that he ruled out natural progression of Hammer's preexisting illnesses as being the sole factor in the worsening of her cardiac disease. He ruled out natural progression based on his forty years of experience seeing patients and how cardiac disease normally progresses. In light of this experience, he found the worsening progression experienced by Hammer was "unusual," R. 183-1 at 15 (Hasanain Dep. 53), "particularly the blood pressure always being very, very high, and the pulmonary hypertension being such a big problem," *id.* (Hasanain Dep. 52). Dr. Hasanain's opinion was that Hammer's cardiac condition "might have progressed [in the absence of stress], but not quite as bad." *Id.* Dr. Hasanain also testified that he ruled out natural progression as being the cause of Hammer's resistant hypertension based on his observations as her treating cardiologist that longstanding resistant hypertension was not a preexisting condition that she had. *Id.* at 20 (Hasanain Dep. 70). Dr. Hasanain's testimony regarding his "objective medical observations" were sufficient to support his conclusion that Hammer's injury was not due solely to the natural progression of her preexisting condition. *Wallace v. McGlothan*, 606 F.3d 410, 423 (7th Cir. 2010); *see also Sisbro, Inc. v. Indus. Comm.*, 797 N.E.2d 665, 673 (Ill. 2003) (whether exacerbated preexisting condition was "attributable solely to a degenerative process of the preexisting condition or to an aggravation or acceleration of a preexisting condition because of

99

[the defendant's tortious conduct] is a factual determination to be decided by [the jury]").

RCS also fails to recognize that, in applying the "ruling out" aspect of differential etiology, the Court must consider the legal standard for the plaintiff's claim. *See Schultz*, 721 F.3d at 433. Dr. Hasanain's testimony was offered on the issue of the extent to which Hammer had been damaged by RCS's conduct, which is "an issue on which courts traditionally do not impose a heavy burden of proof on plaintiffs." *DePass v. United States*, 721 F.2d 203, 208 (7th Cir. 1983) (Posner, J., dissenting) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-65 (1931)). The legal standard Hammer needed to meet to establish damages resulting from aggravation of a preexisting condition was not reasonable certainty that RCS's acts were the *sole* cause of the aggravation, but only that they were *a* cause of the aggravation. *See Schultz*, 721 F.3d at 433 ("Schultz was not required to demonstrate that benzene exposure was the *sole* cause of his disease, so long as he showed that benzene contributed substantially to the disease's development or significantly increased his risk of developing AML.") (emphasis in original); *Gayton*, 593 F.3d at 619 (district court abused its discretion in finding that expert's testimony regarding the link between the plaintiff's vomiting and her death was "unreliable"; the plaintiff did not need to show that the defendants' failure to treat her vomiting "caused" her death, but "merely that it exacerbated her medical problems"). Dr. Hasanain testified that it was his opinion that it was more probable than not that stress was *a* cause of Hammer's worsening cardiac condition, R. 183-1

100

at 15, 23 (Hasanain Dep. 50, 84-85), and this testimony was sufficient for Hammer to meet her burden of proof.[51]

RCS contends that Hammer's counsel improperly argued to the jury that it could conclude Hammer's exacerbated cardiac condition was caused by RCS's conduct based not only on Dr. Hasanain's experience and familiarity with Hammer but also the temporal connection between RCS's conduct and Hammer's aggravated hypertension. *See* R. 183 at 11. RCS argues that this statement is inaccurate because the issue was "a complex medical one" that Hammer was required to prove solely through expert testimony. But RCS fails to cite to any expert testimony or other evidence that would support the view that whether a correlation existed between Hammer's stress and her cardiac condition was such a complex medical question that the jury was required to look only to expert medical testimony to resolve it. The Court finds that this is a situation where the legal issue (extent of damages) and the nature of the causation issue (whether stress aggravated Hammer's cardiac condition) were such that the jury properly could have inferred the requisite causal connection by a combination of circumstantial evidence of timing, common knowledge that stress causes heart problems, and factual and medical opinion testimony from Hammer's treating cardiologist. *See Hardyman,* 243

---

[51] RCS cites to other parts of Dr. Hasanain's deposition testimony where he appeared to retract his testimony that he believed to a reasonable degree of medical certainty that stress was one cause of Hammer's worsening cardiac condition. *See* R. 183 at 8. However, the degree to which Dr. Hasanain's testimony was internally inconsistent is a question of weight and credibility. *See Schultz,* 721 F.3d at 432 (expert's concessions regarding theoretical doubts do not disqualify his testimony where other parts of his testimony meet the requisite standard of proof).

F.3d at 267 (citing Prosser and Keeton on the Law of Torts, § 41, at 270 (5th ed. 1984)); *see also Meyers v. Wal-Mart Stores, East, Inc.* 257 F.3d 625, 630 (6th Cir. 2001) ("'before and after' lay testimony may be competent evidence on issue of damages caused by exacerbation of preexisting medical condition, particularly when it is combined with testimony of treating physician that he observed a change in the disease process after the injury, together with his opinion as a matter of general causation that the preexisting condition could be exacerbated by the kind of injury the plaintiff suffered); *cf. Voykin v. Estate of DeBoer*, 733 N.E.2d 1275, 1280 (Ill. 2000) (trial court may in its discretion determine that the nature of the pre-existing and current injuries are such that a lay person can readily appraise the relationship, if any, between those injuries without expert assistance"); *compare Myers,* 629 F.3d at 643 ("when there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation") (quotation marks and citation omitted).

Finally, even if RCS is correct in characterizing Dr. Hasanain's opinion testimony on the issue of specific causation as being tentative and vacillating, that still would not be a basis for excluding it under Rule 702:

> To be probative on the issue of causation, a medical expert is not required to give an opinion regarding a *specific* cause. Rather, a medical expert is permitted to testify to what might or could have caused an injury, despite any objection that the testimony is inconclusive. Testimony from a physician regarding what might or could have caused an injury is merely a medical opinion given on facts assumed to be true. For evidence to be relevant, it need only tend to make the existence of any fact more probable or less probable than it would otherwise be.

*Hahn v. Union Pac. R.R. Co.*, 816 N.E.2d 834, 841 (Ill. App. 2004) (emphasis in original) (citations omitted). As the Seventh Circuit has "held on many occasions, an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome. The possibility that a cause other than [the defendant's acts] was ultimately responsible for [the plaintiff's] injury is properly left for exploration on cross-examination." *Gayton*, 593 F.3d at 619 (citing cases); *see also Wojcik*, 702 N.E.2d at 314 ("Although an expert may not guess, conjecture, or surmise as to a possible cause for the injury, an expert can testify in terms of possibilities or probabilities so long as the opinion is based on a reasonable degree of medical certainty."); *Dabros by Dabros v. Wang*, 611 N.E.2d 1113, 1117-18 (Ill. App. 1993) (it is "not necessary for [an expert] to give sworn guarantees").

In sum, this is not a case where the expert has either failed to perform a differential diagnosis or performed a differential diagnosis that was so inadequate as to render his opinion of no assistance to the trier of fact. *Compare Caraker v. Sandoz Pharma.*, 172 F. Supp. 2d 1046, 1048 (S.D. Ill. 2001) (cited by RCS) ("if the 'ruling in' step is bad or if an extrapolation from the existing data is particularly questionable or involves too great an analytical leap (or several such leaps), the whole opinion is questionable"). Ultimately, whether stress was the actual proximate cause of Hammer's exacerbated cardiac condition was a question for the jury at trial. *Gayton*, 593 F.3d at 619. The Court's role under Rule 702 was "only [to] evaluate whether [Dr. Hasanain's] conclusion on causation was reasoned and based

on a reliable methodology." *Id.* The possibility that Hammer's exacerbated cardiac condition was attributable to a factor other than RCS's conduct "is a subject quite susceptible to exploration on cross-examination by opposing counsel." *Cooper*, 211 F.3d at 1021. RCS's contention that other conditions of Hammer's might have caused her exacerbated cardiac condition "goes to the weight of the medical testimony, not its admissibility." *Id.* "This is an issue of credibility, not of admissibility." *Kannankeril*, 128 F.3d at 808 ("It is for the jury to decide whether a single cholinesterase test, yielding results within normal limits, outweighs the other factors relied upon by Dr. Gerson and undermines his opinion."). As a result, it would have been an abuse of discretion for the Court to have excluded Dr. Hasanain's testimony. The Court concludes that RCS's arguments for why Dr. Hasanain's differential diagnoses was flawed go to the weight of Dr. Hasanain's testimony and not to its admissibility. Accordingly, no error occurred in the admission of expert testimony that would require a new trial.

## C.

### *RCS's Motion For Remittitur*

In its final post-verdict motion, RCS argues that the jury's damages award was excessive, and asks the Court to order that Hammer be required to choose between a remittitur and a new trial on damages. *See Adams v. City of Chi.*, 798 F.3d 539, 541 (7th Cir. 2015) (a remittitur order "gives the winning party a choice: he may either accept a specific reduced monetary award or he may opt for a new trial"). RCS advances three arguments. First, RCS argues that the compensatory

damages award was excessive in comparison to awards in similar cases. Second, RCS argues that the punitive damages award was excessive in light RCS's lack of malicious intent. Third, RCS argues that both damages awards were the product of passion and prejudice as a result of inflammatory arguments made by Hammer's counsel during opening statements.

### 1. COMPENSATORY DAMAGES

The jury awarded Hammer $500,000 in compensatory damages without allocating that amount between Hammer's claims. The Court first must address the parties' disagreement over whether federal or state law applies in reviewing the jury's compensatory damages award. RCS points to the fact that Hammer's claims included one claim under federal law, and therefore argues that the federal standard should apply. Hammer's only federal law claim was under RESPA, however. Based on the evidence introduced at trial on the RESPA claim, it is safe to say that a very small portion of the compensatory award is attributable to that claim.[52] Therefore, the portion of the jury's compensatory award that is subject to challenge as being excessive must be attributable to Hammer's state law claims, and, in particular, Hammer's claim under the Illinois Consumer Fraud Act.

"When [state] substantive law governs a claim for relief, [state] law and decisions guide the allowable damages." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996). Nevertheless, "[t]he proper role of the trial and appellate

---

[52] Indeed, as previously discussed, one of RCS's post-verdict arguments is that Hammer failed to introduce *any* evidence of damages caused by RCS's RESPA violations.

courts in the federal system in reviewing the size of jury verdicts is . . . a matter of federal law." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1977) (per curiam) (cited with approval in *Gasperini*, 518 U.S. at 437). Ultimately, the Court's task in reviewing the jury's compensatory award for excessiveness is to respect Illinois' "dominant interest . . . without disrupting the federal system." *Gasperini*, 518 U.S. at 437.[53]

The primary difference between the federal and state standards is that the former takes into account "whether the award is comparable to those in similar cases," *Marion Cnty. Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 930-31 (7th Cir. 2010), whereas the latter does not, *Naeem*, 444 F.3d at 611 (Illinois courts "have traditionally declined to make . . . comparisons in determining whether a particular award is excessive.") (quotation marks and citations omitted); *see Tierney v. Cmty. Mem'l Gen. Hosp.*, 645 N.E.2d 284, 294 (Ill. App. 1994) ("With regard to defendants'

---

[53] *Compare Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 739 (7th Cir. 2004) ("Federal courts sitting in diversity jurisdiction must apply a federal standard when determining whether a jury verdict is excessive."); *Pincus v. Pabst Brewing, Co.*, 893 F.2d 1544, 1554 (7th Cir. 1990) ("Federal courts in this Circuit sitting in diversity are to apply a federal standard when determining whether a jury verdict is excessive, though our cases recognize the value of reference to state standards where precedent exists."); *West v. W. Cas. & Sur. Co.*, 846 F.2d 387, 399 n.6 (7th Cir. 1988) ("In this circuit, a federal court sitting in diversity applies a federal standard when reviewing the excessiveness of a jury's verdict. Our cases, however, have recognized that this approach is problematic, and therefore, we have usually examined the verdict under both federal and state law.") (citations omitted) *with Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th Cir. 2006) ("Because Ms. Naeem was awarded damages solely on her state-law intentional infliction of emotional distress claim, Illinois law governs review of that award."); *Hillmann v. City of Chi.*, 2014 WL 4449824, at *2 (N.D. Ill. Sept. 4, 2014) (same).

arguments that the jury's verdict should be compared to other similar awards and thereby found to be excessive, this is simply not the law in Illinois.") (citing cases).

Nevertheless, recently the Seventh Circuit in applying the federal standard cautioned against being overly solicitous to the comparison component of the federal standard, stating that this factor "is not as important as the review of the evidence in the case at hand." *Adams*, 798 F.3d at 545. The court explained that this kind of evidence is "anecdotal," and "offers at best a rough approximation of damage awards." *Id.* "The problem," the Seventh Circuit said, "is that one can always find . . . verdicts [in similar cases] at different levels." *Id.* In short, under the federal standard, awards in other cases may "provide a reference point that assists the court in assessing reasonableness," but "they do not establish a range beyond which awards are necessarily excessive." *Id. (quotation marks omitted)*

> To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur. There must be room for a jury's award to exceed the relevant range of cases when the facts warrant.

*Id.; see also Sec. & Exch. Comm'n v. Lipson,* 278 F.3d 656, 665 (7th Cir. 2002) ("Given [the defendant's] wealth . . ., the flagrancy of his violation, and the obduracy that we've mentioned, the judge did not need any boost from other judges to decide that the maximum penalty was deserved."); *Zurba v. United States*, 247 F. Supp. 2d 951, 962 (N.D. Ill. 2001) ("[D]ifferent plaintiffs can experience different levels of pain and suffering from similar incidents. . . . Our legal system has not attempted to set schedules of presumptive awards for various types of injuries, and a court

cannot and should not do that under the guise of determining 'comparability.'"),
*aff'd*, 318 F.3d 736 (7th Cir. 2002).

After reviewing both federal and state law, the Court concludes that the
difference between the two standards is not "outcome determinative." *Gasperini*,
518 U.S. at 428. Indeed, the Seventh Circuit has noted that, "[i]n virtually every
case" in which the court analyzed the size of the verdict under both federal and
state standards, the result reached was the same. *West*, 846 F.2d at 399 n.6.

Turning, then, to the jury's compensatory award, RCS points to the fact that
Hammer submitted proof of out-of-pocket losses amounting to only about $5,000.
These out-of-pocket losses were primarily for attorney's fees and postage costs. RCS
characterizes the remaining $495,000 of the jury's compensatory award as
emotional distress damages, and argues that this amount is excessive.

"Illinois courts give great deference to the jury," and hold "that it is the jury's
function to consider the credibility of witnesses and to determine an appropriate
award of damages." *Naeem*, 444 F.3d at 612 (quotation marks and citations
omitted). An award of damages will be deemed excessive only "if it falls outside the
range of fair and reasonable compensation or results from passion or prejudice, or if
it is so large that it shocks the judicial conscience." *Id.* Similarly, a federal court will
only remit a jury's compensatory award where it is shown to be "monstrously
excessive" with "no rational connection between the award and the evidence."
*Marion Cnty. Coroner's Office*, 612 F.3d at 930.

This case involves a now-70 year old woman with severe health issues, who lived alone and was threatened by RCS with the loss of her home for a period that extended more than three years. It is not surprising that the jury would evaluate Hammer's pain and suffering and conclude that it was substantial. As an elderly woman, Hammer was a particularly vulnerable plaintiff, and the threatened loss of a home is a particularly stressful event. Hammer presented evidence of her emotional pain and suffering through: (1) testimony from her son and her neighbor about her emotional state and diminished capabilities; (2) evidence by stipulation of the parties that, beginning in March 2011, Hammer's primary care physician had prescribed Hammer Xanax for stress, anxiety, and an inability to sleep, R. 172 at 59 (Tr. Transcript 1034); and (3) Hammer's own testimony regarding the deterioration of her emotional condition while RCS pursued foreclosure proceedings against her. Moreover, Hammer also presented evidence *not* just of emotional distress but of severe *physical* suffering as a result of the aggravation RCS caused to her serious cardiac condition. This is a classic "eggshell plaintiff" case in which the size of the jury's compensatory damages award is rationally explained by the well-established rule that "[a] defendant in a tort case must take his plaintiff as he finds [her], even if she is more susceptible to injury than the average person." *Zurba,* 247 F. Supp. 2d at 962.

The Court finds that the "comparison" cases to which RCS cites are unpersuasive. For instance, RCS has cited to a number of cases involving emotional distress damages for employment discrimination. According to RCS, "Hammer's

109

claimed emotional distress is certainly less significant than the plaintiffs in the cases described above, who lost their jobs, and many of whom were victims of racial discrimination." R. 184 at 4. The Court does not agree with that assessment, and concludes instead that the typical plaintiff in an employment case almost always can replace his or her job with another one, as opposed to the situation here, where the plaintiff was an elderly woman who faced the prospect of having no place to live of her own in the remaining years of her life. In addition, Hammer, unlike the employment discrimination plaintiffs, suffered aggravation of her physical illnesses.

RCS also cites to cases involving consumer claims for emotional distress damages. Many of those cases, however, arise under either the Fair Credit Reporting Act or the Fair Debt Collection Practices Act, which are statutes establishing rules for federal reporting and debt collection activities. Those cases typically do not involve claims for physical injury. Moreover, the facts in such cases are usually not "so inherently degrading that a jury could infer the existence of emotional distress." *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 834 (7th Cir. 2004). Therefore, it makes sense that the courts in those cases would be concerned over emotional distress being "manufactured" by the plaintiff. *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004). The Court does not believe the same concerns play any role here. Rather, the evidence before the jury in this case— which included testimony from witnesses other than Hammer—was more than sufficient to establish that Hammer's emotional distress over RCS's conduct was very real and substantial. Moreover, none of the cases RCS cites involved

compelling evidence of physical suffering in the form of aggravation to an already life-threatening cardiac condition. Finally, most of the cases RCS cites deal with the court's conclusion regarding damages on either a motion for summary judgment or after a bench trial. The Court believes that consideration of Hammer's Seventh Amendment rights counsels against using the results of those cases to justify overturning the jury's verdict here.

To find a truly comparable case, the Court had to look outside this Circuit.[54] The most closely analogous case the Court found was *McGinnis v. Am. Home Mortg.*, 2014 WL 2949216 (M.D. Ga. June 30, 2014). *aff'd,* 2015 WL 3429085 (11th Cir. May 29, 2015). The facts as stated by the court were as follows:

> [S]hortly after Homeward began servicing the Plaintiff's non-residential mortgage in the Fall of 2009, there was an increase in the amount of her monthly payment from $605.38 to $843.58, which Homeward attributed to an increase in the escrow. Following two more escrow analyses, Plaintiff's monthly payment was reduced to $638.32. Plaintiff disputed and refused to pay the increased amounts, and instead continued to submit her original monthly payment of $605.38. Because of this, Plaintiff went into default, and Homeward foreclosed on the property.
>
> At trial, Plaintiff claimed that the foreclosure was wrongful and that her default was caused by Homeward's breach of their lending agreement. Plaintiff asserted that Homeward breached a duty owed to her by unreasonably

---

[54] Hammer cited to *Boatmen's Nat'l Bank of Hillsboro v. Ward*, 595 N.E.2d 622 (1992), as a comparable Illinois case. The jury awarded the plaintiff $248,614.96 in compensatory damages but only $1 in exemplary damages. *Id.* at 624. The facts in *Boatmen's* were not as egregious as they are here. Hammer has filed a motion to amend or correct her response to RCS's motion for remittitur, R. 206, to correct errors in her original response brief concerning the facts in *Boatmen's*. That motion is granted.

increasing her escrow payment, failing to give her proper notice of the increase, and failing to credit her account at the time payments were made. Plaintiff put forth evidence that Homeward refused to reconsider its position that she was in default, harassed her for payments, and foreclosed on her property despite her attempts to cure the deficiency and pay the account in full, and in so doing, caused Plaintiff to suffer severe emotional distress.

*Id.*, at *1.

Although the properties involved in *McGinnis* were commercial investments, the evidence showed that they were the plaintiff's "livelihood, her nest egg, her security, her life's work, and a representation of her character in the community." *Id.* at *12. The plaintiff likewise provided evidence from which the jury could have found that Homeward's actions "had a severe effect on [her] both emotionally and physically." *Id.* In response, Homeward presented evidence to support its claim "that it did not intend to injure Plaintiff, but was simply doing business under a belief that Plaintiff was required to pay the amounts it demanded." *Id.* at *2.

This include[d] evidence that Plaintiff was undisputedly in default and received some notice of the increase; that Plaintiff continually defaulted after the escrow was reduced; that Plaintiff was provided with opportunities to cure her default and refused; that the property involved was a commercial investment, not Plaintiff's home; and that Plaintiff [was] merely complaining of poor customer service and was, at times, equally as stubborn or difficult as Homeward's agents."

*Id.*

The jury awarded the plaintiff $6,000 in economic, compensatory damages, $500,000 in emotional damages, and $3,000,000 in punitive damages. *Id.* at *2. The court reduced the punitive damages award based on a Georgia statute, which placed

a cap of $250,000 on those damages.[55] But the court upheld the emotional distress award of $500,000, finding that the award was supported by the evidence, was not outside the bounds of other awards, and was not so "exorbitant" as to suggest that the jury was swayed by passion and prejudice. *Id.* at *17. This Court makes the same findings here. Moreover, like the *McGinnis* court, *id.* at *18, this Court can discern no principled basis for substituting its judgment for that of the jury as to a reasonable amount to compensate Hammer for her emotional and physical distress. Therefore, RCS's motion for remittitur on the jury's compensatory damages award is denied.

## 2. PUNITIVE DAMAGES

The Court already has rejected RCS's argument that there was insufficient evidence for the Court to have allowed the jury to consider the issue of punitive damages. The only additional issue concerning the jury's punitive damages award, which RCS raises in its motion for remittitur, is whether the amount awarded was excessive.

Punitive damages are not allowed under Hammer's federal RESPA claim. *See, e.g., Sarsfield v. CitiMortgage, Inc.*, 667 F. Supp. 2d 461, 470 (M.D. Pa. 2009); *Pelayo v. Home Capital Funding*, 2009 WL 1459419, at *9 (S.D. Cal. May 22, 2009). Therefore, the jury's punitive damages award was based on Hammer's state law

---

[55] The court found that the evidence was sufficient to find that Homeward acted with reckless disregard for the plaintiff's rights, and therefore that the jury's decision to award punitive damages for "willful and wanton conduct" was proper. *Id.* at *15. The court concluded, however, that "[t]he same evidence did not support a finding that Homeward acted with the specific intent to harm," which was required "to pierce the $250,000.00 cap on punitive damages." *Id.*

claim under the Illinois Consumer Fraud Act. A federal court, in reviewing the amount of punitive damages awarded on a state law claim, must apply state law. *See Gasperini*, 518 U.S. at 430-31. Nevertheless, federal constitutional standards also are implicated. The Supreme Court explained the interplay between state and federal law in reviewing a punitive damages awards for excessiveness as follows:

> In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude, requiring only that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence. Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

*BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 568 (1996) (citation omitted).

Turning first to the state standard, Illinois law does not require that "the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." *Blount v. Stroud*, 915 N.E.2d 925, 940 (Ill. App. 2009). "Juries have the unique ability to 'articulate community values' and evaluate 'the reprehensibility of a defendant's conduct for the purposes of awarding punitive damages.'" *Id.* (citation omitted). "[O]nce the court has determined as a matter of law that punitive damages can be awarded for a particular cause of action, it is for the jury to decide based on the evidence presented whether the defendant's conduct was sufficiently willful or wanton to

warrant the imposition of punitive damages. The measure of punitive damages to be awarded is also a question for the jury." *Id.* at 939 (citations omitted).

"In reviewing a jury's award of punitive damages, relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. However, each case must be assessed in light of the specific facts and circumstances involved, and the underlying purpose of a punitive damage award must be satisfied." *Id.*

> The amount of a punitive damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption. Although the purpose of punitive damages is to punish and deter wrongful conduct, juries have been charged with their determination because they depend so closely upon the jury's fact finding. Because a jury's determination of the amount of punitive damages is a predominately factual issue, [Illinois courts] will not reverse a jury's determination as to the amount of punitive damages unless it is against the manifest weight of the evidence.

*Id.* at 939-40.

Considering the federal constitutional excessiveness standard next, punitive damages awards are evaluated according to three guideposts. *BMW of N. Am.*, 517 U.S. at 574. The first and most important is the degree of reprehensibility of the defendant's conduct. *Id.* at 575. "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580. Finally, the "third indicium of

115

excessiveness" is "civil or criminal penalties that could be imposed for comparable misconduct." *Id.* at 583.

RCS argues that its conduct was not reprehensible and that the amount of the punitive damages award was more than 300 times the amount of economic losses Hammer suffered. R. 184 at 13. On the issue of the reprehensibility of RCS's conduct, the Court will not review the punitive damages award through the lenses of RCS's view of the evidence, which of course the jury rejected. The evidence must be viewed in its totality and with the assumption that the jury resolved any credibility issues against RCS. Viewed in this light, the evidence clearly showed more than a breach of contract case in which RCS was simply pursuing its own self-interest. The evidence also showed more than mere negligence or mistake. Instead, the evidence showed repeated conduct over a lengthy period of time targeting the home of an elderly woman with severe health issues. Moreover, RCS's own internal records showed that RCS acted with intentional malice and deceit, and that RCS intentionally ignored or schemed to avoid the findings and conclusions reached by a court of law regarding Hammer's rights. The jury reasonably concluded that RCS's conduct was significantly reprehensible and warranted a significant amount of punitive damages.

In arguing that its conduct was not reprehensible, RCS blames Hammer for her injuries in that she (1) "unilaterally attempt[ed] to modify the loan terms by changing the amount owed"; (2) rejected the loan modification offer that RCS made to her with essentially the same monthly payment amounts as the FDIC's offer; and

(3) fired her attorneys when they recommended that she settle with RCS. RCS also argues that its good faith is shown by Cull's testimony that RCS's hands were tied when it saw that the Loan Modification Offer had handwritten alterations on it, and that RCS would "never needlessly threaten a consumer's home ownership," R. 184 at 11. These factual issues already have been discussed in this opinion. Suffice it to say that the jury, with substantial evidence behind it, saw things differently.

RCS acknowledges that the punitive damages award is only three times the total compensatory damages award, a multiplier "likely to comport with due process." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). RCS argues that the proper comparison, however, is between the amount of the punitive damages and the amount of Hammer's out-of-pocket losses, which comparison gives rise to a significantly higher ratio. The Court rejects RCS's approach of removing Hammer's compensatory damages for pain and suffering from the calculation. RCS's conduct was particularly egregious and caused Hammer severe pain and suffering. It therefore would not be fair to ignore the pain and suffering element of the compensatory award in calculating the ratio between punitive damages and the actual harm inflicted. Hammer's physical and emotional pain and suffering was real, and should be taken into account as part of the "actual harm inflicted" for comparison purposes. In addition, removing the pain and suffering component of the compensatory damages award would do violence to the deterrent function of punitive damages. Egregious conduct resulting in severe emotional and physical pain would then go insufficiently deterred.

Illinois has a strong interest in punishing and deterring unfair and deceptive trade practices. *See BMW of N. Am.*, 517 U.S. at 568. The evidence justified a finding that RCS's deceptive trade practices were willful and outrageous, that RCS targeted a particularly vulnerable plaintiff, and that, as a result, that plaintiff was seriously injured both emotionally and physically. The Court believes that an award three times the amount of the compensatory damages award is within an acceptable range for punitive damages in this case.

### 3. IMPROPER CLOSING ARGUMENT

RCS's final argument is that the jury's damages award should be reduced because it was the result of passion and prejudice. In support of this argument, RCS raises many of the same issues it made in its motion for judgment as a matter of law and motion for a new trial, all of which this Court already has rejected. The only additional argument RCS makes is that the jury was inflamed by Hammer's counsel's argument in the opening statement that the jury should "send a message" to corporate America. R. 204 at 12. RCS's argument is misleading in that Hammer's counsel never said the words "send a message" in his opening statement. The statement made by Hammer's counsel and to which RCS objected was the following: "And what happens in this case will have much to say about how mortgage companies feel they can treat consumers in the greater Chicago area." R. 168 at 203 (Tr. Transcript 203).

The Court told Hammer's counsel prior to trial that he could tell the jury during opening statement that Hammer intended to ask for punitive damages, but

that, in doing so, he should avoid using inflammatory language, and specifically, that he should not use the exact words "send a message." Counsel's toned-down version of the "send a message" statement arguably complied with the Court's ruling insofar as using inflammatory language is concerned. The statement was a proper way of invoking "the argument that punitive damages must serve as an example to [a] particular community." *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1326-27 (7th Cir. 1989). Nevertheless, the Court sustained an objection to the statement. The Court's reason for sustaining the objection was not that the statement was unduly inflammatory. The reason was that the statement constituted argument and therefore was improper during opening statements. *See Testa v. Village of Mundelein, Ill.*, 89 F.3d 443, 446 (7th Cir. 1996) ("The purpose of an opening statement is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole. It is not an occasion for argument.").

"In determining whether there is a reasonable probability that the verdict of a jury has been influenced by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (*e.g.*, whether it is a close case), and the verdict itself." *DeRance, Inc.*, 872 F.2d at 1327 (quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) (quotation marks omitted)).

"The issue is not whether [Hammer's] counsel's remarks were improper, but whether they were so prejudicial as to deny [RCS] a fair trial. Being argumentative in an opening statement does not necessarily warrant a mistrial, but being argumentative and introducing something that should not be allowed into evidence may be a predicate for a mistrial." *Testa*, 89 F.3d at 446.

The statement of Hammer's counsel was improper for opening statement but it would not have been improper as part of Hammer's closing argument. There was sufficient evidence for the jury to consider the issue of punitive damages, and Hammer's counsel's statement was simply a way of invoking the deterrence goal of punitive damages. Thus, while the timing of the argument was inappropriate, the argument itself and the language in which it was couched were neither improper nor inflammatory. RCS has made no showing as to how it was prejudiced by the argument being mentioned momentarily during opening statement, and the Court finds none. *See id*. ("evidence of the persuasive effect of opening statements is often exaggerated"). The Court quickly admonished Hammer's counsel to limit his opening comments to what the evidence will show, and that was the end of the matter. The jury ultimately was allowed to consider Hammer's counsel's argument in closing, and it awarded Hammer damages in approximately half the amount she requested. The Court concludes that there was no reasonable probability, *DeRance, Inc.*, 872 F.2d at 1327, that the jury's verdict was influenced by Hammer's counsel's improper argument during opening statements.

## III.

## CONCLUSION

In conclusion, RCS's Motion for Judgment As A Matter Of Law (R. 189) is denied; RCS's Motion for New Trial (R. 183) is denied; and RCS's Motion for Remittitur (R. 184) is denied. Hammer's Motion To Amend/Correct Her Response Brief To RCS's Motion For Remittitur (R. 206) is granted.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: December 3, 2015